No. 01-14-00707-CV

IN THE

FIRST COURT OF APPEALS

at HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
10/30/2015 1:52:16 PM
CHRISTOPHER A. PRINE
Clerk

_____

**MARINECORP INTERNATIONAL, LTD.**
**Appellant,**
**v.**
**THE CHOPPER GROUP, LLC, AND**

**OUTLAW COUNTRY, LLC**
**Appellees.**
_____

**Appealed from the 80th Judicial District Court of**
**Harris County, Texas, Trial Court Cause No. 2012-23983**

_____

**BRIEF FOR APPELLANT**
_____

**THE STROTHER LAW FIRM**
Macon D. Strother
Texas Bar No. 19420000
4306 Yoakum Blvd., Suite 560
Houston, Texas  77006
Tel. (713) 557-9238
mstrother@strotherlawfirm.com
ATTORNEY FOR APPELLANT,
*MARINECORP INTERNATIONAL, LTD.*

**APPELLANT REQUESTS ORAL ARGUMENT**

# IDENTITY OF PARTIES AND COUNSEL

**Appellant**:                          Marinecorp International, Ltd.

**Counsel for Appellant**:     The Strother Law Firm
                                            Macon D. Strother
                                            State Bar No. 19420000
                                            4306 Yoakum Blvd., Suite 560
                                            Houston, Texas 77006
                                            Tel. (713) 557-9238
                                            mstrother@strotherlawfirm.com


**Appellees:**                         The Chopper Group, LLC
                                            Backwoods Country Club, LLC
                                            Tony Miller

**Counsel for Appellees:**     The Akers Firm
                                            Brock C. Akers
                                            State Bar No. 00953250
                                            3401 Allen Pkwy., Suite 101
                                            Houston, Texas 77019
                                            Tel. (713) 877-2500
                                            Fax (713) 583-8662
                                            bca@akersfirm.com


**Appellee:**                          Kyle Tones

**Counsel for Appellee:**       The Cochell Law Firm, PC
                                            Stephen R. Cochell
                                            State Bar No. 24044255
                                            5555 W. Loop S., Suite 200
                                            Bellaire, Texas 77401
                                            Tel. (832) 767-1065
                                            Fax (832) 767-1686
                                            srcochell@gmail.com

**Appellees:**               Lee Harless, pro se
                             Dawn Marie Harless, pro se

**Counsel for Appellees:**   N/A


**Trial Court:**             Hon. Judge Larry Weiman
                             Judge, 80th Judicial District Court
                             Harris County Civil Courthouse
                             201 Caroline, 9th Floor
                             Houston, Texas 77002
                             Tel. (713) 368-6100

# TABLE OF CONTENTS

Identity of Parties and Counsel.......................................................................i-ii

Table of Contents…………………………………………………………..iii

Index of Authorities.................................................................................vii-x

Statement of the Case........................................................................ 1-3

Statement Regarding Oral Argument.............................................................3-4

Issues Presented.........................................................................................4-6

Statement of the Facts.................................................................................7-11

Summary of the Argument…………………………………………………..12-15

Argument:

    **Relative to Issue No. 1:** Chopper and Outlaw's claims of a breach of contract fail because they did not meet the conditions precedent of giving written notice of the alleged defaults and allowing Marinecorp thirty days to cure each such default as required by the subject leases. *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]*……………………………………………………………… 15-19

    **Relative to Issue 2:** Chopper and Outlaw deprived themselves of any excuse for ceasing performance on their part because they elected to treat the leases as continuing. *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]*……………………………………………………… 20-22

    **Relative to Issue 3:** The trial court should have rendered judgment against Chopper and Outlaw for damages for past and future lease payments, as ample evidence existed of Marinecorp's mitigation of damages. *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]*…………………………………… 23-24

**Relative to Issue 4:** Outlaw should not have been awarded damages as a result of not being able to open its dance hall for business as a result of Marinecorp's actions because the overwhelming evidence attributes causation of damages to Outlaw preventing it from opening earlier due to its own actions or inactions. *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]…………* 24-29

**Relative to Issue 5:** The trial court committed harmful error by not submitting to the jury an instruction and question regarding mitigation of damages as it relates to Outlaw. *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]……........* 24-29

**Relative to Issue 6:** Chopper and Outlaw's claims constitute a breach of contract action and not a DTPA violation……………………... 30-41

**Relative to Issue 7:** Chopper and Outlaw's claims for damages as a result of an alleged wrongful eviction fail as a matter of law and do not constitute a DTPA violation. *[Germane to Motion to Disregard Jury Findings, CR 449; Third Supplement to Motion to Disregard, CR 592-593; and Motion for New Trial, CR 498]………………………* 30-41

**Relative to Issue 8:** The evidence does not support the jury's answers to a violation of the DTPA by Marinecorp because:

(a) There was no evidence or insufficient evidence to establish that Marinecorp did not have an intention of fulfilling its promise when made. *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]……………………..* 30-41

(b) There was no evidence or insufficient evidence that any representation by Marinecorp was a producing cause of damages to Chopper and Outlaw. *[Germane to Motion for New Trial, CR 498]…………………………………………………* 30-41

(c) There was no evidence or insufficient to establish that Marinecorp's actions were unconscionable. *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]…………………………………………..* 30-41

iv

(d) There was no evidence of insufficient evidence to establish that Marinecorp breached an implied warranty, as the lease provisions stated the tenants accepted the property in its "as-is" condition. *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]*……………………… 30-41

**Relative to Issue 9:** The trial court should not have awarded Chopper and Outlaw pre-judgment interest because the alleged damages were not definitely determinable at a definite time…………………… 41-42

**Relative to Issue 10:** The trial court should have awarded Marinecorp damages for Miller and Tones' breach of the subject guaranty agreements. *[Germane to Motion for New Trial, CR 498]*……….. 42-43

**Relative to Issue 11:** The trial court should not have rendered judgment for cumulative damages for concurrent causes of action arising out of the same acts. *[Germane to Supplemental Motion to Disregard Jury Findings, CR 513]*………………………………………... 43-47

**Relative to Issue 12:** The trial court should have entered judgment against Miller for the full amount of principal and interest owing on his promissory note payable to Marinecorp. *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]* …………………………………………………………. 48

**Relative to Issue 13:** The evidence does not support the jury's answers awarding Chopper and Outlaw damages for loss of the benefit of the bargain; remedial damages; expenses; loss of income; loss of use; and wrongful eviction. *[Germane to Motion to Disregard Jury Findings, CR 449; Supplemental Motion to Disregard Jury Findings, CR 513-517; Third Supplement to Motion to Disregard Jury Findings, CR 592-593; and Motion for New Trial, CR 498]*……………………….. 48-69

Conclusion and Prayer........................................................................ 70-73

Certificate of Service........................................................................ 73

Certificate of Compliance With Tex.R.App.P. 9.4(i)(3)……………… 74

Appendix...................................................................................... 75

   A.  Charge of the Court

   B.  Modified Final Judgment

   C.  Standard Lease Contract by and between Marinecorp as Landlord and Outlaw as tenant

   D.  Standard Lease Contract by and between  Marinecorp as Landlord and Chopper as tenant

# INDEX OF AUTHORITIES

**Cases:**                                                             **Page(s)**

*Alexander of Texas, Inc. v. Bacchus Indus., Inc.,*
754 S.W.2d 252 (Tex.App.-- El Paso 1988, writ denied)............ 29

*Alexander & Sorbus, Inc. v. UHW Corp.,*
855 S.W.2d 771 (Tex.App.-- El Paso 1993, writ denied)............ 29

*American Baler Co. v. SRS Systems, Inc.,*
748 S.W.2d 243 (Tex. App.-- Houston [1st Dist.]
1988 , writ denied)....................................................... 46

*Bd. of Regents of the Univ. of Texas v. S & G Constr. Co.,*
529 S.W.2d 90 (Tex.Civ.App.-- Austin 1975, writ ref'd n.r.e.)... 22

*Bennett v. Bank United,*
114 S.W.3d 75 (Tex.App.—Austin 2003, no pet.)................. 36

*Black Lake Pipe Line Co. v. Union Construction Co., Inc.,*
538 S.W.2d 80 (Tex. 1976)………………………………… 41

*Briseno v. Martin,*
561 S.W.2d 794 (Tex. 1977)………………………………… 28

*Cain v. Bain,*
709 S.W.2d 175 (Tex. 1986)………………………………. 16

*Chastain v. Koonce,*
700 S.W.2d 579 (Tex. 1985)………………………………. 36

*Cheung-Loon, LLC v. Cergon, Inc.,*
392 S.W.3d 738 (Tex.App.-- Dallas 2012, no pet.)…………….. 17

*Crawford v. Ace Sign, Inc.,*
917 S.W.2d 13 (Tex. 1996)………………………………… 31

*Davis v. City of San Antonio,*
752 S.W.2d 518 (Tex. 1988)……………………………….. 15

*Daugherty v. Jacob,*
   187 S.W.3d 607 (Tex.App.--  Houston [14th Dist.] 2006, no pet.).. 36

*El Dorado Motors, Inc. v. Koch,*
   168 S.W.3d 360 (Tex.App.--  Dallas 2005, no pet.)…………….. 53

*Gym-N-I Playgrounds, Inc. v. Snider,*
   220 S.W.3d 905 (Tex. 2007)………………………………… 40, 41

*Harris v. Harris,*
   765 S.W.2d 798 (Tex.Civ.App.--  Houston
   [14th Dist.] 1989, writ denied)…………………………. 28

*Hernandez v. Gulf Group Lloyds,*
   875 S.W.2d 691 (Tex. 1994)………………………………… 22

*Holt Atherton Industries v. Heine,*
   835 S.W.2d 80 (Tex. 1992)…………………………………. 53

*James L. Gang & Associates, Inc. v. Abbott Labbs, Inc.,*
   198 S.W.3d 434 (Tex.App.--  Dallas 2006, no pet.)………….. 49, 59

*Long Trusts v. Griffin,*
   222 S.W.3d 412 (Tex. 2006)(per curium)……………………. 22

*Lyendecker & Associates, Inc. v. Wechter,*
   683 S.W.2d 369 (Tex. 1984)………………………………… 45

*McKenzie v. A.C. Carte,*
   385 S.W.2d 520 (Tex.Civ.App.--  Corpus Christi 1964,
   writ ref'd n.r.e.)………………………………………… 34

*Merrell Dow Pharms., Inc. v. Havner,*
   953 S.W.2d 706 (Tex. 1997)………………………………… 15

*Pinson v. Red Arrow Freight Lines, Inc.,*
   801 S.W.2d 14 (Tex.App.--  Austin 1990, no writ)………….. 29

*Pool v. Ford Motor Co.,*
 715 S.W.2d 629 (Tex. 1986)…………………………………… 16

*Pope v. Moore,*
 711 S.W. 622 (Tex. 1986)…………………………… 24, 42, 47, 48

*Prudential Ins. Co. of Am. v. Jefferson Assoc.,*
896 S.W.2d 156 (Tex. 1995)…………………………………….. 40

*Racko Properties, Inc. v. Alabama Great S.R.R.,*
 No. 07-2898, 2009 WL 178884 (E.D. La. Apr. 17, 2008)…….. 17

*Stewart Title Guar. Co. v. Sterling,*
 822 S.W.2d 1 (Tex. 1991)…………………………………… 46

*Texas Instruments, Inc. v. Teletron Energy Mgt, Inc.,*
 877 S.W.2d 276 (Tex. 1994)………………………………….. 53

*Tony Gullo Motors LLP v. Chapa,*
 212 S.W.3d 299 (Tex. 2006)………………………………….. 32, 44, 46

*Western Irr. Co. v. Reeves County Land Co.,*
 233 S.W.2d 599 (Tex.Civ.App.-- El Paso 1950, no writ)……. 22

*W.O. Bankston Nissan, Inc. v. Walters,*
 754 S.W.2d 127 (Tex. 1988)………………………………… 34


*Statutes:*
Tex.Bus. Comm. Code Sec. 17.45(5)………………………….. 35

Tex.Bus. Comm. Code Sec. 17.45(9)………………………….. 35, 38

Tex.Bus. Comm. Code Sec. 17.50(a)(2)……………………….. 39

Tex.Bus. Comm. Code Sec. 17.50(a)(3)……………………….. 35

Tex.Prop.Code 93.002(g)(1)…………………………………… 33

Tex.Prop.Code 93.002(g)(2)…………………………………… 33

*Rules:*

Tex.R.App.P. 44.1(a)…………………………………………….. 28

Tex.R.Civ.P. 279……………………………………………… 34

Tex.R.Evid. 801(e)(2)………………………………………. 21

## STATEMENT OF THE CASE

The facts and issues in this case involve two commercial real property leases by and between Appellant ("Marinecorp")[1], as the landlord, and Appellees ("Chopper and Outlaw") as the respective tenants and Tony Miller ("Miller") and Kyle Tones ("Tones") as lease guarantors (See Standard Lease Contract by and between Marinecorp as Landlord and Outlaw as Tenant, Appendix "C" and Standard Lease Contract by and between Marinecorp as Landlord and Chopper as Tenant, Appendix "D"). Chopper and Outlaw sued Marinecorp for breach of contract, fraud, and violation of the Texas Deceptive Trade Practices Act (DTPA). (CR 6). Marinecorp filed its counter-claim against Chopper and Outlaw for breach of contract and asserted a third-party action against Miller and Tones on their guaranty agreements and against Miller and Lee and Dawn Harless ("Harlesses") for breach of a promissory note payable to Marinecorp. (CR 97). Tones filed a cross-claim against Miller for fraud. Shortly before trial ended, Tones and Miller entered into a settlement agreement and Tones' cross-claim was severed from the underlying case.

---

[1]    The parties to this appeal will hereafter be referred to in this brief collectively as "Appellees" or individually as follows:

- Appellant Marinecorp International, Ltd. on appeal as "Marinecorp."
- Appellee Chopper Group, LLC  on appeal as "Chopper."
- Outlaw Country, LLC on appeal as "Outlaw."
- Individuals Tony Miller will be referred to as "Miller" and Kyle Tones will be referred to as "Tones."

*Course of Proceedings:*

The jury trial below took place place between the dates of April 14 – 23, 2015. The Honorable Larry Weiman of the 80th District Court, Harris County, Texas, was the presiding judge. The jury found the following: (1) Marinecorp failed to comply with the agreements with Chopper and Outlaw; (2) Outlaw failed to comply with the agreement with Marinecorp; (3) but found that Chopper did not fail to comply with the agreement (CR 427); (4) Marinecorp failed to comply with the agreements first (CR 423); and (5) Marinecorp violated the DTPA, and did so knowingly. (CR 427) (See Charge of the Court, Appendix "A")

The jury awarded Chopper actual damages for the breach of contract and awarded actual damages for the DTPA violations in the amount of $223,000.00 together with attorney's fees in the amount of $104,483.50 and DTPA "knowingly" damages in the amount of $11,000.00. (CR 427) It awarded Outlaw actual damages in the amount of $370,000.00; attorney's fees in the amount of $104,483.50, and DTPA "knowingly" damages in the amount of $11,000.00. (CR 427) (See Charge of Court, Appendix "A"). The Court entered judgment for such amounts. (CR 427).

Marinecorp filed Motions to Disregard Jury Findings (CR 430 and 449) and a Motion for a New Trial (CR 498), which the court denied. (CR 511). Marinecorp also filed Supplemental, Second Supplemental, and Third Supplemental Motions to

Disregard Jury Findings and Motion for New Trial (CR 513, 519 and 592), which the Court also denied. (CR 512). Appellees filed their Motion to Disregard the Jury Answers, which the Court granted. (CR 479)

The Court subsequently reduced Chopper's actual damages to $210,000.00; reduced its previous award prejudgment interest to $21,776.71, and post-judgment interest; and attorney's fees in the amount of $104,483.50 were approved, however, it awarded an additional $20,000 as attorney's fees for an appeal to the court of appeals and another $12,500 for an appeal to the Texas Supreme Court. (CR 589)

The Court subsequently reduced Outlaw's actual damages to $290,000.00; reduced its previous award of prejudgment interest to $30,072.60, and post-judgment interest; and attorney's fees in the amount of $104,483.50 were approved, however, it awarded an additional $20,000 as attorney's fees for an appeal to the court of appeals and another $12,500 for an appeal to the Texas Supreme Court. (CR 589)

Marinecorp challenges on appeal the jury's verdict and the trial court's final Judgment.

## STATEMENT REGARDING ORAL ARGUMENT

The Court should grant oral argument for the following reasons:

   a. Oral argument would give the Court a more complete understanding of the facts presented in this appeal.

b.  Oral argument would allow the Court to better analyze the complicated legal issues presented in this appeal.  This is true because of the numerous theories sued upon, the apparent conflict in the jury answers, and numerous issues raised by Appellant.

c.  Oral argument would significantly aid the Court in deciding the case.

## ISSUES PRESENTED FOR REVIEW

**Issue 1:**  Chopper and Outlaw's claims of a breach of contract fail because they did not meet the conditions precedent of giving written notice of the alleged defaults and allowing Marinecorp thirty days to cure each such default as required by the subject leases. *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]*

**Issue 2:**  Chopper and Outlaw deprived themselves of any excuse for ceasing performance on their part because they elected to treat the leases as continuing. *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]*

**Issue 3:**  The trial court should have rendered judgment against Chopper and Outlaw for damages for past and future lease payments, as ample evidence existed of Marinecorp's mitigation of damages.  *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]*

**Issue 4:**  Outlaw should not have been awarded damages as a result of not being able to open its dance hall for business as a result of Marinecorp's actions because the overwhelming evidence attributes causation of damages to Outlaw preventing it from opening earlier due to its own actions or inactions.  *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]*

**Issue 5:**  The trial court committed harmful error by not submitting to the jury an instruction and question regarding mitigation of damages as it relates to Outlaw. *[Germane to Motion to Disregard Jury Findings, CR 449; Motion for New Trial, CR 498; Appellant's Requested Jury Instructions & Questions, CR 362 & 363]*

**Issue 6:**  Chopper and Outlaw's claims constitute a breach of contract action and not a DTPA violation. *[Supp. RR Vol. 6-A at 11-12]*

4

**Issue 7:** Chopper and Outlaw's claims for damages as a result of an alleged wrongful eviction fail as a matter of law and do not constitute a DTPA violation. *[Germane to Motion to Disregard Jury Findings, CR 449; Third Supplement to Motion to Disregard, CR 592-593; and Motion for New Trial, CR 498]*

**Issue 8:** The evidence does not support the jury's answers to a violation of the DTPA by Marinecorp because:

(a) There was no evidence or insufficient evidence to establish that Marinecorp did not have an intention of fulfilling its promise when made. *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]*

(b) There was no evidence or insufficient evidence that any representation by Marinecorp was a producing cause of damages to Chopper and Outlaw. *[Germane to Motion for New Trial, CR 498]*

(c) There was no evidence or insufficient to establish that Marinecorp's actions were unconscionable and were a knowing violation of the DTPA. *[Germane to Motion to Disregard Jury Findings, CR 449; Motion for New Trial, CR 498; Supp. RR Vol. 6-A at 113-14]*

**(d)** There was no evidence of insufficient evidence to establish that Marinecorp breached an implied warranty, as the lease provisions stated the tenants accepted the property in its "as-is" condition. *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]*

**Issue 9:** The trial court should not have awarded Chopper and Outlaw pre-judgment interest because the alleged damages were not definitely determinable at a definite time.

**Issue 10:** The trial court should have awarded Marinecorp damages for Miller and Tones' breach of the subject guaranty agreements. *[Germane to Motion for New Trial, CR 498]*

5

**Issue11:** The trial court should not have rendered judgment for cumulative damages for concurrent causes of action arising out of the same acts. *[Germane to Supplemental Motion to Disregard Jury Findings, CR 513]*

**Issue 12:** The trial court should have entered judgment against Miller for the full amount of principal and interest owing on his promissory note payable to Marinecorp. *[Germane to Motion to Disregard Jury Findings, CR 449 and Motion for New Trial, CR 498]*

**Issue 13:** The evidence does not support the jury's answers awarding Chopper and Outlaw damages for loss of the benefit of the bargain; remedial damages; expenses; loss of income; loss of use; and wrongful eviction. *[Germane to Motion to Disregard Jury Findings, CR 449; Supplemental Motion to Disregard Jury Findings, CR 513-517; Third Supplement to Motion to Disregard Jury Findings, CR 592-593; and Motion for New Trial, CR 498]*

Chopper opened its doors for business as a biker's bar in mid-July 2010. (3 RR 142:12)   Chopper was operating under a lease agreement it signed with Marinecorp.  (8 RR 1,  Exs. 1 and 2)  After open for business, Outlaw negotiated another lease for the adjoining former Walgreens space where Miller and Tones intended to operate a country western dance hall. (3RR 140:1 & 147:17)  The parties to the lease were Marinecorp and Outlaw, with the lease date of September 20, 2010 and its commencement date was November 1, 2010.  The Walgreens store had been vacant for several years and it was structurally sound, however, it needed repairs to make the premises ready for business.  (3 RR 148:5)  The lease provided that Marinecorp must pay Outlaw a tenant improvement or " build out" allowance, which would be equal to a sum of $17.73 per square foot (10,998 s.f.) for a total of $194,994.54 and that the completion date was January 31, 2011.

Prior to the Outlaw lease being executed, thieves stole the electrical wires from the premises.  (3 RR 148:10).   The Outlaw lease therefore included a hand written provision in the "as-is" section as follows:  "Except for electrical, service shall remain at 1000 amps and installed by landlord, HVAC at 60 tons." (4 RR 32:9)  Marinecorp's property manager told Outlaw that it would have the power restored and AC units installed sometime during the first part of November 2010. However, the electrical hook up was Outlaw's responsibility because Marinecorp

does not supply the meters, but only has the ability to connect the meters. (6 RR 67:8)

On November 8, 2010, Marinecorp's electrician presented his invoice for his labor involved in installing the electrical power to Outlaw's building. (9 RR P:Ex. 20) However, the power company did not approve the work. (5 RR 178:4). So, the electrician talked to Marinecorp's property manager and then he disassembled it and rebuilt it. (5 RR 179:2) Outlaw had service on January 24, 2011. (3 RR 179:6)

Marinecorp bought and installed all the air conditioning as agreed and paid AC Dang Heating $53,800 in the months of October and November of 2010 for the units and installation (21 RR D-Exs. 11, 12 & 13)

Tones had no prior experience owning or operating a bar. (6 RR 97:15) However, he had a considerable sum of money, having received a second million dollar settlement in a personal injury accident many years ago. (6 RR 88:12) In contrast, Miller had uncommon business sophistication as he was previously involved in building commercial strip malls (3 RR 131:23) and projects such as the Chopper and Outlaw business ventures. (3 RR 132:1) He had experience dealing with bankers, lawyers, CPAs, realtors (3 RR 179:22); he had put a business plan together (3 RR 134:13); he had worked with trustees (13 RR 137:6); and he owned corporations (3 RR 141:9). The parties negotiated the terms of both leases, which

8

included the requirement that Miller guarantee both leases and Tones guarantee the Chopper lease. (4 RR 18:2; 18:20; 18:21; 19: 22; 20:5)

Miller, Tones and their broker, Tibbs, all knew that the larger Outlaw building that was going to be the country-western dance hall, which needed many more repairs than the Chopper's premises. Outlaw's building had been sitting vacant for several years; the roof leaked severely; there was insulation everywhere; mold was present; the air conditioners had been stolen off the roof; and copper thieves had stolen all the wires. (3 RR 148:5)

Marinecorp agreed to pay Miller the build-out monies and he would pay for the labor and materials using Marinecorp's money for the build-out allowance in the lease. (8 RR P Ex.2) Miller was aware of the condition of the buildings when Chopper and Outlaw entered into the leases. (3 RR 148:5) The leases expressly provided that except for those matters set forth on p. 29 of the lease, they were leasing the building in an "as-is" condition. (8 RR, P. Ex. 1&2, Section 3.1) The Outlaw lease was executed on September 28, 2010, but the commencement date was November 1, 2010.

Chopper's restaurant next door was up and running the middle of July 2010. (3 RR 142:12) However, after the restaurant had been in operation for some time, thieves also stole the facility's air conditioning units and underground electrical lines. (3 RR 144:3 and 6 RR 7:10). The nature of the theft made it very difficult

9

to restore the power. (6 RR 7:11) During the period of time that Chopper's power was not at full strength, Marinecorp brought in four 300 watt spotlights and big diesel lights to illuminate the parking lot. (3 RR 145:7 and 146:9)

During the early part of Chopper's lease, the tenant complained that the roof leaked and the air conditioners weren't working properly. In addition to the electrical power problems, Outlaw also complained about leaks on the dance floor. However, Marinecorp repaired all of the leaks to Outlaw's satisfaction (4RR 64:16), with repairs occurring before there was damage to the dance floor. (4 RR 65:12)

From the very beginning, Outlaw failed to timely pay its rent. (5 RR 84:1). It's first payment was two months late but the check bounced (5 RR 83:21 & 3 RR 83:22). Outlaw was never current with its payments. (3 RR 84:1) Miller sold Outlaw to the Harlesses in October 2011. (3 RR 69:21) After the Harlesses purchased Outlaw, the delinquency in rent became so large that as a means of avoiding having to evict Outlaw, Marinecorp accepted a personal promissory note from Miller and the Harlesses for rent in arrears in the amount of $56,545.00. (RR 9, D Ex. 36) This represented the amount necessary to bring the lease payments current. (5 RR 96:3 & 5 RR 96:3) However, they did not make these payments as agreed either. The then current balance of the promissory note was $53,000. (5 RR 96:16). Subsequently, Chopper and Outlaw continued to fail to pay the rent,

10

causing Marinecorp to lock them out in January 2011. (3 RR 74:5) The underlying lawsuit was filed by Chopper and Outlaw shortly thereafter.

## SUMMARY OF ARGUMENT

Neither Chopper nor Outlaw complied with the conditions precedent set forth in the respective leases requiring that they give Marinecorp thrity (30) days written notice to cure alleged defects and notice of default in the terms of the lease agreement. They did not send the notice in writing to Marinecorp's offices; and their texts and oral complaints wholly failed to comply with the lease notice requirements.

Appellees treated the leases as continuing and, therefore, they were not excused for ceasing performance on their part. They admitted at trial that they wanted the leases to continue. They were only concerned about the repairs, electrical power, air conditioning and general maintenance matters.

The Court refused to render judgment for Marinecorp and against Appellees for damages and for past and future lease payments. The jury found that Outlaw breached the lease and that its failure was unexcused but did not award Marinecorp damages. Ample evidence exists that Chopper also breached its lease without excuse and, therefore, Marinecorp was entitled to an award of past and future rents. Therefore, as argued above, since Appellees continued to treat the lease as continuing, they were not excused from future performance. The record is rife with evidence of Marinecorp's mitigation of damages.

Damages should not have been awarded Outlaw because of the alleged failure of Marinecorp to connect the power, as the overwhelming evidence attributes any damages to Outlaw's actions and inactions preventing it from opening earlier. Its failure to open was due to Outlaw's actions and inactions, not Marinecorp's failure to connect power.

The trial court erred by not submitting to the jury an instruction and question regarding mitigation of damages as it relates to Outlaw.

Marinecorp challenges the jury's award of DTPA damages. To begin with, Outlaw's damage claim relates to the alleged failure of Marinecorp to connect the power, which sounds in contract, not in DTPA. Appellees' remedy was in contract, as any representations from Marinecorp regarding the provision of power originated in the express terms of the subject leases. Also lacking is evidence that Marinecorp intended not to perform when representations, thereby defeating all DTPA claims. No evidence exists that any Marinecorp representation was a producing cause of damages to Appellees.

Appellees never alleged or proved an action for wrongful eviction and the jury did not consider the elements of such a cause of action; therefore, a wrongful eviction cannot serve as the basis of a DTPA claim.

There could be no unconscionable DTPA violation by Marinecorp because the Plaintiff, Miller, was a sophisticated businessman who had the knowledge,

13

ability, experience and capacity that would take him out of the unconscionable category. No evidence exists that Marinecorp engaged in unconscionable action or course of action that was a producing cause of damages to Chopper and Outlaw. Also lacking was evidence of a knowing violation of the DTPA.

Evidence was lacking that Marinecorp breached an implied warranty, as the lease provisions in question stated that tenants accepted the leased property "as-is."

The judgment should not have awarded prejudgment interest because the alleged damages were not definitely determinable at a definite time.

The trial court should have awarded Marinecorp damages for their cause of action against Miller and Tones as a result of their breach of the personal Guaranty Agreements.

Marinecorp challenges the judgment in that it improperly awards cumulative damages for concurrent causes of action arising out of the same acts. This violated Texas' "one satisfaction" rule.

Marinecorp should have been awarded a judgment against Miller and the Harlesses for the full amount of principal and interest owing on the promissory note executed by them and payable to Marinecorp. Miller admitted he executed the note but has not paid it. A directed verdict was rendered against the Harlesses.

Finally, Marinecorp challenges all the jury's damage awards because the jury did not follow the court's instructions and there was no, or insufficient, evidence to

14

support the jury's award of different elements of damages and, moreover, Appellees failed to meet their burden in proving up such damages. The damages awarded were also against the great weight and preponderance of the evidence and manifestly unjust.

## ARGUMENT

**Issue 1:    Chopper and Outlaw's claims of a breach of contract fail because they did not meet the conditions precedent of giving written notice of the alleged defaults and allowing Marinecorp thirty days to cure each such default as required by the subject leases.**

### A.  Standard of Review

In assessing whether the evidence supporting a jury finding is *legally sufficient,* the appeals court only considers evidence favorable to the jury's decision and disregards all evidence and inferences to the contrary. See *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex. 1988). If there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Id.* A legal sufficiency point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact is no more than a mere scintilla, or (c) the evidence conclusively establishes the opposite of a vital fact. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997).

By comparison, in considering a challenge to the evidence's *factual sufficieny,* the appeals court is to review all of the evidence and reverse for a new

15

trial only if the challenged finding shocks the conscience, clearly demonstrates bias, or is so great against the great weight and preponderance of the evidence that it is manifestly unjust. See *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986). A finding is set aside only if the evidence is so weak or the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. See *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986) (per curium).

***b. Legally and Factually Sufficient Evidence Does Not Support the Jury's Findings that Marinecorp breached the Chopper and Outlaw lease agreements, as the latter two parties did not meet contractual conditions precedent of providing Marinecorp with notice of defaults and by allowing Marinecorp thirty days to cure each alleged default, as expressly required by the subject leases.***

The lease agreements required Appellees to give 30 days' written notice to Marinecorp's offices of the matters giving rise to any alleged default by Marinecorp of the terms of the leases. This would have allowed Marinecorp 30-days to cure any such default. Neither Appellee complied with this condition precedent. Their few complaints did not comply with the requirements set forth in the leases providing that if the tenants, at any time, alleged Marinecorp was in default in the terms of the lease, they agreed to give written notice to Marinecorp specifying each default. Since they failed to comply with the agreements, their claims fail.

16

The case of ***Cheung-Loon, LLC v. Cergon, Inc.***, 392 S.W.3d 738 (Tex.App.— Dallas 2012, no pet.), involved was a similar lease provision requiring the tenant to give "written notice of any failure by Landlord to perform any of Landlord's obligations under this Lease to Landlord…" (Supp. RR Vol. 6-A at 7). Under the belief that it had exclusive use of a parking lot, the tenant gave actual, but not written, notice to the landlord that other tenants were using the parking lot. The court found this notice not sufficient and in noncompliance with the requirement of the lease and it did not serve as notification of a breach. In summary, the tenant bore the burden of showing all conditions precedent were met, with a condition precedent being an act that must occur before there is a breach of a contractual duty.

In the instant case, Appellees failed to produce any evidence that they provided notice of any alleged breach to Marinecorp. Also see cf. ***Racko Properties, Inc. v. Alabama Great S.R.R.,*** No. 07-2898, 2009 WL 178884, at *4 (E.D. La. Apr. 17, 2008) ("[N]otice and cure requirements are entitled to no less deference than the obligations imposed upon the lessee.").

With regard to the matter of notice and the landlord's right to cure, Sections 3.1 and 17.11 of the leases required that thirty (30) days' notice be given at Marinecorp's offices, and Section 21.1 required the tenants to provide written

notice to the Houston address provided at Section 1.1c of the leases. Neither Appellee complied with these conditions precedent. Appellees' claim that actual notice was provided is besides the point, as it remains undisputed that Marinecorp never received actual notice of an alleged default. At the most, Marinecorp's property manager received some texts and oral complaints--but no notice of an alleged default. However, the property manager was not on the board of directors of Marinecorp, nor did he have an interest in said corporation (5 RR 222:22 & 222:25), as he was simply a property manager in charge of day-to-day routine matters related to the properties (5 RR 222:19). Any such notices or complaints were never received by Marinecorp's officers, directors, principals, or corporate management (6 RR 69:8), and Marinecorp never received any notice, actual or otherwise, that Chopper and Outlaw were claiming that Marinecorp defaulted or breached the subject leases.

It was especially important that Marinecorp's management receive the notice rather than one of its employees because the president and principal of the company, Mr. Ayaz Nasser, testified without contradiction that he was "a hands-on owner" (6 RR 68:14) and that he was personally involved in all tenant problems. He met regularly with his employees, including the property manager. (6 RR 68:14) He would go over the many issues which would include any notices of breach of contract or repairs needed. Mr. Nasser further testified that if he had

18

known that the power had not been connected, he would have hired someone to make sure it was done (6 RR 69:16). He was denied this option by Appellees because they did not comply with the lease by sending the company notice of any default. As a result, Marinecorp cannot be held to have been in default of the terms of the leases.

Miller testified that it was reasonable for Marinecorp to expect him to comply with the lease until its higher management and even the owner could make sure all problems were taken care of. (4RR 26:11) He doesn't know why once he had learned of the electrician's problems with getting the power connected, that he didn't give Marinecorp an opportunity to take care of it (4RR 41:22). He further admits that he never told Marinecorp of the air conditioning problems in November, December, or January. (4RR 48:11)

The evidence discussed above establishes that there is a complete lack of evidence, or alternatively less than a scintilla of evidence, supporting a finding that Marinecorp breached the subject lease agreements, as instead the uncontroverted evidenced established that Appellees did not meet conditions precedent of providing proper notice of default and providing an opportunity to cure. This same evidence is against the great weight and preponderance of the evidence and is manifestly unjust. For these reasons, Marinecorp's arguments should be sustained on appeal.

19

**Issue 2: Chopper and Outlaw deprived themselves of any excuse for ceasing performance on their part because they elected to treat the leases as continuing.**

### A. *Standard of Review*

In this point of error, Marinecorp challenges the jury's affirmative answer to Question No. 3, wherein they answered that Marinecorp was the first party to fail to comply with the agreement. (CR 423; Supp. RR Vol. 6-A at 7)  The evidence was legally and factually insufficient to support the jury's answer to Question No. 3. The trial court further erred in failing to disregard the jury's answer to Question No. 3 because under the evidence and facts presented, this answer is immaterial, improper, and prejudicial to Marinecorp in that the jury's answer prevented the jury from advancing to questions regarding damages to Marinecorp and its attorney's fees.

### B. *Appellees Elected to Treat the Lease Agreements as Continuing.*

Even if Marinecorp is found to have committed a material breach of the agreements, Appellees were not discharged or excused from their obligations to perform because they elected to treat the lease agreements as continuing, thereby depriving themselves of any excuse from continued performance under the lease agreements (Supp. RR Vol. 6-A at 7).  Evidence that Appellees elected to treat the leases as continuing includes: (1) Appellees' acknowledgements that monthly rent

was always due; (2) Appellees never claiming a set off for any alleged damages or breach of the leases by Marinecorps; (3) continued operation of their businesses on leased premises and their receipt of income; (4) continuing to request from the landlord additional repairs and lighting; (5) continuing to work with the electrician to obtain a permit; and (6) testimony by Miller (at 4 RR 135:24), which was corroborated by Miller's realtor (agent), Grady Tibbs (at 5 RR 8:13), that Miller was not trying to get out of the lease agreements.[2]

By continuing to operate under the lease agreements, rent became due with each passing month, ultimately resulting in a total of $56,000 in rent in arrears for Outlaw. Outlaw opted to continue business under its lease in spite of its nonpayment of rent, ultimately resulting in its lock out by Marinecorp in January of 2011.

It is a fundamental proposition of contract law that when one party breaches its contract, the other party is put to an election of continuing or ceasing performance, and any action indicating an intention to continue will operate as a conclusive choice, not depriving the injured party of his cause of action for breach which has already taken place, depriving him only of any excuse for ceasing

---

[2] Such relevant testimony by Miller qualifies as a statement made by a party that is admissible against that party This rule is known as "an admission by a party-opponent," which is included as statements not considered hearsay. See *TexR.Evid.* 801(e)(2).

performance on his own part. ***Bd. of Regents of the Univ. of Texas v. S & G Constr. Co.,*** 529 S.W.2d 90, 97 (Tex.Civ.App.--  Austin 1975, writ ref'd n.r.e.) (*citing* ***Western Irr. Co. v. Reeves County Land Co.,*** 233 S.W.2d 599 (Tex.Civ.App.--  El Paso 1950, no writ)).  In ***Long Trusts v. Griffin,*** 222 S.W.3d 412 (Tex. 2006) (per curiam), the Supreme Court of Texas, citing ***Hernandez v. Gulf Group Lloyds,*** 875 S.W.2d 691, 692 (Tex. 1994),  held that "a party who elects to treat a contract as continuing deprives himself of any excuse for ceasing performance on his own part."

Since, as discussed above, the matter of who breached the subject lease agreements first is wholly irrelevant, Marinecorp was entitled to damages that resulted from the material breaches by Appellees of the express terms of the lease agreements.  Such an award of damages to Marinecorp is warranted in part in light of the jury's answer to Question No. 2, where it found that Outlaw failed to comply with the agreement and that its failure  was material.

Appellees waived their excuse for nonperformance, as explained in ***Long Trusts, <u>supra</u>.***  Therefore, the Court should not have submitted jury Question No. 3 as to who breached the contract first.  This error effectively prevented the jury from answering the questions relating to Marinecorp's damages.  Such appellate error resulted in the rendition of an improper judgment, warranting reversal and remand.

22

**Issue 3:      The trial court should have rendered judgment against Chopper and Outlaw for damages for past and future lease payments, as ample evidence existed of Marinecorp's mitigation of damages.**

The jury's answers to Question No. 8 [where the jury found that Marinecorp failed to exercise reasonable care and diligence to avoid or minimize its damages] and Question No. 9 [where the jury found that Marinecorp would have suffered no (zero damages) damages] are legally and factually insufficient and are against the great weight and preponderance of the evidence and manifestly unjust.

The testimony of Marinecorp's real estate broker and its accountant, Ed Wolochin, was the only testimony heard regarding the measure of damages for past and future rentals.  He established that with respect to Chopper, the past and future damages, *i.e.,* the lease payments, would be in the amount to $585,000.00, while the past and future damages for Outlaw were valued at $1,172,000.00.   Neither Appellee offered any expert or other testimony or evidence to the contrary. Mr. Wolochin testified positively regarding Marinecorp's due diligence and its reasonable efforts to re-lease the subject commercial premises through the date of trial, yet such efforts had been unsuccessful.

Additional evidence of Marinecorp's entitlement to delinquent rent and future rent payments can be found at Pl-Ex. 38 (showing delinquent rents were then due for $92,000), Pl. Ex. 39 (showing rent due for $15,814) and Pl. Ex. 40 (an email from Appellees regarding rent payment delinquency).

23

In summary, no evidence or insufficient evidence was presented supporting the jury's answers to (1) Question No. 8 finding that Marinecorp failed to mitigate its damages, and (2) Question No. 9 finding that Marinecorp would have suffered no damages if it had mitigated its damages. Both findings are also against the great weight and preponderance of the evidence and are manifestly unjust. For these reasons, reversal is warranted.

**Issue 4**: **Outlaw should not have been awarded damages as a result of not being able to open its dance hall for business as a result of Marinecorp's actions because the overwhelming evidence attributes causation of damages to Outlaw preventing it from opening earlier due to its own actions or inactions.**

**Issue 5: The trial court committed harmful error by not submitting to the jury an instruction and question regarding mitigation of damages as it relates to Outlaw.**

[Since Issues Nos. 4 and 5 are interrelated in that they deal with the issue of damages, they will be argued together.]

*A. Causation Not Supported by Sufficient Evidence & Applicable Standard of Review.*

The jury's award of damages to Outlaw "that resulted from such failure to comply" in response to Question No. 6 (CR 409) is against the great weight and preponderance of the evidence and is manifestly unjust. Such damages are also not factually supported by sufficient evidence. The standard for a request for remittitur is factual insufficiency of the evidence. ***Pope v. Moore,*** 711 S.W.2d 622, 624 (Tex. 1986).

24

Even if Outlaw's electrical power would have been connected in November of 2010, Outlaw could not have obtained an occupancy permit and could not have opened for business until February 2011 (long after the power was connected) for the following reasons:

a. On November 18, 2010, Outlaw, could not have opened for business because on that date, it submitted for the first time a commercial permit application with the City which was not approved. ( 9RR P Ex. 21);

b. On November 29, 2010, Outlaw could not have opened because its electrician (which was also Marinecorp's electrician) was still working for Outlaw installing wiring inside the building ( 9RR P Ex 22);

c. On December 3, 2010, Outlaw could not have opened for business because on said date it was still getting quotes for the fire security work ( 9RR, P Ex 24);

d. On December 27, 2010, Miller could not have opened for business because on that date, he sent a text to a performer for the dance hall stating that he couldn't even get an inspection scheduled with the City. There is no mention that because of Marinecorp's failure to have the electrical service connected, he was prevented from opening ( 9RR P Ex 25);

e. On February 10, 2011 Outlaw could not have opened because it had not installed its refrigerator ( 9RR P Ex 28); and

f. Finally, even as late as February 26, 2011 (approximately a month after the City approved the electrical service, Outlaw was still working to obtain fire upgrades to meet City codes. ( 9RR P Ex 30 and P Ex 31)

This plethora of delaying factors, which were not directly attributable to Marinecorp, caused repeated delays in Outlaw starting up its business.

25

The overwhelming evidence establishes that if in fact Outlaw was damaged in this case, as found in response to Question No. 6, it resulted from its own failure to comply, and not that of Marinecorp. This fact is highlighted by the uncontroverted testimony of Marinecorp's experienced and knowledgeable Property Manager, Michael Mirza. He testified regarding the simple process that a person or entity can go through to get a temporary construction permit (6 RR 10:9):

Q. Now, explain to the jury how he could have done that.

A. … It's very simple process. If you're doing a construction you have to line out the things and you can apply for – it's called a construction meter and they come and right away and connect that to that property. And then you can perform all that, the construction you need to do. And then they come out and inspect and you will be a permanent meter.

(6 RR 10:11) He had been previously successful in obtaining the temporary permit and electricity involving another property where the wiring has been stolen. (6 RR 10:11)

Mr. Mirza's uncontroverted testimony serves as overwhelming evidence of:

(1) Outlaw's cause of its own damages specifically attributed to what it did and did not do; and

(2) Outlaw's failure to mitigate its damages as a reasonable person would have done under the same or similar circumstances.

26

The uncontroverted evidence established that Outlaw wholly failed to mitigate its damages, making insignificant and not credible Outlaw's contention that Marinecorp's alleged failure to have the electrical power connected the first part of November was the cause of its damages. In fact, overwhelming evidence to the contrary was presented that Outlaw was the cause of its own damages. In this connection, Outlaw claims that it could not get its permit until the power was connected by Marinecorp. However, Mr. Mirza, essentially testified that Outlaw could have obtained a temporary construction meter and that in his experience working with Harris County and Reliant Energy, these entities would have allowed the temporary meter to be used for inspection purposes. Appellees were just as capable as Marinecorp in obtaining a temporary construction meter and construction permit in the manner described above.

Appellees opted not take the simple measures needed to get a temporary construction meter and permit. Most compelling in this regard is the fact that Miller testified that with regard to other properties, he had previously taken out temporary meters and obtained temporary construction permits. (6 RR10:7) Since the evidence was factually insufficient to support the causation element to jury Question No. 6 as it relates to Marinecorp and Outlaw's alleged damages, if any, the finding of damages in this case should be set aside. Considering the evidence discussed above, the jury's finding of causation as to Marinecorp is so against the

27

great weight and preponderance of the evidence that it is manifestly unjust, warranting reversal and a remand for a new trial.

**B. Harmful error in the trial court refusing Marinecorp's request for a jury instruction and question regarding mitigation of damages relative to Outlaw.**

Appellees failed to mitigate their damages by failing to utilize the simple two day procedure to get electricity. While the trial court granted an instruction and question directed at Marinecorp's alleged failure to mitigate damages (See Jury Question 8 at CR 411), the court committed error in refusing to allow Marinecorp's similar properly requested instruction and question directed at the Appellees (See CR at 362 and 363), which related to the vital defense of mitigation of damages and was supported by more than a scintilla of evidence.

For reversible error purposes, the submission should be considered as a whole to determine whether the error was prejudicial. ***Briseno v. Martin,*** 561 S.W.2d 794, 796 (Tex. 1977); also see Tex.R.App.P. 44.1(a). The decision to submit a particular instruction, question or definition is reviewed for an abuse of discretion with the essential question being whether the instruction or definition aids the jury in answering the questions. See ***Harris v. Harris,*** 765 S.W.2d 798, 801 (Tex. Civ.App.—Houston [14th Dist.] 1989, writ denied). A court should submit a mitigation instruction [and question] whenever the evidence raises an issue as to whether the plaintiff could have avoided, in whole or in part, his or her

28

losses. *Alexander & Sorbus, Inc v. UHW Corp.,* 855 S.W.2d 771, 775 (Tex.App.-- El Paso 1993, writ denied). The standard is that of ordinary care, or what an ordinary prudent person would have done under the same or similar circumstances. *Pinson v. Red Arrow Freight Lines, Inc.,* 801 S.W.2d 14, 16 (Tex.App.-- Austin 1990, no writ). The burden of proving whether the plaintiff failed to do so is on the party who caused the loss. *Alexander of Texas, Inc. v. Bacchus Indus., Inc.,* 754 S.W.2d 252, 253-254 (Tex.App.-- El Paso 1988, writ denied).

The trail court's failure to grant Marinecorp's requested jury instruction and question on Outlaw's mitigation of damages likely resulted in the rendition of an improper jury verdict and judgment. The jury was given no instruction as to how Outlaw's failure to mitigate could effectively reduce and even eliminate any recovery of damages by Outlaw. Even more troubling is the fact that even though strong failure to mitigate damages evidence was presented to the jury against Outlaw, the jurors were not given an option by means of a jury question to redirect fault away from Marinecorp, taxing Outlaw for essentially causing its own damages. In fact, the way the charge reads in this case, the jury never even considered Outlaw's failure to mitigate its damages much less allowing the jury to tax Outlaw monetarily for causing its own damages. This was an abuse of discretion which likely resulted in the rendition of an improper judgment, thereby warranting reversal.

29

**Issue 6:  Chopper and Outlaw's claims constitute a breach of contract action and not a DTPA violation.**

**Issue 7:  Chopper and Outlaw's claims for damages as a result of an alleged wrongful eviction fail as a matter of law and do not constitute a DTPA violation.**

**Issue 8:  The evidence does not support the jury's answers to a violation of the DTPA by Marinecorp because:**

> **(a)  There was no evidence or insufficient evidence to establish that Marinecorp did not have an intention of fulfilling its promise when made.**
>
> **(b)  There was no evidence or insufficient evidence that any representation by Marinecorp was a producing cause of damages to Chopper and Outlaw.**
>
> **(c) There was no evidence or insufficient to establish that Marinecorp's actions were unconscionable.**
>
> **(d) There was no evidence of insufficient evidence to establish that Marinecorp breached an implied warranty, as the lease provisions stated the tenants accepted the property in its "as-is" condition.**

[Issues 6, 7 & 8 will be argued together because they relate to Appellees' DTPA/Breach of Warranty Causes of Action.]

The jury found in answer to Question No. 13 that Marinecorp engaged acts or practices in violation of the DTPA.  (CR 416)  It also found that Marinecorp failed to comply with a warranty that was a producing cause of damages. (See Jury Question No. 14; CR 417)  The jury also found that Marinecorp engaged in an unconscionable act or course of action that was a producing cause of damages to

30

Appellees (Jury Question No. 15; CR 418) and that Marinecorp engagement in prohibited conduct knowingly, awarding each Appellee $11,000 (Jury Question No.s 17 & 18; CR 421-422).

## (ISSUES 6 & 8(a))

### A. *The claims of Chopper and Outlaw sound in breach of contract.*

### B. *Marinecorp had every intention of fulfilling its promise when initially made.*

The Outlaw lease contains a commencement date of November 1, 2010, and it required Marinecorp to provide electrical service. See Outlaw Lease at Section 3.1: "electrical services shall remain at 1000 amps and installed by landlord." (Pl. Ex. 4). Since electricity was a requirement or obligation of Marinecorp that was set forth in the lease, its duty to act arose out of a contract. The fact that Marinecorp's Property Manager made a representation about the electricity requirement did not change the character or nature of the representation, as the fact remains that its genesis was in the subject lease (contract). According to the Texas Supreme Court in *Crawford v. Ace Sign, Inc.,* 917 S.W.2d 13, 14-15 (Tex. 1996), "a failure to fulfill a [contractual] promise is actionable only under a breach of contract theory and not under the DTPA." *Id.* The Court added, "the failure [to perform] actually caused the [alleged harm], and that injury is governed by contract law, not the DTPA." *Id.* Accordingly, any breach of the subject

31

representation would have constituted a breach of contract. (Supp. RR Vol. 6-A at 11-12)

The distinction between a mere breach of contract and the violation of the DTPA comes down to whether there was an intent not to perform when the representation was made and whether the representation was false or misleading when it was made. See **_Tony Gullo Motors LLP v. Chapa,_** 212 S.W.3d 299 (Tex. 2006). In the instant case, Marinecorp's Property Manager made his representation to provide electricity fully intending to fulfill his promise and his representation was not false or misleading. No evidence to the contrary was presented at trial. The evidence presented showed that Marinecorp's electrician, Hofelich, by November 8, 2010, had invoiced Marinecorp for the 1000 amp service to Outlaw (Pl. Ex. 20) and Marinecorp ordered the electrical supplies on or about October 21, 2010.

Finally, even though the claims of Appellees both sound in contract, no evidence, or insufficient evidence, exists supporting the measure of damages that they would have been entitled to upon meeting their burden, specifically proof of lost profits.

*C.  Alleged wrongful eviction did not constitute a violation of the DTPA.*

Appellees' claims for damages as a result of an alleged wrongful eviction or lockout, pursuant to Tex. Prop. Code §§93.002(g)(1) and 93.002(g)(2), fail and do not constitute a DTPA violation.  Appellees never specifically pled a cause of action for wrongful eviction and  they never proved up by a preponderance of the evidence conduct by Marinecorp which rose to the level of an actionable violation of the wrongful eviction provisions set out in the Texas Property Code.  To the contrary, Appellees and their legal counsel at trial were nonchalant in claiming that Appellees had been "wrongfully evicted," but anything short of evidence that there had been a judicial finding of "wrongful eviction" cannot serve as the basis supporting a violation of the DTPA.  No evidence exists that any misrepresentation was made or that Appellees relied on same to their detriment.  Upon satisfying their burden of proving up a wrongful eviction, which Appellees failed to do, the Texas Property Code would have provided an array of remedies which would have been available to the wronged commercial tenant.

The  specific  elements  required  to  have  a  viable  cause  of  action  for wrongful eviction were never alleged or proven in this case, See *McKenzie v. A.C. Carte,* 385 S.W.2d 520, 528 (Tex.Civ.App.--  Corpus Christi 1964, writ ref'd n.r.e.), and certainly such a complete cause of action was not contemplated by the

parties, their attorneys and the trial court when finalizing the Jury Charge at the charge conference (Supp. RR Vol. 6-A).

Further, a party must submit a request for jury instruction, definition and issue when it has the burden of proof, otherwise, the items never requested are waived. See *W.O. Bankston Nissan, Inc. v. Walters,* 754 S.W.2d 127, 128 (Tex. 1988); *Tex.R.Civ.P.* 279. Since Appellees never requested any jury instruction, definition and issue regarding a cause of action for wrongful eviction, such a cause of action was completely waived and cannot serve as the basis for alleged DTPA violations.

### (ISSUE 8(b))

### D. Statements and representations allegedly relied on by Appellees were not a producing cause of any damages.

Provisions in the subject leases and oral representations made by Marinecorp's Property Manager in connection with these contractual provisions regarding the provision of electricity were not a producing cause of DTPA damages to Appellees. More specifically, such representations were not a substantial factor in bringing about damages and any such damages would have occurred with or without such representations. This is established in the evidence more fully discussed immediately above under the discussion regarding Issues Nos. 1, 4 and 7, *supra,* to wit:

34

1.  Appellees are not entitled to damages from Marinecorp because they failed to comply with material notice of default and cure lease provisions;

2.  Appellees caused any damages which they may have sustained; and

3.  An unpled or unproved wrongful eviction of Appellees did not violate the DTPA.

Plaintiffs testified that Chopper was making a profit and Outlaw was breaking even. There was no evidence of any act or omission by Marinecorp that affected this net income. Appellees failed to meet this burden of proof relative to the DTPA element of causation.

## (ISSUE 8(c))

*E. There was no evidence or insufficient evidence to establish that Marinecorp's actions were unconscionable or knowingly in violation of prohibited conduct under the DTPA.*

### Unconscionable Action

There was insufficient evidence to establish that Marinecorp's actions were unconscionable in that it grossly took advantage of Chopper and Outlaw's principal, Miller. (See answer to Jury Question No. 15 at CR 418) Section 17.50(a)(3) of the DTPA provides that a consumer may recover actual damages for "any unconscionable action or course of action" that is the producing cause of damages. Tex. Bus. & Com.Code § 17.50(a)(3). Section 17.45(5) of the DTPA defines "unconscionable action or course of action" to mean "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge,

35

ability, experience, or capacity of the consumer to a grossly unfair degree." For purposes of the definition of unconscionable action, the term "gross" should be given its ordinary meaning of glaringly noticeable, flagrant, complete, and unmitigated. ***Chastain v. Koonce,*** 700 S.W.2d 579, 583 (Tex. 1985).

To prove an unconscionable action or course of action, a plaintiff must show that the defendant took advantage of his lack of knowledge and "`that the resulting unfairness was glaringly noticeable, flagrant, complete *and* unmitigated.'" *Id.* The relevant inquiry into an alleged unconscionable action or course of action under the DTPA examines the entire transaction, not only a defendant's intent. ***Bennett v. Bank United,*** 114 S.W.3d 75, 82 (Tex.App.--  Austin 2003, no pet.).

Another relevant inquiry on appeal is what the consumer could have or would have done if he or she had known about the information, and there also needs to be some showing of the consumer's knowledge, ability, experience, or capacity. ***Daugherty v. Jacob,*** 187 S.W.3d 607, 616 (Tex.App.--  Houston [14th Dist.] 2006, no pet.).

In the instant case, there is no evidence that Marinecorp took an unfair advantage of Miller to a grossly unfair degree.  Miller was a sophisticated businessman with a wealth of business experience and knowledge. He was previously involved in building large commercial strip malls and he had previously been involved in projects similar to the Chopper and Outlaw projects.  He

36

commonly dealt with lawyers, bankers, CPAs and realtors. He was experienced in putting together business plans and he often dealt with fiduciary settings involving trustees. Miller also owned and had been involved in corporations in the past. These personal and professional traits of Miller demonstrate his great capacity and ability in dealing with the matters that he was presented with.

Absent from the record is evidence that Miller lacked knowledge from which Marinecorp could have taken advantage, as Miller was business savvy and had a sophistication which was not common to the average consumer that the DTPA was intended to protect. No evidence exists that Marinecorp took advantage of Miller's lack of knowledge. Moreover, no evidence exists in the record suggesting that there was a resulting unfairness in the subject transaction that was unfair to the extent of being glaringly noticeable, flagrant, complete and unmitigated. In evaluating the transaction, the evidence establishes that the parties negotiated the terms of the leases, which included the requirement that Miller personally guarantee both leases.

Miller was fully aware of the condition of the buildings when Chopper and Outlaw entered into the leases. This fact was even accounted for in the lease, which expressly provided that the parties were leasing the buildings in an "as is" condition, yet still expressly excluding various matters at page 29 of the lease that would not be subject to this agreed to "as is" clause. Finally, it was certainly

37

within the realm of Miller's experience and knowledge  that a consequence of a commercial tenant not paying its rent is ultimately a lockout.  The focal transaction here involves the connection of power to the Outlaw structure.  This obligation was placed on Marinecorp pursuant to the lease agreements.   In spite of numerous and severe theft incidents where thieves stole copper electrical wiring from both buildings, Marinecorp never ceased its attempts to restore the power.  Fact of the matter is that Marinecorp had the power to both buildings restored months before Chopper and Outlaw were locked out.

As established above, there is insufficient evidence to support the jury's finding of unconscionability under the DTPA.  (CR 418)

### *"Knowing" DTPA Violation*

Further, there was no evidence or insufficient evidence to establish that Marinecorp's alleged representations constituted an engagement in DTPA prohibited conduct "knowlingly."  The jury found that Marinecorp engaged in such knowing conduct as to both Appellees in answer to Question No. 17 (CR 421), awarding Appellees $11,000 each for related damages in answer to Question No. 18 (CR 422).

The Texas Business & Commerce Code, Sec. 17.45(9) defines "knowingly" as meaning actual awareness, at the time the act of practice complained of, of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's

claim or, in an action brought under subdivision (2) of subsection (a) of Section 17.50, actual awareness of the act, practice, condition, defect, or failure constituting the breach of warranty, but actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

The evidence presented at trial established that Marinecorp's property manager represented to Appellees that the electricity would be connected the first week of November. When this representation was made, he had no idea that the electricity would not be connected at a later date. No evidence exists that when made, the subject representation was made with actual awareness of falsity, deception or unfairness, nor do objective manifestations to the contrary exist in the record. Therefore, there was no intentional or knowing misrepresentation. More evidence of the lack of a knowing violation is shown by the hiring of the electrician who represented to the Appellees that he connected the electricity and that he had been paid for his work.

### (ISSUE 8(d))

***F. No implied warranty was breached and the "as-is" lease provision.***

There was no evidence or insufficient evidence to establish that Marinecorp breached an implied warranty (See Jury's answer to Question No. 15 at CR 417;

39

Supp. RR Vol. 6-A at 12-13) because of the lease provisions stating the tenants accepted the property in its "as-is" condition

In the case of *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905 (Tex. 2007), the Texas Supreme Court held that the implied warranty of suitability may be contractually waived by a tenant who enters into an "as is" clause in a commercial lease. Underlying the Court's holding was its recognition of strong public policy encouraging parties the freedom to contract. *Id.* at 913. The Court held that by agreeing to lease property "as is," a lessee agrees to make his own appraisal of the bargain and accepts the risk that he may misjudge its value. *Id.* at 914 (*citing Prudential Ins. Co. of Am. v. Jefferson Associates, Ltd.,* 896 S.W.2d 156, 161 (Tex. 1995)). The lessor gives no assurances, express or implied, concerning the value or condition of the premises. *Gym-N-I,* 220 S.W.3d at 914. Thus, an "as is" agreement precludes the lessee from proving that the lessor's conduct caused harm. *Id.* The commercial tenant in *Gym-N-I* contractually disavowed any reliance upon any representation by the landlord. *Id.* By agreeing to lease the building "as is," the tenant agreed to make its own appraisal of the physical condition of the premises. *Id.* Thus, the sole cause of the tenant's injury, by its own admission, was itself. *Id.* The Court, therefore, held that the "as is" clause negated the tenant's claim regarding causation as to causes of action for

40

negligence *per se,* gross negligence, violations of the Deceptive Trade Practices-Consumer Protection Act, and fraud. See *Id.* at 913-914.

Similarly, in the instant case, by agreeing to commercial leases which contained similar "as is" clauses, as a matter of law Appellees were precluded from proving that Marinecorp's conduct caused them harm. Appellees were free to inspect the premises for defects. If in fact they were damaged because of the conditions of the subject premises, causation lies directly on them and not on Marinecorp.

In conclusion, reversal and remand is warranted for reasons set out above in connection with Issues Nos. 6, 7 and 8.

**Issue 9:** **The trial court should not have awarded Chopper and Outlaw pre-judgment interest because the alleged damages were not definitely determinable at a definite time.**

In the trial court's Modified Final Judgment (attached as Appendix "B"), the trial judge awarded actual damages to each Appellee and then proceeded to award prejudgment interest to Chopper for $21,776.71 and Outlaw for $30,072.60. As to both Appellees, the trial court's award of prejudgment interest was erroneous.

While prejudgment interest is recoverable as a matter of right where damages are established as of a definite time and the amount thereof if definitely determinable, ***Black Lake Pipe Line Co. v. Union Construction Co., Inc.,*** 538

41

S.W.2d 80, 95-96 (Tex. 1976), in the instant case the damages awarded to Appellees are not "definitely determinable" at a definite time and, therefore, the award of pre-judgment interest on such damages should not have been awarded. This constitutes fundamental error. There is simply no reasonable means of calculating prejudgment interest on the damages awarded without a determined date or definite time from which an interest calculation can be made. For these reasons, there is no evidence, or insufficient evidence, in the record to support an award of prejudgment interest on the damages awarded by the jury and, more specifically, a "definitely determinable at a definite time" reference date from when prejudgment interest calculations could be made. Accordingly, Appellant requests an appropriate remittitur under the authority of *Pope v. Moore,* 711 S.W.2d at 624, or, alternatively, it requests a reversal and remand.

**Issue 10: The trial court should have awarded Marinecorp damages for Miller and Tones' breach of the subject guaranty agreements.**

The parties negotiated the terms of the Chopper and Outlaw leases. The Chopper lease was personally signed and guaranteed by Miller whereas the Outlaw lease was personally signed and guaranteed by Miller and Tones; therefore, if the terms of these leases were not fulfilled, the signatories would be personally liable for each tenant's failure to fulfill the lease's terms. (4 RR 18:2; 18:20, 18:21, 19:22; 20:5)

42

The jury found in answer to Question No. 2 (CR 404) that Outlaw failed to comply with the lease agreement. In answer to jury Question No. 4 (CR 406-407), the jury found that Outlaw's failure to comply was not excused. However, in its answer to Question No. 7 (CR 410), it declined to award any past or future rents to Marinecorp as a result of Outlaw's failure to comply.

Reversal is warranted and Marinecorp prays that the Court render judgment in its favor for Outlaw's past and future rents or, alternatively, that the Court reverse the above-referenced finding and enter an order directing the trial court to enter judgment accordingly or, in the final alternative, that the Court reverse and grant Marinecorp a new trial.

**ISSUE 11: The trial court should not have rendered judgment for cumulative damages for concurrent causes of action arising out of the same acts.**

In the trial court's Modified Final Judgment, the trial judge awarded $210,000 in actual damages to Chopper and $290,000 in actual damages to Outlaw. These damages were awarded by the court under the DTPA theory of recovery alleged by Appellees. These actual damage awards were made up of two

damage components awarded by the jury in their answer to Question No. 16 [CR 419-420][3], namely:

--**For Chopper**: $110,000 for <u>expenses</u> and $100,000 for <u>loss of use</u>, and

--**For Outlaw**:  $150,000 for <u>expenses</u> and $140,000 for <u>loss of use.</u>

The award of these damages cumulatively in the final judgment is contrary to Texas' "one satisfaction rule," which provides that there can be but one recovery for one injury; and the fact that there may be more than one theory of liability does not modify the rule. *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 303 (Tex. 1991). The award of these damages also constitutes an impermissible double recovery.

Included in the jury charge were definitions for the different measures of damage which the Appellees sought to recover under the DTPA and for breach of contract.   The following table summarizes these definitions:

---

[3]  Note that the loss of benefit of the bargain damages that the jury awarded Appellees with regard to the breach of contract and DTPA causes of action were ultimately omitted by the trial

| Element of Damages | Breach of Contract (Q. #6 [CR 409]) | DTPA (Q. #16 [CR 419-420]) |
|---|---|---|
| Loss of benefit of the bargain | Difference, if any, between the value of the premises as agreed and the value of the premises as provided by Marinecorp. | Difference, if any, in the value of the premises as received and the value it would have had if it had been represented. |
| Remedial damages/ Expenses | Remedial damages: Reasonable and necessary cost to reimburse Chopper or Outlaw for the loss of investment in construction and equipment costs. | Expenses: The expenses incurred by Chopper in constructing and equipping the lease premises in order to operate. |
| Loss of income/Loss of use | Loss of income: Loss of net income for the time Chopper or Outlaw was unable to operate due to Marinecorp's conduct. | Loss of use: The reasonable value of the lease premises for the time Chopper was unable to operate due to Marinecorp's conduct. |

Note that while different labels for the categories of damages listed above may have been used in the jury charge, "remedial damages" and "expenses" are essentially defined as the same measure of damages. Likewise, the jury charge's terms "loss of income" and "loss of use" are defined as the very same measure of damages.

Plaintiffs cannot recover the same damages for the same injury, regardless of Plaintiffs' theories. Even *Leyendecker & Associates, Inc. v. Wechter,* 683 S.W.2d 369, 373 (Tex. 1984) prevents plaintiffs from recovering more than once for the same injury.

---

court. (See CR 589).

The one satisfaction rule also applies to prevent a plaintiff from obtaining more than one recovery for the same injury, even if caused by different acts. ***Stewart Title Guar. Co. v. Sterling,*** 822 S.W.2d 1, 7 (Tex. 1991), *holding modified by* ***Tony Gullo Motors I, L.P. v. Chapa,*** 212 S.W.3d 299 (Tex. 2006). Appellate courts have applied the one satisfaction rule when the defendants commit the same act as well as when defendants commit technically differing acts which result in a single injury. ***Stewart Title,*** 822 S.W.2d at 7. The ***Stewart Title*** court cited ***American Baler Co. v. SRS Systems, Inc.,*** 748 S.W.2d 243, 246 (Tex.App.-- Houston [1st Dist.] 1988, writ denied) with approval of that court's conclusion that the same wrongful act or misrepresentations connected with the sale of equipment related to causes of action for fraud, breach of contract, negligent misrepresentation and DTPA, thereby requiring the plaintiffs to elect a remedy. ***Stewart Title,*** 822 S.W.2d at 7 (*citing* ***American Baler***, 748 S.W.2d at 246).

Whether Appellees contend that Marinecorp made misrepresentations about making repairs and the provision of power or its alleged actual failure to make repairs and provide power, the resulting consequence would have been the same, i.e., their inability to generate revenue. The trial court's Modified Final Judgment awarded Chopper and Outlaw damages for "expenses" and "loss of use" under a DTPA theory, however, Appellees should not be entitled to both types of damages because the wrongful conduct alleged against Marinecorp would have resulted in

46

the same consequence of Appellees' inability to generate revenue. Plaintiffs should not be allowed to recover twice (i.e., damages for expenses and for loss of use) for the same resulting injury which was the consequence of the same complained of act. The trial court's Modified Final Judgment awarding both measures of damages cannot stand under Texas law.

Finally, it is important to note that in jury Question No. 16's definition of the terms "expenses" and "loss of use" (CR 419), which incidentally was submitted by the Appellees, Outlaw is selectively excluded and, therefore, by written instruction from the Court these measures of damages only relate to Chopper and otherwise selectively exclude Outlaw from recovering such these elements of damages. Most disturbing is the fact that the jury obviously disregarded the express instructions given to them by the trial court, as against the court's directive they proceeded to award Outlaw $150,000 for "expenses" and $140,000 for "loss of use" in response to Question Nos. 16b and 16c (CR 420).

Marinecorp contends that the legal consequence is that Outlaw effectively elected its remedy under the DTPA cause of action.

The appellate error discussed above warrants that the Court reduce the damages awarded in the trial court's Modified Final Judgment. ***Pope v. Moore,*** 711 S.W.2d at 624. Alternatively, Marinecorp asks that the Court to vacate said Judgment, reverse and order a new trial of this matter.

47

**Issue 12:  The trial court should have entered judgment against Miller for the full amount of principal and interest owing on the promissory note executed by him and payable to Marinecorp.**

The jury found by answering Question No. 10 that Tony Miller failed to comply with the terms of the Promissory Note (CR 413) and proceeded to award Marinecorp damages in answer to Question No. 11 for $15,000. (CR 414)

The jury's award of only $15,000 to Marinecorp for Miller's breach of the subject promissory note (CR 414) is against the great weight and preponderance of the evidence and is manifestly unjust.  No evidence or insufficient evidence supports the jury's award of a mere $15,000 for damages attributed to Miller's failure to comply.  Instead, the undisputed and only evidence is that the balance on the promissory note payable to Marinecorp was $53,000 (5 RR 96:15), not $15,000.

**Issue 13:    The evidence does not support the jury's answers awarding Chopper and Outlaw damages for loss of the benefit of the bargain; remedial damages; expenses; loss of income; loss of use; and wrongful eviction because there was no evidence or insufficient evidence to support these findings of damages.**

*A. Standard of Review*

The legal and factual sufficiency of the evidence standards of appellate review set out above under Issue 1 apply here, as well as the great weight and preponderance of the evidence standard.  The standard for a request for remittitur is factual sufficiency of the evidence. ***Pope v. Moore,*** 711 S.W.2d at 624.  To

48

better understand Issue 13 challenging the jury's award of damages in this case, Marinecorp requests that the Court review with a critical eye the "evidence" presented to the trial court by Appellees in support of their claims for damages. After all, Appellees had the burden of proof at trial. In their effort to prove up damages, Appellees relied upon their bank statements, Chopper Px-75 and Outlaw Px-76, respectively, along with documents called "weekly reports." However, Marinecorp will show that this evidence was completely unreliable to serve as the basis of damages awarded, in violation of the standard set out in *James L. Gang & Associates, Inc. v. Abbott Labs, Inc.,* 198 S.W.3d 434, 443 (Tex.App.-- Dallas 2006, no pet.), where it was held that a Plaintiff must have facts and figures to support its claims; mere allegations of expenses without objective facts, figures, or data do not amount to any evidence of out of pocket damages.

### B. Breach of Contract Damages (Jury Question No. 6 [CR 409])

In answering Question No. 6, the jury awarded Appellees breach of contract damages for: (1) loss of the benefit of the bargain[4], (2) remedial damages, and (3) loss of income. Question No. 6 instructs the jury to consider the following elements of damages and none other. (*Id.*).

---

[4] This award of damages [Q. 6a at CR 409] as to each Appellee was omitted by the trial court in its Modified Final Judgment. However, the jury awarded these damages by ignoring the court's unambiguous definition of this measure of damages.

49

## 1. **Remedial Damages**

Question No. 6 defined "remedial damages" as the "reasonable and necessary cost to reimburse Chopper and Outlaw for the loss of investment in construction and equipment costs." (CR 409) The jury ignored this definition and Appellees failed to produce credible and reliable evidence entitling Appellees to an award of such damages. Appellees, through Miller, testified at trial that evidence of money spent in construction equipment costs was contained in bank statements and weekly reports (4 RR 86, line 10), however, this proof promised by Appellees simply does not exist in the record. Further undermining Appellees' claim for "remedial damages" is the fact that absent from the record is evidence that the alleged costs were reasonable and necessary. (CR 409) Nevertheless, the jury proceeded to award Chopper and Outlaw remedial damages for $110,000 and $150,000, respectively (*Id.*). The jury did not even account for the $194,994.54 in build-out costs paid to Outlaw in connection with the Outlaw lease property, for which Marinecorp was entitled to a credit. Not surprisingly, Outlaw never included this amount in its accounting and calculations and the jury simply ignored Marinecorp's undisputed evidence that such monies were paid out.

Appellees sought to prove their entitlement to remedial damages by relying on Miller's shoddy and incomplete accounting records which had no backup or corroborating documentation. He submitted to the jury commingled records, as he

50

did not as much as separate "loss of investment" documentation related to the two separate business ventures of Chopper and Outlaw, presumably leaving it to the jury to sift through and figure out on its own.

Further confusing the issue of damages was the vacillating and inconsistent testimony of Miller. He initially testified to investing half-million dollars. His credibility was then placed into serious doubt when he subsequently testified that he and Tones spent over $550,000 (CR 3, p. 162, line 19), yet still he would later testify that they had invested over one million in the building alone (CR 4, p. 73, line 3). He would once again change his testimony testifying that his operating expenses were $2,455,000. None of this testimony was ever supported by corroborating or credible evidence. Bank statements introduced into evidence reveal no such capital investments or deposits in the referenced amounts. Testimony was elicited that Miller and Tones were withdrawing monies from the bank accounts on a regular basis, however, Miller testified that he had no idea why the withdrawals were made (CR 4, p. 87 and p. 18). Appellees presented no evidence from experts or other witnesses explaining the contents of the financial records presented. Instead, Appellees passed on the burden of proof on to the jury and left it to grapple with and try to make sense of the confusing, incomplete, and contradictory documents introduced. This made it virtually impossible for the jury to have awarded specific damages based on this "evidence."

## 2. **Loss of Income**

In Question No. 6, the jury was provided with the definition of "loss of income" as "loss of *net income* for the time Chopper or Outlaw was unable to operate due to Marinecorp's conduct." (*emphasis added*) The jury proceeded to award breach of contract damages for loss of income in the amounts of $100,000 for Chopper and $140,000 for Outlaw. However, at no time was evidence of "net income," gross income and operating expenses presented, nor was the jury provided with financial data that would have enabled it to make this calculation and ultimately find that Appellees experienced a loss of income attributed to the acts and/or omissions of Marinecorp. Both Chopper and Outlaw operated their businesses throughout the applicable periods of time in 2010 and all of 2011. Miller testified that Chopper was always making a profit and Outlaw was about breaking even. (4 RR82:17)

Each business had its income and expenses. However, well aware that they carried the burden of proof, Appellees fell short in this task by failing to produce an accounting as to the amount of gross income each business received and their related operating expenses, which would have allowed the "net" calculation to be made. Bank reports and weekly reports presented by the Appellees had no separation of the monies spent for equipment and making improvements and the monies spent in the ordinary course of conducting business and the money

52

contributed as capital.  Although it was his burden, Miller never explained which of the expenses were operating expenses, which were for the construction and equipment, and which were capital contributions.  Nevertheless, the jury awarded loss of income damages to both Appellees.  There is no evidence or insufficient evidence to support the jury's award of such damages.

As set forth in *El Dorado Motors, Inc. v. Koch,* 168 S.W.3d 360, 366-367(Tex.App.--  Dallas 2005, no pet.), at a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profit can be ascertained.  Mere conclusions are incompetent and do not amount to any evidence at all.  See *Id.*  Further, the Texas Supreme Court held in *Holt Atherton Industries v. Heine,* 835 S.W.2d 80 (Tex. 1992), the testimony was legally insufficient because it did not provide any indication how they determined what their lost profits were.  See *Id.* at 84-86; also see *Texas Instruments, Inc. v. Teletron Energy Mgt., Inc.,* 877 S.W.2d 276, 279-280 (Tex. 1994) (holding that while modern business methods have cost a relaxation of the rigid rule entitling one to recover lost profits, the law still demands proof with a degree of certainty.).  The  jury in the instant case had no basis for determining  loss of income damages with reasonable certainty.   Its award of such damages was based on pure speculation and mere conclusions. Miller's  testimony that Chopper was always

making a lot of money and that Outlaw was about breaking even further justifies

no recovery of damages for loss of income and a reversal of the verdict.

## C.  DTPA Damages (Jury Question No. 16 [ CR 419])

In answering Question No. 16, the jury awarded Appellees DTPA damages

similar to those it awarded them for breach of contract under Question No. 6, *supra*

(CR 409).  Specifically, the damages awarded were for: (1) loss of the benefit of

the bargain[5], (2) expenses, and (3) loss of use.  Importantly, note that the

definitions the jury was given in Question No. 16 for "expenses" and "loss of use"

damages were strikingly similar to those give to the jury in Question No. 6 for

"remedial damages" and "loss of income," respectively.  For this reason, the jury

considered identical measures of damages in answering Questions Nos. 6 and 16.

### 1.  Expenses

In answer to Question No. 16 (CR 419), the jury awarded Chopper and

Outlaw $110,000 and $150,000, respectively, in "expenses." (CR 419-420)  The

trial court defined the "expenses" measure of damages as "The expenses incurred

by **The Chopper Group** in Constructing and equipping the lease premises in order

---

[5]  This award of damages [Q. 16a at CR 419] as to each Appellee was omitted by the trial court in its Modified Final Judgment. However, the jury awarded these damages by ignoring the court's unambiguous definition of this measure of damages.

to operate." (CR 419) (*emphasis added*) The jury obviously ignored the trial court's limited definition of expenses incurred only by Chopper, as in spite of this limiting language it awarded Outlaw $150,000 in expenses. This award is also not supported by sufficient evidence in the record.

A remittitur of the $150,000 awarded to Outlaw for expenses is warranted because it is contrary to the express instructions and definitions provided in the Court's Jury Charge. Furthermore, Marinecorp paid Outlaw $194,994 in build-out costs to get the premises business ready. Allowing Outlaw to recover an additional $150,000 in "expenses", i.e., expenses incurred in constructing and equipping the premises in order to operate, would be the equivalent of compensating Outlaw twice for the same costs that Marinecorp previously paid in build-out costs pursuant to the lease agreement. Not surprisingly, Outlaw's accounting and calculations do not account for the build-out costs paid by Marinecorp as an offset or credit.

Appellees failed to produce competent evidence entitling them to expenses as damages. In challenging the jury's $110,000 expenses damage award to Chopper (CR 420), Marinecorp would show that the Chopper lease was signed in April 18, 2010 and said Appellee opened its doors for business approximately three months later in the middle of July 2010 (3 RR 142:12). Therefore, it would follow that all checks identified by Chopper after this opening date were not for

construction costs but rather were for operating costs. Miller testified that he has receipts for all expenses (4 RR 86:10) and he further testified that his proof is in the check books (4 RR at p. 82). However, a review of Chopper's bank statements (Chopper Px-75) and weekly reports discloses that corroborating evidence of these expenses was never produced, are not part of the record, and were never considered by the jury in answering Question No. 16.

Miller never testified that any of the company checks issued during the time period in question represented monies spent on construction costs. In fact, Miller never even mentioned any repairs made to the Chopper leased premises. Chopper did not have to do many repairs on the Chopper leased premises because the premises were previously occupied by a Mexican restaurant, so the premises were already built-out for Chopper's business purposes as a biker's restaurant and bar. For this reason, the Chopper lease did not provide for any build-out allowance of monies to be advanced. Finally, reviewing Chopper's bank statement for the from the April 18, 2010, discloses that lease signing through Chopper's opening for business in mid-July 2010, at best very few checks were cut on the Chopper bank account during this short time period and the checks that were issued were for very small amounts, nowhere near the $110,000 in expenses awarded by the jury to Chopper.

With regard to Outlaw, any expense documents relied on by the jury in awarding Outlaw $150,000 in expenses damages in answer to Question No. 16 should have included a credit for the build-out allowance paid early on to Outlaw by Marinecorp.

Weekly reports and bank statements introduced into evidence by Chopper and Outlaw were wholly unreliable. Accounting and record-keeping produced by Appellees did not separate Miller's personal investments from the separate Chopper and Outlaw investments. All records were commingled without there ever being a separation from which the jury could have determined construction and equipping the premises expenses needed to calculate recoverable expenses.

Equally problematic here was the lack of Miller's credibility, with him testifying to four significantly different values of his investment without corroborating proof or evidence.

In spite of falling short of meeting their burden of proof, the jury awarded Chopper and Outlaw expense damages for $13,000 and $80,000, respectively. Not surprisingly, however, no credit was provided in Outlaw's accounting and record keeping for the $194,994 paid by Marinecorp for build-out.

Bank statements and weekly reports produced by Appellees did not prove up any capital investment made or deposits into the bank in connection with the Chopper and Outlaw investments. Evidence showed frequent bank account

withdrawals by Miller and Tones without ever providing an explanation behind the withdrawals. The burden of proof in this case was always with the Appellees. It was their burden to prove up their entitlement to damages for expenses which specifically related to constructing and equipping the leased premises in order to operate.

Appellees did not fulfill their burden of proof in that they failed to isolate for the jury's consideration "expenses," as defined in jury Question Nos. 6 and 16. More specifically, the financial records submitted by Appellees as evidence of "expenses," at best, accounted for comingled expenses and costs, some for operating costs and perhaps others for constructing and equipping the premises in order to operate. From what was presented to the jury, neither the jurors nor witnesses with expertise in accounting could have isolated from Appellees' proof "remedial damages" or "expenses" contemplated under jury Question Nos. 6 and 16. Therefore, even if liability rests with Marinecorp, the Appellees wholly failed to satisfy their burden of proof by failing to present competent and clear evidence of "remedial damages" and/or "expenses, as expressly defined by the trial court in its jury charge. In this regard, the jury clearly ignored the definition of "expenses" set out in the jury charge, as no evidence or, alternatively, insufficient evidence supports the jury's award of "remedial damages" and/or "expenses in connection with jury Question Nos. 6 and 16.

In attempting to prove their alleged damages, Chopper and Outlaw relied upon their bank statements and "weekly reports," which were totally unreliable, in violation of the minimum proof standard set out in ***James L. Gang & Associates, Inc. v. Abbott Labs, Inc.,*** 198 S.W.3d 434, 443 (Tex.App.-- Dallas 2006, no pet.), where the court held that a Plaintiff must have facts and figures to support its claims; mere allegations of expenses without objective facts, figures, or data do not amount to any evidence of out of pocket damages. They are inaccurate, incomplete, contradictory and meet no known accounting standards. Appellees claim they represent expenses paid, but many of the expenses they are claiming are supported by only invoices for which no evidence established that they were ever paid. In addition, many entries were merely for "cash," leaving us to wonder cash for what?

Marinecorp directs the Court to Section "D" (i), (ii) and (iii), *infra,* detailing the unreliability of bank statements, accountings and weekly reports upon which Appellees relied on as evidence supporting their claims for damages.

Neither Miller nor any expert ever explained the numbers in the bank statements and weekly reports. The numerical content of these records were never categorized or itemized in detail for each income amount and source of income, and expenses were at no time itemized or otherwise explained. Appellees' attorney never argued that their claims for damages were supported by any specific detailed

analysis. It was like throwing receipts in a shoe box and telling the jury "here's my evidence." It was impossible for the jury to have understood the weekly reports and the bank statements without explanation by somebody.

### 3. Loss of Use

The Court instructed the jury in Question # 16 (CR 419) that they could consider:

> "The reasonable value of the leased premises for the *time the Chopper Group* was unable to operate due to Marinecorp's conduct."

(*emphasis added*). Outlaw did not request the court to insert a jury question as to the reasonable value of the leased premises for time it was unable to operate due to Marinecorp's conduct. Therefore, the court instructed the jury they could only consider the reasonable value of the lease premises for the time *Chopper* was unable to operate due to Marinecorp's conduct. However, the jury ignored the court's instructions and proceeded to award Outlaw $140,000.00 for its alleged loss of use damages. It awarded Chopper $100,000 for similar damages. A remittitur of these damages for $140,000 awarded to Outlaw is warranted, as it is contrary to the express instructions and definitions provided in the Court's Jury Charge. Further, insufficient evidence supports loss of use damage awarded to each Appellee.

The evidence clearly established that Chopper was always able to operate and that Marinecorp's conduct did not inhibit this ability. Appellees never failed to

60

open their doors because of any alleged problems caused by Marinecorp. In this regard Miller testified that Chopper was always making a profit and Outlaw was about breaking even. (4 RR82:17) There was no evidence presented as to the reasonable value of the Chopper and Outlaw leased premises at any time. It was therefore impossible for the jury to calculate any such reasonable value as to both Appellees. For these reasons, remittitur or, alternatively, reversal as to loss of use damages for both Chopper and Outlaw is warranted.

**D. Bank Statements and Weekly Reports relied on By Chopper and Outlaw to prove up damages were unreliable, not based on objective facts, accurate figures and data, and were without support of corroborating evidence.**

Miller tesitified that the weekly reports and their totals represented his damages. He testified that he has a copy of a receipt in the weekly reports for every expense claimed (4 RR 86:10). He further testified, "It's all in the bank statements." Contrary to Miller's representation, an untold number of receipts and proof of payment do not exist to corroborate Appellees' claims for damages. The following discussion explains the major flaws in the primary form of proof that served as the basis of damages awarded to both Chopper and Outlaw (i.e., Appellees' bank statements and weekly reports).

### i. *Outlaw's actual expenses and claimed expenses do not add up.*

Weekly reports relied on by Appellees in their effort to prove damages in this case were rife with claimed expenses that were false, uncorroborated and simply not supported by credible evidence. While this evidentiary problem was extensive and permeated the documents that purportedly supported Appellees' claim for damages, a few examples of this extensive evidentiary shortfall follow:

**Jim Hofelich**: Outlaw claims that it paid Mr. Hofelich $37,121.15 for property expenses, yet the only checks in the bank statement total $9,845.00 (Check Nos. 1004, 1186 & 114 at Outlaw Px-76), falling short $27,275.15 never proven or corroborated with competent evidence.

**Redhawk:** Outlaw claims that it paid Redhawk $38,189.41 for Outlaw for property related expenses, however, the only check in the bank statement for expense payments to Redhawk was for $5,000 (Check No. 1025 at Outlaw Px-76, ), falling short $33,189.00 in claimed expenses which Outlaw was never able to corroborate with competent evidence.

**CRS:** Outlaw claims that it paid CRS $34,783 for its property expenses. However, only checks accounted for in the Outlaw bank account payable to CRS total $13,541.25 (Check Nos. 1035, 1037, 1059, 1099 and 1141 at Outlaw Px-76), falling short $21,242.72 in claimed expenses never proven or corroborated with competent evidence.

62

The above represents merely a few examples totaling $81,708.28 worth of claimed expenses which were never corroborated with competent evidence. Further examination of the financial records produced by the Appellees will exhibit even more ambiguity which poisons the record as a whole with uncorroborated, unverified, unreliable and questionable "evidence" which Appellees claim support the jury's award of "expense" or "remedial" damages. Outlaw's expenses damages should, therefore, be reduced or taken away as a whole.

### ii. Discrepancies between bank statements and accountings of Appellees

Outlaw bank statements from October 10, 2010 through March 11, 2011, disclose checks processed during this period in the amount of **$389,014.78.** This figure would necessarily include operating expenses for Outlaw through March 11, 2011. During this same period of time, checks from this same account were made payable to Miller, Tones, Karen Miller and Art Kunzeman in the amount of **$71,740.00.** In stark contrast, during this same period of time, Outlaw's accounting claimed expenses in the amount of **$664,838.43,** however, this figure does not represent solely "expenses," but, instead, includes unrecoverable operating expenses**.** However, note that Miller submitted a separate Outlaw "Expense Report" claiming expenses for $620,655.69. In any event, such huge discrepancies between alleged expenses and the total checks processed, *supra,*

make highly questionable and unreliable Outlaw's accounting and its Expense Report with regard to expenses claimed.

As expected, Outlaw never credits Marinecorp for checks it paid to build-out costs totaling $194,994.00. The inclusion of this amount omitted from checks processed results in a discrepancy of approximately $400,000 from what Outback is claiming in expenses and that which is supported by competent corroborating evidence. Chopper's bank account from May to August of 2011 reports expenses in the amount of $45,875.08, however, it is claiming $231,241.97.00 in expenses. As a consequence of the unreliability of the financial records presented by Appellees, Marinecorp asks that all damages awarded to the Appellees based on this "evidence" be stricken and taken away from the Appellees. In the alternative, Appellees' recovery of damages should be reduced to the extent that such damages are not supported by competent, clear and credible evidence in satisfaction of the burden of proof placed on the Appellees.

### iii. Outlaw's Weekly Reports are unreliable without objective facts, accurate figures, or supporting data.

On appeal, Marinecorp challenges the veracity, reliability and competency of Outlaw's Weekly Reports as they serve as nothing more than evidence of Miller and Outlaw's slipshod business bookkeeping/recordkeeping, accounting and management. They hardly serve as competent evidence of the numerous expense

64

transactions which they purport to represent. At the heart of these Weekly Reports are significant accounting problems, which include:

1.  They purport to be a summary of all expenses incurred, however, many of the documents attached are only invoices or quotes with no evidence of payments;

2. They are not accurate, for every item listed under "payment" states "cash." Unaccounted for are payments made by credit card or by check;

3. "Mexican Labor" entries have no backup whatsoever;

4. Lists "payroll" or "labor" with no backup whatsoever;

5. Lists no credit for income;

6. Do not account for build-out payments made by Marinecorp.

The following table entitled, "Outlaw Weekly Report Review," sets out in detail transactions which Outlaw sought to qualify as costs and expenses in support of the damage claims:

# Outlaw Weekly Report Review

| Week | Content-- Alleged payments, costs and expenses | Defects |
|---|---|---|
| 1 | Claim expenses of $34,504.05….. | --Only one paid receipt for $104.05<br><br>--$5,500 cash payments to labor noted, however, no payment receipts<br><br>--$25,000 cash payment to Canon Enterprises, but no supporting documents |
| 2 | Expense entitled "Deposit" for $13,289.25 | --No supporting documents<br><br>--No explanation where money went |
| " | Expense for "rent" for $10,539.76 | Rent not an expense for construction or cost of equipping premises |
| 4 | Numerous cash payments for "Mexican labor" and other labor | No documentation evidencing money ever paid |
| 5 | Electrician expense for $8,796.15 | " |
| 6 | "Cash" payment to electrician for $6,000.00 | Only have invoice from electrician, which is not evidence of payment |
| " | "Cash" payment to Wrap Stars for $5,775 | No supporting documentation |
| 7 | Several thousand dollars in cash payments to laborers | " |
| " | Cash payment for hardwood | " |

| | | |
|---|---|---|
| | floors for $3,292.50 | |
| " | Cash payment to Farley Specialities for $2,104.66 | " |
| 7B | Payment to Hajjis Restaurant Solutions for $14,505.50 | No evidence of payment; only note advising Miller to make check |
| " | Expense to Wrap Stars for $8,324 | Total owed was $10,166.50, so payment of $1,842.50 was made. No evidence $8,324 balance ever paid |
| " | Wrap Stars expense for $6,522 | No evidence of payment |
| " | Wrap Stars expense for $38,400 | " |
| " | Expense to Catalyst Design for $6,000 | Is an invoice and quote, but directed to Chopper, not Outlaw. |
| " | Expense for payment to Musician's Friend for $10,399.09 | Merely a quote for products with no evidence of payment |
| 8 | Cash payment to Red Hawk for $15,298.34 | Only have a quote from Red Hawk to sell products for referenced amount; no evidence of payment. |
| " | Cash payment to Quality Air Care for $2,976.88 | Only have document requesting payment of referenced amount. |
| " | Thousands of dollars in alleged cash payments to laborers | No supporting documentation. |
| 9 | Cash payment to Deerwood A/C & Heating for $10,312.90 | Only document is an invoice for referenced amount. |

| | | |
|---|---|---|
| 12 | Cash payment to Esi, Inc. for $3,939 | Only have quote from company |
| " | Cash payments for thousands of dollars to laborers | No supporting documentation of payments. |
| 13 | Cash payment to Quality Air Car for $1,976.88 | Only have invoice showing amount due, yet no evidence of payment |
| 14 | Over $5,000 for cash payments to laborers | No supporting documentation |
| 15 | Cash payments to electrician for $8,820 | Only have invoice, but no evidence of payment |
| 16 | Cash payment to Houston Security for $3,425 | No supporting documentation other than invoice. |
| " | Cash payment to Hajjis Restaurant for $6,845 | No supporting documents |
| " | Cash payment to Crs for $5,000 | " |
| 17 | Over $18,000 in cash payments made to various vendors | " |
| 19 | Cash payments to laborers for approximately $10,000 | " |
| " | Over $6,000 in cash payments to various vendors | " |
| 20 | Payment of payroll by Miller for $7,635 | No evidence of payment |
| 21 | $5,000 loan to Juan Gorde | Not an expense or cost |
| " | Expenses in total of $39,306.52-- payments to laborers | No documentation of payment |

| | | |
|---|---|---|
| " | Invoices for liquor sales, and sale of cleaning supplies, office supplies and invoices to Outlaw | No evidence of payment |
| 22 | Cash payment to ASCAP for $10,260 | Only have invoice advising that referenced amount is due. No evidence of payment. |
| " | Cash payment to electrician for $5,430 | Only have invoice advising that referenced amount due. |
| " | Cash payment to Miller for $6,900 | No supporting documentation. |
| 23 | Cash payment for $20,000 for liquor for resale | " |
| " | Payroll payment for $13,927.77 | " |
| " | Two claims for payment to Miller for $4,879 and $15,361.68 | " |
| " | Cash payment to Red Hawk for $19,534.26 | " |
| 25 | Approx. $15,000 in cash payments for laborers (including Miller) | " |
| " | Thousands of dollars in smaller invoices | " |
| 26 | Expenses for $8,875 | " |

Marinecorp contends on appeal that the damages awarded to the Appellees based on defective, faulty, and inadequate claims of costs and expenses serves as a basis for reversal and/or remittitur.

## CONCLUSION AND PRAYER

The jury ignored overwhelming evidence that neither Appellee complied with conditions precedent in both commercial lease agreements requiring that Appellant be given written 30-day's written notice to cure alleged defects of default in the terms of the lease agreement. The Appellees were also not excused from ceasing to perform under the leases, as they treated the leases as continuing and, therefore, continued under the law to own Appellant rents due under the lease agreements. The trial court erred in refusing to render judgment for Appellant against Appellees for past and future lease payments. This failure is inconsistent with the jury's finding that Appellee Outlaw breached its lease without excuse. Overwhelming evidence also existed of Appellee Chopper's breach of its lease agreement without excuse. Overwhelming evidence also existed of Appellee Chopper's breach of its lease without excuse, yet error was committed in failing to award Appellant past and future lease payments.

The overwhelming evidence was that Appellant mitigated damages, yet this evidence was ignored by the jury and trial judge. By comparison, any damages

70

sustained by Appellee Outlaw are attributable to its own action of inactions. In this connection, the trial court erred in failing to approve a jury instruction and question which related to Appellees' failure to mitigate damages. As a consequence, the jury was not allowed an opportunity to reduce damages awarded to Appellees for their failure to mitigate.

The jury's award of DTPA damages was improper as Appellee Outlaw's damage claim sounds in contract, not in DTPA. Lacking with respect to Appellees' DTPA claim was sufficient evidence of causation of damages, unconscionable conduct, and a knowing violation of the DTPA. Further, it was reversible error to allow Appellees to base their DTPA claim on claims that Appellant wrongfully evicted the Appellees without first proving the elements of such a cause of action and demonstrating a judicial finding of a wrongful eviction.

"As-is" lease provisions legally precluded Appellees from asserting an implied warranty claim and, therefore, the award of DTPA damages was improper. The trial court's award of prejudgment interest on damages awarded to Appellees in the Modified Final Judgment was improper and erroneous in that the alleged damages were not definitely determinable at a definite time. Error exists in the trail court's failure to award Appellant damages against Miller and Tones for their breach of personal guaranty agreements that they approved and signed. Texas'

71

"one satisfaction rule" was violated by the jury and trial court awarding Appellees cumulative damages for concurrent causes of action arising out of the same alleged acts . Damages awarded in this regard were excessive and not supported by the evidence.

Error also existed in the court below failing to award Appellant judgment against Miller and the Harlesses for the principal and interest owed pursuant to a promissory note executed by them which was due and payable to Appellant for rent in arrears. Finally, the record is rife with examples demonstrating how the jury flat out ignored specific written instructions given to them in connection with this case. For instance, when the trial court in the jury charge authorized, upon sufficient supporting evidence, the award of expenses and loss of use damages only as to Appellee Chopper, it ignored this instruction and proceeded to award Appellee Chopper $290,000 in such damages, which has no support, or inadequate support, in the evidence. The Appellees failed to prove damages with adequate, competent, and clear evidence but, rather, opted to submit to the jury comingled and confusing financial records that fell well short of the required level of proof to recover damages.

For the reasons stated in this Brief, Appellant Marinecorp asks the Court to sustain the legal sufficiency issues and render judgment for Appellant. If the Court

overrules the legal sufficiency challenges to the evidence, Appellant Marinecorp requests that the court reverse and remand based on the factual sufficiency issues of error. In the alternative, Appellant Marinecorp asks the Court to modify its judgment and delete damages which the Appellees were not entitled to under the law and evidence presented. In the final alternative, Appellant asks that the Court to enter a remittitur for the complained of damages. Finally, Appellant asks the Court for such other and further relief which the Court may deem appropriate.

Respectfully submitted,

THE STROTHER LAW FIRM


**/s/ Macon D. Strother_____**
MACON D. STROTHER
State Bar No. 19420000
4306 Yoakum Blvd., Suite 560
Houston, Texas 77006
(713) 557-9238 (Telephone)
mstrother@strotherlawfirm.com
ATTORNEY FOR APPELLANT
*MARINECORP INTERNATIONAL, LTD.*


## CERTIFICATE OF SERVICE

I hereby certify that Appellant's Brief was e-filed by utilizing the Court's official e-filing system on this 30th day of October, 2015, which system should also forward a true and correct copy via e-mail to all attorneys of record in this case, including:

Brock C. Akers
The Akers Firm
3401 Allen Parkway, Suite 101
Houston, Texas  77019
bca@akersfirm.com

Stephen R. Cochell
The Cochell Law Firm, PC
5555 W. Loop South, Suite 200
Bellaire, Texas  77401
srcochell@gmail.com


I further certify that on this same date, a true and correct copy of Appellant's Brief was sent via First Class U.S. Mail, Certified Delivery, Return Receipt Requested, to:

Lee Harless
Dawn Marie Harless
11435 Log Cabin Dr.
Tomball, TX  77375
**CM/RRR 7013 0600 0001 1817 8599**

*/s/ Macon D. Strother*_____
**MACON D. STROTHER**


<u>**CERTIFICATE OF COMPLIANCE WITH TEX.R.APP.P. 9.4(i)(3)**</u>

Relying on the word count function in the word processing software used to produce this document, namely MS Word Version 7, I certify that the number of words in this Appellant's Brief, excluding any parts exempted by Tex.R.App.P. 9.4(i)(1), is 14,759.

*/s/ Macon D. Strother*_____
**MACON D. STROTHER**

No. 01-14-00707-CV

IN THE

FIRST COURT OF APPEALS

at HOUSTON, TEXAS

MARINECORP INTERNATIONAL, LTD.
Appellant,
v.
THE CHOPPER GROUP, LLC, AND

OUTLAW COUNTRY, LLC
Appellees

**APPELLANT'S APPENDIX**

LIST OF DOCUMENTS

A. Charge of the Court.................................................... TAB A

B. Modified Final Judgment, signed July 31, 2014.................. TAB B

C. Standard Lease Contract by and between Marinecorp as
   Landlord and Outlaw as tenant...................................... TAB C

D. Standard Lease Contract by and between Marinecorp
   as Landlord and Chopper as tenant................................. TAB D

**TAB A**

ORIGINAL

p26

CAUSE NO. 2012-23983

| | | |
|---|---|---|
| THE CHOPPER GROUP, LLC AND | § | IN THE DISTRICT COURT OF |
| OUTLAW COUNTRY, LLC | § | |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| | § | |
| MARINECORP INTERNATIONAL, LTD. | § | 80TH JUDICIAL DISTRICT |

FILED
Chris Daniel District Clerk
Time:
By
APR 23 2014
Harris County, Texas
Deputy

## CHARGE OF THE COURT

**Members of the Jury:**

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions.

1. Do not let bias, prejudice, or sympathy play any part in your decision.

2 Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3. You are to make up your own minds about the facts. You are the sole judges of the

1

400

credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11. Unless otherwise instructed, the answers to the questions must be based on the decision of at least 10 of the 12 jurors. The same 10 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

2

Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

3

# QUESTION NO. 1

Did MarineCorp International fail to comply with the agreements with The Chopper Group or Outlaw Country?

A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include:

1. the extent to which the injured party will be deprived of the benefit which he reasonable expected;

2. the extent to which the injured party can be adequately compensated for the part of the benefit of which he will be deprived;

3. the extent to which the party failing to perform or to offer to perform will suffer forfeiture,

4. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances;

5. the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Answer "Yes" or "No" as to each agreement

Chopper agreement: ___Yes___ Outlaw agreement ___Yes___

4

403

## QUESTION NO. 2

Did The Chopper Group or Outlaw Country fail to comply with the agreement?

A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include:

1. the extent to which the injured party will be deprived of the benefit which he reasonable expected;

2. the extent to which the injured party can be adequately compensated for the part of the benefit of which he will be deprived;

3. the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

4. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances;

5. the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Answer "Yes" or "No" as to each agreement.

Chopper agreement: _____No_____ Outlaw agreement _____yes_____

5

If you answered "Yes" to any portion of both Question No. 1 and Question No. 2, then answer Question No. 3. Otherwise, do not answer Question No. 3.

## QUESTION NO. 3

Who failed to comply with the agreement first?

Answer "MarineCorp International" or "Chopper" or "Outlaw"

Answer: *MarineCorp*

6

If your answer to any portion of Question No. 2 is "Yes," then answer the following question. Otherwise, do not answer the following question.

QUESTION NO. 4

Was Chopper or Outlaw's failure to comply excused?

Failure to comply by Chopper or Outlaw is excused by MarineCorp International's previous failure to comply with a material obligation of the same agreement. Failure to comply is also excused by fraud of MarineCorp International.

Fraud occurs when—

    a.    a party makes a material misrepresentation, and

    b.    the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and

    c.    the misrepresentation is made with the intention that it should be acted on by the other party, and

    d.    the other party relies on the misrepresentation and thereby suffers injury.;

or

Fraud occurs when—

    a.    a party makes a false promise to do an act,

    b.    the promise is material,

    c.    the promise is made with the intention of not fulfilling it,

    d.    the promise is made to a person for the purpose of inducing that person to enter into a contract, and

    e    that person relies on the promise in entering into that contract

"Misrepresentation" means:

A false statement of fact, or

A promise of future performance made with an intent, at the time the promise was made, not to perform as promised.

7

Failure to comply by Chopper or Outlaw is also excused if compliance is waived by MarineCorp International.

Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

Answer "Yes" or "No" as to each agreement.

Chopper agreement: ___*Yes*___ Outlaw agreement___*No*___

8

If your answer to Question No. 1 is "Yes," then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 5

Was MarineCorp International, Ltd's failure to comply excused?

Failure to comply by MarineCorp International, Ltd is excused by The Chopper Group, LLC's previous failure to comply with a material obligation of the same agreement.

Failure to comply by MarineCorp International, Ltd is also excused if compliance is waived by The Chopper Group, LLC. Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

Failure to comply by MarineCorp International, Ltd is also excused if The Chopper Group, LLC ratified MarineCorp International, Ltd failure to comply A party's conduct includes conduct of others that the party has ratified. Ratification may be express of implied. Implied ratification occurs if a party, though he may have been unaware of unauthorized conduct taken on his behalf at the time it occurred, retains the benefits of the transaction involving the unauthorized conduct after he acquired full knowledge of the unauthorized conduct. Implied ratification results in the ratification of the entire transaction

Answer "Yes" or "No"

Answer: _____ NO _____

9

408

If your answer to Question No. 5 is "No," then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 6

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Chopper and/or Outlaw for its damages, if any, that resulted from such failure to comply?

Consider the following elements of damages, if any, and none other.

*Loss of the benefit of the bargain*

The difference, if any, between the value of the premises as agreed and the value of the premises as provided by MarineCorp International.

*Remedial damages*

The reasonable and necessary cost to reimburse Chopper or Outlaw for the loss of investment in construction and equipment costs.

*Loss of income*

Loss of net income for the time Chopper or Outlaw was unable to operate due to MarineCorp's conduct.

Do not add any amount for interest on damages, if any.
Answer separately in dollars and cents for damages, if any.

a.     Loss of benefit of the bargain.

Answer for Chopper: $13,000

Answer for Outlaw: $80,000

b.     Remedial damages.

Answer for Chopper: $110,000

Answer for Outlaw: $150,000

c.     Loss of income.

Answer for Chopper: $100,000

Answer for Outlaw: $140,000

10

409

If your answer to Questions 3 or 4 is "No", then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 7

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate MarineCorp International, Ltd for its' damages, if any, that resulted from such failure to comply?

Consider the following elements of damages, if any, and none other:

> Rents owed to MarineCorp International, Ltd under the Chopper Group, LLC Lease Agreement.

> Rents owed to MarineCorp International, Ltd under Backwoods Country Club, LLC d/b/a Outlaw Country Lease Agreement.

Do not add any amount for interest on damages, if any. Answer in dollars and cents for damages, if any.

Answer for Chopper:

1.      Rents sustained in the past.

Answer: _____ 0 _____

2.      Rents that, in reasonable probability, will be sustained in the future.

Answer: _____ 0 _____

Answer for Outlaw:

1.      Rents sustained in the past.

Answer: _____ 0 _____

2.      Rents that, in reasonable probability, will be sustained in the future.

Answer: _____ 0 _____

11

410

If you have answered Question No. 7, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 8

Do you find from a preponderance of the evidence that MarineCorp International failed to exercise reasonable care and diligence to avoid or minimize its damages, if any?

In connection with this question, you are instructed that a person is required to exercise reasonable care and diligence to avoid loss and to minimize the consequences of damages. If with reasonable care and diligence he can do so, he must protect himself from the injurious consequences of the act of another. And if he fails to do so and by reason of his failure, his damages become aggravated, he may not recover for such part of the damages as may be attributed to his omission to take preventive measures and his recovery will be limited only to those damages that would have resulted had he fulfilled his duty.

Answer "Yes" or "No"

Answer: _Yes_

12

411

If you have answered "Yes" to Question No. 8, answer the following question. Otherwise do not answer the following question.

## QUESTION NO. 9

What amount, if any, would have been the damages, if any, suffered by MarineCorp International if it had exercised reasonable care and diligence to avoid or minimize its damages?

Answer in dollars and cents, if any.

Answer: $_____*0*_____

13

If you have answered "No" to Question No. 4, or if you have answered "Yes" to Question No. 2, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 10

Did Tony Miller fail to comply with the terms of the Promissory Note?

Answer, "Yes" or "No".

Answer: _____ Yes _____

14

If your answer to Question No. 10 is "Yes," then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 11

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate MarineCorp International, Ltd for its damages, if any, that resulted from such failure to comply?

Consider the following elements of damages, if any, and none other:

The total amount Tony Miller agreed to pay under the Promissory Note less any payments.

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any.

Answer: $ 15,000

15

414

If you answered "Yes" to Questions 2 and 4, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 12

What is a reasonable fee for the necessary services of MarineCorp International, Ltd's attorney, stated in dollars and cents?

Answer with an amount for each of the following:

  a.  For preparation and trial.

Answer: $ _____197,000_____

  b.  For an appeal to the Court of Appeals

Answer: $ _____- 0 -_____

  c.  For an appeal to the Supreme Court of Texas.

Answer. $ _____- 0 -_____

## QUESTION NO. 13

Did MarineCorp International engage in any false, misleading, or deceptive act or practice that The Chopper Group or Outlaw Country relied on to its detriment and that was a producing cause of damages?

"Producing cause" means a cause that was a substantial factor in bringing about the damages, if any, and without which the damages would not have occurred. There may be more than one producing cause.

"False, misleading, or deceptive act or practice" means any of the following:

- Representing that goods or services had or would have sponsorship, characteristics, uses or benefits that they did not have, or

- Representing that goods or services are or will be of a particular standard, quality or grade if they were of another, or

- Advertising services with intent not to sell them as advertised, or

- Representing that an agreement confers or involves rights or remedies that it did not have or involve, or

- Breach of implied warranty,

- Failing to disclose information about goods or services that was known at the time of the transaction with the intention to induce The Chopper Group into a transaction it otherwise would not have entered into if the information had been disclosed

Answer "Yes" or "No" as to each party

Answer for Chopper: __yes__          Answer for Outlaw: __yes__

17

416

QUESTION NO. 14

Was the failure, if any, of MarineCorp International to comply with a warranty a producing cause of damages to Chopper or Outlaw?

"Producing cause" means a cause that was a substantial factor in bringing about the damages, if any, and without which the damages would not have occurred. There may be more than one producing cause.

"Failure to comply with a warranty" means the failure to provide commercial lease premises that are suited for their intended commercial purposes

Answer "Yes" or "No" as to each party

Answer for Chopper: ___yes___     Answer for Outlaw: ___yes___

18

417

## QUESTION NO. 15

Did MarineCorp International engage in any unconscionable action or course of action that was a producing cause of damages to Chopper or Outlaw?

"Producing cause" means a cause that was a substantial factor in bringing about the damages, if any, and without which the damages would not have occurred. There may be more than one producing cause.

An unconscionable action or course of action is an act or practice that, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.

Answer "Yes" or "No" as to each party

Answer for Chopper: ___yes___          Answer for Outlaw: ___yes___

19

418

If your answer to any portion of Questions 13, 14 or 15 is "Yes," then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 16

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Chopper or Outlaw for their damages, if any, that resulted from such conduct?

Consider the following elements of damages, if any, and none other.

*Loss of the benefit of the bargain*

The difference, if any, in the value of the premises as received and the value it would have had if it had been as represented.

*Expenses*

The expenses incurred by The Chopper Group in constructing and equipping the lease premises in order to operate.

*Loss of use*

The reasonable value of the lease premises for the time The Chopper Group was unable to operate due to MarineCorp's conduct.

*Rental and other payments*

Rental and other payments made by The Chopper Group to MarineCorp International.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

a. Loss of benefit of the bargain.

Answer for Chopper: $ 13,000          Answer for Outlaw: $ 80,000

20

419

b.   Expenses.

Answer for Chopper:  $ 110,000    Answer for Outlaw:  $ 150,000


c.   Loss of use.

Answer for Chopper:  $ 100,000    Answer for Outlaw:  $ 140,000


d.   Rental and other payments.

Answer for Chopper:  $ - 0 -    Answer for Outlaw:  $ - 0 -

21

*dh to two*
*13 14 15*

If your answer to any portion of Questions 13, 14 or 15 is "Yes," then answer the following question. Otherwise, do not answer the following question.

QUESTION NO. 17

Did MarineCorp International engage in any such conduct knowingly?

"Knowingly" means actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question or actual awareness of the conduct constituting a failure to comply with a warranty. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

In answering this question, consider only the conduct that you have found was a producing conduct of damages to Chopper or Outlaw.

Answer: "Yes" or "No"

Answer for Chopper: ___Yes___          Answer for Outlaw: ___Yes___

22

If your answer to any portion of Question No. 17 is "Yes," then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 18

What sum of money, if any, in addition to actual damages, should be awarded to Chopper and/or Outlaw against MarineCorp International because MarineCorp International's conduct was committed knowingly?

Answer in dollars and cents, if any.

Answer for Chopper: $ __11,000__     Answer for Outlaw: $__11,000__

23

If you answered "Yes" to any portion of Questions 1, 4, 13, 14 or 15, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 19

What is a reasonable fee for the necessary services of Chopper and Outlaw's attorney, stated in dollars and cents?

Answer with an amount for each of the following:

a.      For representation in the trial court and trial.

Answer for Chopper: $ _104,483.50_    Answer for Outlaw: $ _104,483.50_

b.      For representation through appeal to the court of appeals.

Answer for Chopper: $ _0_    Answer for Outlaw: $ _0_

c.      For representation at the petition for review stage in the Supreme Court of Texas.

Answer for Chopper: $ _0_    Answer for Outlaw: $ _0_

d.      For representation at the merits briefing stage in the Supreme Court of Texas.

Answer for Chopper: $ _0_    Answer for Outlaw: $ _0_

e.      For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

Answer for Chopper: $ _0_    Answer for Outlaw: $ _0_

24

When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

**Presiding Juror**

The presiding juror has these duties:

    a. Read the complete charge aloud.
    b. Preside over your deliberations. This means the presiding juror will manage the discussions, and see that you follow the instructions.
    c. Give written questions or comments to the bailiff who will give them to the judge.
    d. Write down the answers you agree on.
    e. Get the signatures for the verdict certificate.
    f. Notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

**Instructions for Signing the Verdict Certificate**

1. Unless otherwise instructed, you may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you cannot have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

2. If 10 jurors agree on every answer, those 10 jurors sign the verdict.
   If 11 jurors agree on every answer, those 11 jurors sign the verdict.
   If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3. All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on **every** answer will sign the verdict.

Do you understand these instructions? If you do not, please tell me now.

_____
Judge Presiding

25

424

# Verdict Certificate

Check one:

_____ Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us.

_____      _____
Signature of Presiding Juror                    Printed name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

| SIGNATURE | NAME PRINTED |
|---|---|
| 1. *Meghan Priestley* | Meghan Priestley |
| 2. *(signature)* | Rosa Toro |
| 3. *(signature)* | Josie Hernandez |
| 4. *Billie Jean Johnston* | Billie Jean Johnston |
| 5. *Tom Marley* | Tom Marley |
| 6. *Belinda C. de Leon* | BELINDA C. DELEON |
| 7. *(signature)* | Henry C. Scott II |
| 8. *(signature)* | VALDEMAR FLORES |
| 9. *(signature)* | Maria Rosas |
| 10. *Blanca E Wells* | Blanca E Wells |
| 11. | |

26

**TAB B**

NO. 2012-23983

*P-3*

**MODIX**

| THE CHOPPER GROUP L.L.C. and | § | IN THE DISTRICT COURT |
| OUTLAW COUNTRY, L.L.C. | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| MARINECORP INTERNATIONAL LTD. | § | 80TH JUDICIAL DISTRICT |

## **MODIFIED** FINAL JUDGMENT

On April 14, 2014, came on to be heard the above entitled and numbered cause Plaintiffs/CounterDefendants The Chopper Group L.L.C. and Backwoods Country Club, L L.C, d/b/a Outlaw Country, appeared in person and by and through their attorney of record. Defendant/Counter-Plaintiff MarineCorp International Ltd. appeared in person and by and through its attorney of record. Third Party Defendants Tony Miller and Kyle Tones appeared in person and by and through their respective attorneys of record. Third Party Defendants Lee Harless and Dawn Harless failed to appear. A jury having been previously demanded, a jury consisting of twelve (12) good and lawful citizens was impanelled and the case proceeded to trial

During trial, by agreement of the parties, the claims by Third Party Plaintiff against Tony Miller were severed from the trial and will be resolved by the Court at a later date. These claims are not part of the judgment herein.

On April 22, 2014, after presentation of the testimony, other evidence and argument of counsel, special issues were submitted to the jury. The charge of the Court, including the special issues, and the verdict of the jury are incorporated herein for all purposes by reference.

On April 23, 2014, the jury answered the questions submitted by the Court. On the basis of the answers to the special issues, the Court is of the opinion that on the merits, judgment should be entered as follows:

1. Plaintiff The Chopper Group L.L C recover judgment against Defendant

*DC/2-1*

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

MarineCorp International Ltd. for its actual damages in the amount of $225,000; further, The $210,000.00

Chopper Group L.L.C. recover judgment against MarineCorp International Ltd. for additional

damages for the knowing violation found by the jury under the Deceptive Trade Practices Act in the

amount of $11,000; further, The Chopper Group L.L.C. recover judgment against MarineCorp

International Ltd. for attorney's fees through trial in the amount of $104,483.50. The Court also

finds that the jury's answer of $0 for attorney's fees in the Court of Appeals and the Texas Supreme

Court is against the clear and uncontradicted evidence; accordingly, the Court enters judgment

notwithstanding the jury's verdict on these issues, and orders that The Chopper Group L.L.C.

recover judgment against MarineCorp International Ltd. for attorney's fees in the Court of Appeals

in the amount of $20,000 and in the Texas Supreme Court in the amount of $12,500.

2.    Plaintiff Backwoods Country Club, L.L.C., d/b/a Outlaw Country recover judgment

against Defendant MarineCorp International Ltd. for its actual damages in the amount of $270,000; $290,000.00

further, Backwoods Country Club, L.L.C., d/b/a Outlaw Country recover judgment against

MarineCorp International Ltd. for additional damages for the knowing violation found by the jury

under the Deceptive Trade Practices Act in the amount of $11,000; further, Backwoods Country

Club, L.L.C., d/b/a Outlaw Country recover judgment against MarineCorp International Ltd. for

attorney's fees through trial in the amount of $104,483.50. The Court also finds that the jury's

answer of $0 for attorney's fees in the Court of Appeals and the Texas Supreme Court is against the

clear and uncontradicted evidence; accordingly, the Court enters judgment notwithstanding the

jury's verdict on these issues, and orders that Backwoods Country Club, L.L.C., d/b/a Outlaw

Country recover judgment against MarineCorp International Ltd. for attorney's fees in the Court of

Appeals in the amount of $20,000 and in the Texas Supreme Court in the amount of $12,500.

2

590

3. Counter-Plaintiff MarineCorp International Ltd. take nothing on its claims for breach of the lease agreement and guarantee agreements against Counter-Defendants The Chopper Group L.L.C. and Backwoods Country Club, L.L.C., d/b/a Outlaw Country, and Third Party Defendants Tony Miller, Kyle Tones, Dawn Harless and Lee Harless.

4. It is further Ordered that prejudgment interest of 5%, from April 25, 2012 to May 22, 2014, in the amount of $21,776.71 ~Lw~ be awarded to The Chopper Group L.L.C. and that post-judgment interest is awarded at the rate of 5% from the date of judgment until paid.

5. It is further Ordered that prejudgment interest of 5%, from April 25, 2012 to May 22, 2014, in the amount of $30,072.60 ~Lw~ be awarded to Backwoods Country Club, L.L.C., d/b/a Outlaw Country, and that post-judgment interest is awarded at the rate of 5% from the date of judgment until paid.

6. It is further Ordered that Plaintiffs The Chopper Group L.L.C and Backwoods Country Club, L.L.C., d/b/a Outlaw Country, recover their costs of court from Defendant MarineCorp International Ltd.

7. All relief not expressly granted in this final judgment is Denied. Except for the severed claims, this judgment is Final and disposes of all claims of all parties, and is subject to appeal.

8. The Court further Orders that Plaintiffs The Chopper Group L.L.C. and Backwoods Country Club, L.L.C , d/b/a Outlaw Country, shall have all writs of execution and other process necessary to enforce this judgment.

SIGNED this 31st day of July, 2014.

_Larry Weiman_
Presiding Judge

3

**TAB C**

# STANDARD LEASE CONTRACT

## ARTICLE I

## SUMMARY OF BASIC LEASE PROVISIONS AND CERTAIN DEFINED TERMS

Section 1.1 When used herein, the following terms shall have the indicated meanings:

a. DATE OF LEASE: (Reference Only)　　　　　　　September 20, 2010

b. LANDLORD:　　　　　　　　　　　　　　　MarineCorp International Ltd

·c: ADDRESS OF LANDLORD:　　　　　　　　2900 Wilcrest, Suite 100
　　　　　　　　　　　　　　　　　　　　Houston, Texas 77042

d. SHOPPING CENTER: Cypresswood II a commercial shopping center which is located upon the lot, tract, or parcel of land situated in Harris County, Texas, as more particularly described in Exhibit "A-1" attached hereto, together with such additions and extensions as Landlord may from time to time designate as included within the Shopping Center.

e. TENANT:　　　　　　　　　　　　　　　OUTLAW COUNTRY, L.L.C

　　　　　　　　　　　　　　　　　　　　DL #:
　　　　　　　　　　　　　　　　　　　　SS #:　▮▮▮▮▮▮▮
　　　　　　　　　　　　　　　　　　　　DL #: 29057982

f. TENANT'S ADDRESS:　　　　　　　　　　18443 Kuykendahl
　　　　　　　　　　　　　　　　　　　　Spring, Texas 77379
　　　　　　　　　　　　　　　　Phone #:

　　NOTICE ADDRESS:　　　　　　　　　　Same_____

　　　　　　　　　　　　　　　　Phone #: _____

　　BILLING ADDRESS:　　　　　　　　　Same__·_____

　　　　　　　　　　　　　　　　Phone #: _____

g. TENANT'S TRADE NAME:　　　　　　　Same, OUTLAW COUNTRY, L.L.C

h. DEMISED PREMISES:　　　　　　　　An area of approximately 10,998 square feet

i. ADDRESS OF DEMISED PREMISES:　　18443 Kuykendahl Road
　　　　　　　　　　　　　　　　　Spring, Texas 77379

j. PERMITTED USE:

k. LEASE TERM: The term of this lease shall commence on the "Commencement Date", and shall terminate on the last day of the sixtieth (60) full calendar months thereafter, unless sooner terminated in accordance with the provisions hereinafter set forth.

l. COMMENCEMENT DATE:　　　　　　　November 1, 2010

m. EXPIRATION DATE:　　　　　　　　October 31, 2015

·n. ESTIMATED COMPLETION DATE:　　January 31, 2011
　　(See Section 3.3)

o. DEFAULT DEPOSIT: (See Section 17.3)　$ 13,289.25

p. PREPAID RENTAL: to be applied to　　$ 10,539.75
　　first monthly installments of rental

q. MONTHLY SALES HURDLE:　　　　　　N/A_____
　　(See Section 4.4)

2

r.  MONTHLY PERCENTAGE RENTAL:                    N/A_____
    (See Section 4.4)

s.  SIGN CHARGES (See Section 8.1 & 8.2)
    Pylon Sign Charge                             N/A_____
    Under Canopy Sign Charge                      N/A_____
    Fascia Sign Deposit                           N/A_____

                                                  November 1-February 29-2011 Free

t.  MONTHLY RENTAL:(See Sections 4.1 & 4.2)
u.  $10,539.75 per month for year 1 from March 1, 2011-October 31 2011
    $13,014.30 per month for year 2 from November 1,2011-October 31 2012
    $13,930.80 per month for year 3 from November 1, 2012-October 31 2013
    $14,847.30 per month for year 4 from November 1,2013-October 31 2014
    $15,763.80 per month for year 5 from November 1,2014-October 31 2015

Charges
Rent Start Date: March 1,    | Commencement Date - November 1, 2010 |   2011

u.  MONTHLY ESTIMATED COMMON                      $4,179.24 per month
    AREA MAINTENANCE:  (See Section 5.2)          the demised premises.

v.  MONTHLY ESTIMATED TAX AND                     Included in the CAM
    INSURANCE CHARGE: (See Section 16.1)

w.  MONTHLY REFUSE CHARGE:                        Included in the CAM
    (See Section 6.4)

x.  MONTHLY ESTIMATED UTILITY                     Responsibility of Tenant
    CHARGE:  (See Section 9.1)

y.  MONTHLY ADVERTISING CHARGE:                   N/A

z.  MISCELLANEOUS:                                Included in the CAM

aa.  GROSS LEASABLE RETAIL AREA: Presently comprises 46,998 square feet subject to expansion by the construction of additional building, or the reduction of leasable retail area, if any, in the Shopping Center.

bb.  GUARANTY:  The guaranty attached hereto and made a part hereof as Exhibit "B".

In the event of any conflict between any Summary of Basic Lease Provisions on the one hand and the balance of this Lease on the other, the latter shall control.  Each of the foregoing basic lease provisions and defined terms shall be construed in conjunction with the references thereto contained in the other provisions of this Lease and shall be limited by such other provisions.  Each reference in this Lease to any of the foregoing basic lease provisions and defined terms shall be construed to incorporate each term set forth above under such basic lease provision or defined term.

## ARTICLE II
## GRANTING CLAUSE

Section 2.1.  In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants and conditions hereof, Landlord hereby demises and leases to Tenant, and Tenant hereby leases from Landlord the Demises Premises as described in Section 1.1(h).  The "area" of the Demised Premises when referred to in this Lease shall be computed from the measurements to the exterior of outside walls of the building and to the center of interior demising walls.  TO HAVE AND TO HOLD said Demised Premises for a term commencing on the "Commencement Date" and extending for said number of months specified in Section 1.1(k), all upon the terms and conditions set forth in this Lease.

Section 2.2.  The purpose of the plot plan attached hereto as Exhibit "A" is to set forth the outline of the Demised Premises in relation to the general layout of the Shopping Center, and it is expressly understood and agreed:

(a) That the general layout of the Shopping Center as set forth thereon is subject to all of the terms and conditions of the Lease, including, without limitation, the provisions regarding future changes, expansion, rules and regulations; and

(b) That no representation or warranty is made as to the exact location of any other particular building, or as to the time, if ever, that any other buildings and/or store space or spaces may or might be erected and occupied or as to the continued occupancy by other tenants of the Shopping Center of any other building or buildings or store space or spaces, or the purpose for which said other building or buildings and/or store space or spaces may or might be used.

3                                                                  25

Section 2.3. So long as Tenant shall pay the Rental, Estimated Common Area Maintenance Charge, Estimated Tax and Insurance Charge, and all other Sums or other payment due hereunder and shall observe and perform all of the covenants on Tenant's part to be observed and performed hereunder, and Tenant is not in default hereunder, Tenant shall peaceably and quietly hold and enjoy the Demised Premises for the entire term hereof without interruption by Landlord or person or persons lawfully or equitably claiming by, through or under Landlord, subject, nevertheless, to all of the terms and provisions of this Lease and to all of the reservations, restrictions, encumbrances and limitations of record affecting the title to or use of the demised Premises or the property upon which the Shopping Center is situated.

Section 2.4. Notwithstanding the fact that the Lease Term will commence at a date subsequent to the execution of this instrument by Landlord and Tenant, such parties intend that each shall have vested rights immediately upon the signing of this instrument and that this instrument shall be fully binding and in full force and effect from and after execution hereof by Landlord and Tenant. In the event that the lease term shall not have, in fact, commenced within two (2) years from the date hereof (and if this Lease shall not theretofore have been canceled by Landlord as herein permitted), then, in addition to all the other rights and remedies of Landlord set forth herein, this Lease shall thereupon be automatically null and void and of no further force and effect, and neither party shall have any further obligation or liability hereunder.

ARTICLE III
CONSTRUCTIONS AND ACCEPTANCE OF PREMISES

Section 3.1. If this Lease is for a portion of the Shopping Center already constructed, Tenant acknowledges that it has, prior to the execution hereof, inspected the Demised Premises, that Landlord's work is completed (expect as may be otherwise expressly provided in Exhibit C attached hereto), and that Tenant has accepted the Demised Premises in its "AS-IS" condition, it being agreed that Landlord shall have no liability or responsibility for defects in the Demised Premises, including latent defects. By occupying the Demised Premises, Tenant shall be deemed to have accepted the same and to have acknowledged that the same fully comply with Landlord's obligations and covenants hereunder, as shown on Exhibit C. *EXCEPT FOR ELECTRICAL SERVICE SHALL REMAIN AT 100 AMPS AND INSTALLED BY LANDLORD, HVAC AT 6 TONS.*

Section 3.2. Subject to the provisions contained in Section 3.4 below, if this Lease is for a portion of the Shopping Center to be constructed, Landlord shall construct and deliver to Tenant the Demised Premises substantially in accordance with Landlord's and Tenant's Architectural and Construction Work attached hereto as Exhibit "C".

Section 3.3. Tenant agrees to open the Demised Premises to the public for business within thirty (30) days after the same is ready for occupancy. Except as otherwise provided under Article I of this Lease, the "Commencement Date" of this Lease shall be the earlier to occur of (i) the date thirty (30) days after Landlord has notified Tenant that the Demised Premises are ready for occupancy or (ii) the date upon which Tenant opens the Demised Premises to the p[public for business. In the event the provisions of this Section 3.3 with respect to the establishment of the Commencement Date of this Lease conflict or are otherwise inconsistent with the Commencement Date specified in Article I of this Lease, the provisions of Article III shall govern and control the provisions contained in this Section 3.3, which for all purposes shall be construed to have been superseded by the terms of said Article III. Any occupancy of the Demised Premises by Tenant prior to the Commencement Date shall be subject to all of the terms and provisions of this Lease excepting only those requiring the payment of Rental. Tenant agrees that at the request of Landlord it will, following the Commencement Date, execute and deliver a recordable short form lease containing the basic provisions of this Lease, acknowledging that Tenant has accepted possession, and reciting the exact Commencement Date and termination date of this Lease.

Section 3.4    N/A

Section 3.5. If Landlord shall not be able, by the use of such efforts and means as Landlord, in its exclusive judgment, finds suitable and convenient, to obtain all requisite governmental, quasi-governmental, regulatory authority and other permits, licenses, consents and permissions (collectively called "building permit") relating to Landlord's construction with respect to the Demised Premises or any other requisite consent in connection with such construction., then in any of the aforesaid circumstances, Landlord may terminate this Lease at any time prior to the Commencement Date by giving Tenant written notice thereof. Upon such termination, this Lease will be of no further force or effect, and neither party will have any further obligation or liability hereunder. No expenditure by Tenant or incurring of any liability for merchandise, fixtures, equipment or labor or material or otherwise shall alter or affect the rights of said parties as set forth in this Section 3.5.

Section 3.6. Except as otherwise provided in this Article III above, all construction by Tenant shall be governed by the provisions specified in Article VII hereof, including work to be performed by Tenant as described in Exhibit "C".

Section 3.7. Landlord's obligation to construct and deliver to Tenant the Demised Premises within the time period set forth hereinabove shall be extended by a period of time equal to the total of "excusable delays" (as hereinafter defined). For the purposes of this Section 3.7, the term "excusable delays" shall mean all delays caused by governmental restrictions, strikes, lock-outs, shortages of labor or material, acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or cause beyond the reasonable control of Landlord.

## ARTICLE IV
## RENTAL

Section 4.1. All rental shall accrue hereunder from the Commencement Date as defined above, and shall be payable at the place designated for the delivery of notices to Landlord at the time of payment.

Section 4.2. Tenant shall pay to Landlord Rental in monthly installments in the amounts specified in Section 1.1(t) above. The first such monthly installment shall be due and payable on or before the Commencement Date, and installments in the respective amounts specified in Section 1.1(t) shall be due and payable on or before the first day of each succeeding calendar month during the Lease Term; Rental will be considered late after the 10th day of each succeeding calendar month during the Lease Term; Provided that if the Commencement Date should fall on date other than the first day of a calendar month there shall be due and payable on or before such date as Rental for the balance of the calendar month during which such date shall fall, a sum equal to that proportion of the Rental specified for the first calendar month as herein provided, which the number of days from the Commencement Date to the end of the calendar month during which the Commencement Date shall fall bears to the total number of days in such month, and all succeeding installments of the Rental shall be payable in the respective amounts specified in Section 1.1(t) on or before the first day of each succeeding calendar month during the Lease Term; provided, further, that if the Lease Term ends on other than the last day of the month, the last monthly installment shall be reduced proportionately.

Section 4.3. Commencing with the second Lease Year (as hereinafter defined), the Rental shall be automatically adjusted (without the necessity of the execution of any further instrument) after the end of each Lease Year during the term of this Lease in the following manner:

(a) **Rental Schedule as per Article I, Section 1.1, Item t**

Section 4.4. N/A

Section 4.5. All Rental and all other sums hereunder provided to be paid by Tenant shall be due and payable by Tenant without demand, deduction, abatement or off-set except as expressly provided herein.

All other sums and charges of whatsoever nature required to be paid by Tenant to Landlord pursuant to the terms of this Lease constitute additional rent and failure by Tenant to timely pay such other sums or charges may be treated by Landlord as a failure by Tenant to pay the Rental.

In the event of any failure to pay Rental or to make any other payment due Landlord hereunder, in the manner or time provided for herein, and such Rental, or other payment is not made by the tenth (10th) day following the date on which said payment was due, Tenant shall pay to Landlord, in addition to the amounts then due and without prior demand therefore and without any deduction or offsets, an administrative charge in the amount of $50.00 per each occurrence, or 5% of the amount due, whichever is greater.

Acceptance by Landlord of any late rent payment and administrative charge due therefor shall not constitute a waiver of any of Landlord's rights and remedies available in connection with any subsequent failure of Tenant to pay the Rental or to make any other payment due Landlord hereunder in the manner or time provided for herein. If tender of late Rental or any other payment due Landlord hereunder is made, Landlord at its sole discretion, shall have the option to accept the tendered late Rental payment and administrative charge computed as above specified, or to purse the rights and remedies provided in Article XVII without the necessity of any further notice or demand.

If within any six (6) month period during the term of this Lease, Tenant shall fail for three (3) times to make timely payment to Landlord of any Rental and/or any other payment due Landlord hereunder on the date when due, the Landlord shall have the immediate right, without the necessity of giving any notice of default, to pursue the rights and remedies provided in Article XVII hereof.

Section 4.6 (Insufficient Checks or Payments) Tenants shall pay to Landlord upon demand a fifty and NO/100 Dollar ($50.00) charge for each check tendered to Landlord in payment of Rental (or Percentage Rental) or any other payment due Landlord hereunder which is returned uncollectible to Landlord.

## ARTICLE V
## COMMON AREA

Section 5.1. The "Common Area" of the Shopping Center is that part of the Shopping Center designated by Landlord from time to time for the common use of all tenants, including among other facilities, parking area, sidewalks, signs erected by Landlord advertising or identifying the Shopping Center, under canopy signs, landscaping, seasonal/permanent decorating, curbs, truckways, delivery passages, loading areas, private streets and alleys, lighting facilities, and the like, all of which shall be subject to Landlord's sole management and control and shall be operated and maintained in such manner as Landlord in his discretion shall determine. Landlord reserves the right to change from time to time the dimensions

and location of the Common Area, as well as the dimensions, identity and type of any buildings, and to construct additional buildings or additional stories on existing buildings or other improvements in the Shopping Center. Landlord also reserves the right to dedicate portions of the Common Area and other portions of the Shopping Center (excepting only the Demised Premises) for street, park, utility and other public purposes. Tenant, and its employees, customers, subtenants, licensees, and concessionaires shall have the non-exclusive right to use the Common Area as constituted from time to time, such use to be in common with Landlord, other tenants of the Shopping Center and other persons entitled to use the same, and subject to such reasonable rules and regulations governing such use as Landlord may from time to time prescribe. Landlord may elect (without any obligation to do so) to designate from time to time, Tenant employee, subtenant, licensee and concessionaire parking areas. Should Landlord so designate such parking area, then Tenant, its employees, subtenants, licensees and concessionaires may have the non-exclusive use, along with other Tenants and their employees, subtenants, licensees and concessionaires, of only that available space so designated by Landlord for such use and neither Tenant, nor Tenant's employees, subtenants, licensees or concessionaires shall use any other parking space in the Shopping Center. Upon request of Landlord, Tenant will furnish to Landlord a complete list of the license numbers of all automobiles operated by Tenant, its employees, subtenants, licensees or concessionaires. If any automobile or other vehicle owned by Tenant or any of its employees or any of its subtenants, licensees or concessionaires, or any of their respective employed, shall at any time be parked in any part of the Shopping Center, other than the specific areas designated by Landlord from time to time for employee parking, Landlord shall be, and is hereby, authorized to cause such automobile or other vehicle to be removed to such other location, either within or beyond the Shopping Center, and Tenant shall, and does hereby, agree to indemnify Landlord, his employees, and agents, and hold each of them harmless from any and all claims of whatsoever sort which may arise by reason of such removal. Tenant shall not solicit business or display merchandise within the Common Area, or distribute handbills therein, or take any action which would interfere with the rights of other persons to use the Common Area. Landlord may temporarily close any part of the Common Area for such periods of time as may be necessary to prevent the public from obtaining prescriptive rights or to make repairs or alterations.

Section 5.2. Tenant agrees to pay as additional rent, as hereinafter provided, an amount equal to "Tenant's Share" of "Common Area Maintenance Charges" (as such quoted terms are hereinafter defined) adjusted from time to time, pursuant to the provisions hereinafter stated. For purposes of this Lease, the phrase "Common Area Maintenance Charge" shall mean, for each calendar year (or portion thereof) during the term of this Lease, the aggregate of all costs, expenses, and liabilities of every kind or nature paid or incurred by Landlord (to the extent that Landlord regards it as reasonable necessary or appropriate to proved the services and materials hereinafter referred to and to pay the incurred costs, expenses, and liabilities hereinafter referred to ) including appropriate and reasonable reserves in connection with: sweeping, cleaning, removing debris from, maintaining, respiring and repairing the Common Area; lighting the Common Area (including replacement of bulbs and ballast's and repair of light standards); the cost of supplying water, electricity, gas, security, sere disposal and/or garbage pick-up and disposal, if Landlord so elects, providing project identification signs and the repair and maintenance of the pylon and all signs thereon; providing traffic control and watchman service at the Common Area; constructing, maintenance, and repairing and maintaining any on-site or off-site utilities necessary or appropriate for the operation of the Common Area; providing and maintaining planting and landscaping with respect to the Common Area; providing security services with respect to the Common Area; plus all other costs and expenses of every kind or nature paid or incurred by Landlord relative to maintenance, managing, and equipping the Common Area, including, without limitation, management fees for overall management of the Shopping Center, subdivision maintenance fees or dues; property owners association fees or dues, and similar charges, annual charges for reserves established by Landlord for future replacements or improvements to the Common Area (inclusive of periodic new black topping or concreting of the Common Area) included as **administrative fee of fifteen (15%) percent of the aggregate of all of the aforesaid costs and expenses and liabilities (including, without limitation, the aforesaid reserve) paid or incurred by Landlord.**

The Phrase "Tenant's Share," as applied to the Common Area Maintenance Charges, shall refer to a sum calculated by multiplying the Common Area Maintenance Charges by a fraction, the numerator of which is the floor area (in square feet) of the Demised Premises (as indicated in Article I of this Lease) and the denominator of which for which the calculation referred to in this paragraph is being made; provided, however, for any period of less than twelve (12) full calendar months with respect to which such calculation is being made, a pro rata portion of the resulting product shall be calculated to determine Tenant's share.

Monthly, during the first year of this Lease, Tenant will pay Landlord the Estimated Common Area Maintenance Charge (as indicated in Section 1.1 (u), monthly in advance, payable at the same time and place as the Rental is payable, except, however, if the Lease Term does not begin on the first day of a calendar month. Landlord shall have the right to adjust such monthly estimate on an annual basis, pursuant to the following paragraph.

At the end of each calendar year occurring during the term of this Lease (or subsequent to the expiration or other termination of this Lease, if such occurs on a date other than the last day of a calendar year), Landlord will give Tenant notice of the total amount paid by Tenant for the relevant calendar year together with the actual amount of Tenant's Share of the Common Area Maintenance Charges ("Total Cost") for such calendar year. If the actual amount of Tenant's Share of the Total Cost with respect to such period exceed the aggregate amount previously paid by Tenant with respect thereto during such period, Tenant shall pay to Landlord the deficiency within Thirty (30) days following notice from Landlord; however, if the aggregate amount previously paid by Tenant with respect thereto exceeds Tenant's Share of

6

28

the Total Cost for such period, then at Landlord's election, such surplus (net of any amounts then owing by Tenant to Landlord) shall be credited against the next ensuing installment of any such cost due hereunder by Tenant, or Landlord may refund such net surplus to Tenant. Periodically, during the term of this Lease, Landlord shall have the right to estimate Tenant's Share of Common Area Maintenance Charges for the next fiscal period (determined by Landlord) of the term of this Lease, whereupon, Tenant shall pay Landlord such amounts as may be so indicated by Landlord in the same manner as the Estimated Common Area Maintenance Charge.

Tenant shall have the right for the ninety (90) day period immediately following the end of each calendar year during the term of this Lease, at its sole cost and expense, to audit the cost of Common Area Maintenance Charges at reasonable times during Landlord's regular business hours and at the office of the Landlord upon twenty-four (24) hours advance written notice to the Landlord. In the event Tenant fails either to notify the Landlord in writing of its intent to audit the cost of Common Area Maintenance Charges at least twenty-four (24) hours in advance of the date of its intended audit or to audit Common Area Maintenance Charges within said ninety (90) day period, Tenant shall not thereafter be entitled to audit Common Area Maintenance Charges for the Lease Year in question.

Section 5.3. If there is presently in effect or hereafter adopted any nature of sales tax or use tax or other tax on rents or other sums received by Landlord under this Lease (herein referred to as "Rent Sales Tax"), and in addition to all Rental and other payments to be made by Tenant as provided above, Tenant will also pay Landlord a sum equal to the amount of such Rent Sales Tax. The term "Rent Sales Tax" shall not include income taxes applicable to Landlord.

Section 5.4.     N/A

ARTICLE VI
USE AND CARE OF PREMISES

Section 6.1. The Demised Premises may be used and occupied only for the purpose or purposes specified in Section 1.1(j) above, and for no other purpose or purposes without the prior written consent of Landlord. Tenant shall use in the transaction of business in the Demised Premises the trade name specified in Section 1.1(g) above. Tenant shall not at any time leave the Demised Premises or any part thereof vacant, and it is the essence of this Lease, that Tenant shall in good faith continuously throughout the term of this Lease, during usual business hours, occupy and conduct and carry on in the entire Demised Premises the type of business for which the Demised Premises are leased. Tenant shall operate its business in an efficient, high class and reputable manner and shall, except during reasonable periods, for repairing, cleaning and decorating, keep the premises properly equipped with fixtures, stocked with an adequate supply of merchandise, and open to the public for business with adequate personnel in attendance on all days and during all hours when other tenants of the Shopping Center are generally open for business to the public and as may be determined by the Landlord, except to the extent Tenant may be prohibited from being open for business by applicable law, ordinance or governmental regulation. Without any way expanding the use of the Demised Premises hereinabove expressly limited, Tenant shall not use any portion of the Demised Premises for any purpose in conflict with any exclusive usage rights, now or hereafter existing in favor of some other occupant of the Shopping Center or use the Demised Premises to some purpose substantially duplicating some other usage of premises now or hereafter made in the Shopping Center, without the prior written consent of Landlord.

Tenant shall remain open on regular business days during regular reasonable business hours, but Tenant shall remain open for business not less than the hours of 10:00a.m. until 6:00p.m. Monday through Friday.

Tenant shall warehouse, store and/or stock in the Demised Premises only such goods, wares and merchandise as Tenant intends to offer for sale at retail at, in from or upon the Demised Premises. This shall not preclude occasional emergency transfers of merchandise to other stores of Tenant, if any, not located in the Shopping Center. Tenant shall use for office, clerical and other non-selling purposes only such space of the Demised Premises as is from time to time reasonable required for Tenant's business in the Demised Premises. No overnight lodging shall be permitted on the Demised Premises.

Section 6.2. Tenant shall not, without the Landlord's prior written consent, keep anything within the premises or use the premises for any purpose which increases the insurance premium cost or invalidates any insurance policy carried on the Demised Premises or on other parts of the Shopping Center. If Landlord should consent to such use and occupancy by Tenant, Tenant shall pay on demand as additional rent the additional insurance premiums resulting from such use and occupancy. All property kept, stored, or maintained within the premises by Tenant shall be at Tenant's sole risk.

Section 6.3. Tenant shall not conduct within the Demised Premises any fire, auction, "lost-our-lease", "going out of business", bankruptcy or similar sales or operate within the Demised Premises a cooperative store, a "second hand" store or a "surplus" store. Tenant shall not permit any objectionable or unpleasant odors to emanate from the premises; nor place or permit any radio, television, loud speaker or amplifier on the roof or outside the Demised Premises or where the same can be seen or heard from outside the Demised Premises; nor place any antenna or other projection on the exterior of the Demised Premises; nor take any other action which would constitute a nuisance or would disturb or endanger other tenants of

7

29

the Shopping Center or unreasonable interfere with their use of their respective premises; nor do anything which would tend to injure the reputation of the Shopping Center as may be determined by Landlord.

Section 6.4. Tenant shall take good care of the Demised Premises and keep the same free of rodents and insects at all times. Tenant will not commit any act which is a nuisance or annoyance to Landlord or to other Tenants, or which might, in the exclusive judgment of Landlord, appreciably damage Landlord's goodwill or reputation. Tenant shall keep the Demised Premises, and sidewalks, serviceways, and loading area adjacent to the premises and the Common neat, clean, and free from dirt or rubbish at all times, and shall carefully store in an orderly manner all trash and refuse within the area specified by Landlord or in addition to any other remedies available to Landlord, Landlord shall have the right to do and Tenant shall pay to Landlord the full cost thereof. **Landlord** shall arrange for the regular pick-up of such trash and refuse **included in the CAM** expense, in which case Tenant shall use such refuse service and pay the cost of such service as specified in Section 1.1(w). Tenant acknowledges that Landlord shall have the right to increase the charge for refuse service from time to time, and Tenant shall be liable to Landlord therefor. Receiving and delivery of goods and merchandise and removal of refuse and trash shall be made only in the manner and areas prescribed by Landlord and shall be subject to such regulations as Landlord may from time to time prescribe. Tenant shall not operate an incinerator or burn trash or refuse within the Shopping Center area.

Section 6.5. Tenant shall maintain all display windows in a neat and attractive condition and shall keep said display windows and exterior signs lighted from dusk until such time as other tenants of the Shopping Center generally do.

Section 6.6. Tenant shall include the address and identity of its business activities in the Demised Premises in all advertisements made by Tenant in which the address and identity of any similar local business activity of Tenant is mentioned. Use by Tenant in advertising, letterheads or otherwise of the name of the Shopping Center and buildings contained therein, or any distinctive trade name or trademark used by Landlord shall be subject to such restrictions and regulations as Landlord may prescribe from time to time.

Section 6.7. Tenant shall procure at its sole expense any permits and licenses required for the transaction of business in the Demised Premises and otherwise comply with all applicable laws, ordinances, and governmental regulations. Tenant shall also comply with all reasonable rules and regulations regarding sanitation, cleanliness and other matters governing the conduct of business within the Shopping center which Landlord may from time to time prescribe. Tenant will be responsible for causing its employees, customers, subtenants, licensees, and concessionaires to comply with all such laws, ordinances and regulations.

Section 6.8. Tenant will at all times keep all merchandise and displays within the Demised Premises above described, and will not at any time display any merchandise or offer it for sale or (other than during essential loading or unloading operations) permit it to be on any other point outside the Demised Premises, nor will Tenant in any other way use or obstruct such area outside the Demised Premises.

Section 6.9. Tenant, at Tenant's own expense, will furnish and maintain an adequate number of fire extinguishers in good operating condition as may be reasonable required by Landlord, and in any event not less than such number of extinguishers as may be, from time to time, required by applicable statues, laws, ordinances, and codes.

Section 6.10. If Tenant is a restaurant, or if otherwise required by Landlord or any governmental agency having jurisdiction thereof, Tenant shall at its sole cost and expense, install any and all grease traps and/or grease interceptors which Landlord deems necessary or desirable or which any governmental entity having jurisdiction thereof shall deem necessary to handle liquid waste, including grease, oil or any material whatsoever which would or could damage, obstruct or overload any drainage, sewer or other systems. All grease and oil traps and/or interceptors shall be constructed in accordance with the requirements promulgated by any entity having jurisdiction thereof and Tenant shall at its sole cost and expense maintain and make all necessary or required repairs and replacements and maintain said traps and/or interceptors at Tenant's expense without liability to Tenant for any loss or damage by reason of such repairs, maintenance or replacement (and Tenant shall indemnify and hold Landlord harmless therefrom), and Tenant shall pay to Landlord upon demand as additional rental hereunder the cost of such maintenance, repairs or replacements plus interest, at the then highest lawful contract rate which Tenant is authorized to pay under the laws of the State of Texas or the United States of America, whichever is then in effect.

Section 6.11. N/A

Section 6.12. Tenant hereby stipulates and acknowledges that the attempted or threatened breach of any covenant contained in this Article VI by Tenant would constitute a severe impediment to the ability of Landlord to operate the Shopping Center and to receive the benefits contemplated by this Lease; that the existence of such breach or threatened breach will cause irreparable harm thereto for which there would not be an adequate remedy at law for which no other equitable remedy would be adequate or available and shall entitle Landlord to obtain an injunction prohibiting such breach or attempted breach in addition to all other legal remedies provided hereunder or by law.

8

30

ARTICLE VII
MAINTENANCE AND REPAIR OF PREMISES;
ALTERATIONS; LANDLORD'S RIGHT OF ACCESS

Section 7.1. Landlord shall keep the foundation, the exterior walls (except plate glass; windows; doors; door closure devices; window and door frames, molding, locks and hardware; and interior painting or other interior treatment of exterior walls), and roof of the Demised Premises in good repair, provided, that Landlord shall not be required to make any repairs occasioned by the act, omission or negligence of Tenant, its employees, subtenants, licensees, contractors and concessionaires; further provided, Landlord shall not be required to make any roof repairs required as a result of maintenance work on Tenant's air conditioning equipment or roof penetrations or perforations required or necessitated by the installation of Tenant's fixtures or the construction or remodeling of the Demised Premises for or by Tenant whether by law, ordinance or otherwise. In the event that the Demised Premises should become in need or repairs required to be made by Landlord hereunder, Tenant shall give immediate written notice thereto to Landlord, and Landlord shall not be responsible in any way for failure to make any such repairs until a reasonable time shall have elapsed after delivery of such written notice which in no event shall be less than thirty (30) days therefrom.

Section 7.2. Tenant will not permit or commit waste and will not injure the Demised Premises, but shall keep the Demised Premises in good, clean condition and shall at its sole cost and expense make all needed repairs and replacements, including, but not limited to air conditioning and heating equipment, electrical equipment and fixtures, doors, moldings, trim, window frames, door frames, closure devices, hardware, and equipment, wiring (including that within the wall or ceiling or under flooring or floor covering),, and plumbing lines (including water lines and gas lines) within walls or ceiling and under flooring and floor covering, and further including replacement of cracked or broken glass, and repairs, replacements and alterations required by any governmental authority, except for repairs and replacements required to be made by Landlord under the provisions of Section 7.1 and Article XII. Tenant shall also make all necessary repairs and replacement of its fixtures required for the proper conduct of its business. Additionally, Tenant shall pay to Landlord upon demand, and without contribution from any other tenant or Landlord, all costs and expenses for the maintenance, repair, replacement and/or construction of any utility lines, including, without limitation, gas lines, sewer lines, water lines and drains, drainage systems, drainage piping, water service pipes, underground water pipes, storm sewer systems or storm sewer piping, sanitary sewer systems and piping and any plumbing equipment, fixtures or appliances servicing the Demised Premises, the Building of which the Demised Premises are a part of the Shopping Center as a result of any obstruction of the flow, clogging, backing-up or other malfunction or disrepair of said systems due to any act or omission of Tenant in its use and/or occupancy of the Demised Premises or the act or omission of any other party holding the Demised Premises by or through Tenant or any other party using or occupying the Demised Premises. If any repairs required to be made by Tenant hereunder are not made within ten (10) days after written notice delivered to Tenant by Landlord, Landlord may at his option make such repairs without liability to Tenant for any loss or damage which may result to its stock or business by reason of such repairs (and Tenant shall indemnify and hold Landlord harmless therefrom), and Tenant shall pay to Landlord upon demand as additional rental hereunder the cost of such repairs plus interest, at the then highest lawful contract rate which Tenant is authorized to pay under the laws of the State of Texas or the United States of America, whichever is then in effect. Upon termination of this lease, Tenant will surrender and deliver up the Demised Premises to Landlord broom- clean and in the same condition in which the Demised Premises existed at the commencement of the term of this Lease, excepting only ordinary wear and tear and damage arising from any cause not required to be repaired by Tenant. Upon termination of this Lease, Tenant will also surrender to Landlord all keys to the Demised Premises at the place stated herein for the payment of rent.

Section 7.3. Tenant shall not make any alterations, additions, or improvements to the Demised Premises without the prior written consent of Landlord, except for the installation of "Unattached, Movable Trade Fixtures" (as hereinafter defined which may be installed without drilling, cutting or otherwise defacing the premises. All alteration, addition, improvements and fixtures (other than "Unattached, Movable Trade Fixtures") which may be made or installed by either party hereto upon the Demised Premises shall remain upon, and be surrendered with, the premises and become the property of Landlord at the termination of this Lease, unless Landlord requests their removal, in which event Tenant shall remove the same and restore the premises to their original condition at Tenant's expense. Any linoleum, carpeting, or other floor covering of similar character installed by Tenant on the Floor of the Demised Premises shall become the property of Landlord, all without credit or compensation to Tenant. Subject to the lien and security interest right of Landlord hereinafter referred to, Tenant may remove "Unattached, Movable Trade Fixtures" (as hereinafter defined) (not including, however, ducts, conduits, wiring, pipes, paneling or other wall covering or floor covering) provided: (1) such removal is made prior to the termination of the term of this Lease; (2) Tenant is not in default in the performance of any obligation or covenant under this Lease at the time of such removal; and (3) such removal may be effected without damage to the Demised Premises and Tenant promptly repairs all damage caused by such removal. For purposes hereof, the phrase "Unattached, Movable Trade Fixtures" means the following: counters, tables, chairs, desks, racks, merchandisers and displays, standards, wall brackets, hand rods, shelves, mirrors, marking equipment, cash registers and other business machines, provided that they are not permanently attached in any way to the floors, walls or ceilings.

All plumbing or electrical wiring connections exposed as a result of the removal of Tenant's "Unattached, Movable Trade Fixtures", or other alterations, additions, fixtures, equipment and property

9

31

installed or placed by it in the Demised Premises (id such removal is so requested by Landlord) shall be capped by Tenant in a safe and workmanlike manner.

In the event that Tenant shall have assigned this Lease or subleased the Demised Premises (in whole or in part), but subject to and in accordance with the provisions of Article XV, alterations in the Demised Premises of any scope or extent made (without prior notice to or consent of Tenant) by Landlord or by the party occupying (or contemplating occupancy of) the Demised Premises (with or without the consent of Landlord) shall not have the effect of discharging or otherwise impairing or affecting the continuing liability under this Lease of Tenant or anyone holding under Tenant; provided, however, the foregoing shall not be interpreted as dispensing with the necessity for consent of Landlord to alterations of the Demised Premises under the circumstances in which such consent is required under the other provisions of this Lease.

Section 7.4.  All construction work done by Tenant within the Demised Premises shall be performed in a good and workmanlike manner, satisfactory to Landlord and in compliance with all governmental requirements and applicable building codes, and at such times and in such manner as to cause a minimum of interference with other construction in progress and with the transaction of business in the Shopping Center.  Without limitation on the generality of the foregoing Landlord shall have the right to require that such work is performed during hours when the Shopping Center is not open for business, and in accordance with other rules and regulations which Landlord may from time to time prescribe.  Labor and material used in the installation of Tenant's equipment, furniture and fixtures, and in any other work on the Demised Premises performed by Tenant, will be subject to Landlord's prior written approval. Such written approval shall not be unreasonably withheld or unduly delayed.  With respect to any contract for any such labor or materials, Tenant acts as principal and not as the agent of Landlord, and Tenant shall give written notification to any contractor engaged by Tenant for construction of imp movements on or within the Demised Premises that Tenant is no the agent of Landlord but is acting as principal in its own behalf, and Tenant shall furnish a copy of said notice to Landlord prior to commencement of any work on or within the Demised Premises.  Tenant agrees to indemnify and hold Landlord harmless for all claims (including costs and expenses of defending against such claims) arising or alleged to arise from any act or omission of Tenant or Tenant's agents, employed, contractors, subcontractors, laborers, materialmen or invitees or arising from bodily injury or property damage occurring or alleged to have occurred incident to Tenant's work at the Demised Premises, Tenant shall not have authority to place any lien upon the Demised Premises or any interest therein or in any way to bind Landlord; and no action or failure to act by Landlord shall constitute a ratification by Landlord of Tenant's contract for construction of improvements on or within the Demised Premises; and any attempt to do so shall be void and of no effect.  Landlord expressly disclaims liability for the cost of labor performed for or materials furnished to Tenant.  All costs for such construction performed shall be paid promptly to prevent the assertion of any liens for labor or materials.  If, because of any actual or alleged act or omission of Tenant, or any contractor of Tenant or any such contractor's subcontractor or any laborer performing labor or materialmen furnishing materials at or for the Demised Premises or by reason of any specially fabricated material whether or not placed at the Demises Premises, any lien, affidavit, charge or order for the payment of money shall be filed against Landlord, the Demised Premises or any portion thereof or interest therein, whether or not such lien, affidavit, charge or order is valid or enforceable, Tenant shall, at its own cost and expense, cause same to be discharged of record by payment, bonding or otherwise no later than fifteen (15) days after notice to Tenant of the filing thereof, but in all events prior to the foreclosure thereof.  Tenant shall, if requested by Landlord, furnish payment and performance bonds or other security satisfactory to Landlord against any such loss, liability or damage.  Whenever Tenant proposes to do any construction work within the Demised Premises, it shall first furnish to Landlord plans and specifications in such detail as Landlord may request o covering all such work.. Tenant must have Landlord's prior written approval of such plans and specifications prior to the commencement of any construction.

Section 7.5.  Landlord (and any Mortgagee or Deed of Trust beneficiary as to the Demised Premises) with advanced notification, shall have the right to enter upon the Demised Premises at any time for the purpose of inspecting the same or of making repairs or additions to the Demised Premises, or of making repairs, alterations, or additions to adjacent premises, or of showing the Demised Premises to prospective purchasers, lessees, or lenders.

Section 7.6.  Any penetrations or perforations through the roof of the Demised Premises necessitated or required by the installation of Tenant's fixtures or the construction or remodeling of the Demised Premises for or by Tenant shall be first approved in writing by Landlord and shall be performed by a contractor, sub-contractor, mechanic or repairman approved in writing by Landlord.

Section 7.7.  Tenant shall pay the full amount of all taxes, assessments, impositions, levies, charges, excises, fees, licenses and other sums levied, assessed, charged or imposed by any governmental authority or other taxing authority upon Tenant's leasehold interest under this Lease and all alterations, additions, fixtures (including "Unattached, Movable Trade Fixtures), inventory and other property installed or placed or permitted at the Demised Premises by Tenant.  Within thirty (30) days after notice from Landlord, Tenant shall furnish Landlord a true copy of receipts evidencing such payment received by Tenant from the Governmental authority or other taxing authority assessing such charges.

10

32

Tenant will also pay all insurance premiums assessed or levied upon any alterations, additions, fixtures or property installed in the Demised Premises by the Tenant and all insurance related to Tenant's use, occupancy and operations within the Demised Premises and the Shopping Center.

## ARTICLE VIII
## SIGNS; STORE FRONTS; ROOF

Section 8.1. Tenant shall not, without Landlord's prior written consent (a) make any changes to the store front or (b) install outside the interior surface of the perimeter walls of the Demised Premises any lighting or awnings, or any decorations or paintings or (c) install any drapes, blinds, shades or other coverings on display window or door lettering, placards, decorations or advertising media of any type which can be viewed from outside of the Demised Premises, excepting only dignified displays of customary type for its display windows. Tenant must pay for the installation of an exterior sign and the same shall conform in all respects to the sign criteria established by Landlord for the Shopping Center and BE SUBJECT TO LANDLORD'S PRIOR WRITTEN APPROVAL. If required by Landlord, Tenant shall also install an under canopy sign and the same shall conform in all respects to the sign criteria established by Landlord for the Shopping Center and be subject to Landlord's prior written approval; provided, however, Landlord may elect, at the expense of Tenant, to install any such exterior sign, and Tenant shall pay the Under Canopy Sign Charge (set forth in Article I) and indemnify and save Landlord harmless from the cost and expense thereof. If requested by Landlord, Tenant shall cause Tenant's exterior sign to be "hooked-up" to the existing electrical connection and be placed on a time clock and photoelectric cell device such that the electricity illuminating such sign shall keep Tenant's electric signs on from dusk until 11:00 p.m. every day during the lease term. The failure of Tenant to install any such exterior sign within ninety (90) days of the date hereof shall constitute a default by Tenant hereunder and entitle Landlord to exercise any remedies permitted under the term of this Lease without the necessity of further notice to Tenant (notwithstanding any provision to the contrary contained in Article XVII). All signs installed shall be kept in good condition and in proper operating order at all times and (except for the fascia sign) shall become the property of Landlord at the termination of this Lease. Upon the expiration or earlier termination of this Lease, Tenant shall remove the fascia sign and restore the surface, to which said sign was attached, to its original condition at Tenant's expense. In the event Tenant fails to remove the fascia sign within three(3) days from the expiration or earlier termination of this Lease, said sign shall become the property of Landlord without any credit or compensation to Tenant, and Landlord may (but shall not be obligated to) remove and store or dispose of said sign and Tenant shall be liable to Landlord for all costs incurred by Landlord in connection with such removal and storage or disposal and Tenant shall indemnify and hold Landlord harmless from all loss, damage, costs, expenses and liability in connection with such removal, storage or disposal. Use of the roof is reserved to the Landlord, and Landlord may install upon the roof equipment, signs, antenna, displays and other objects and may construct additional stories above the Demised Premises, provided such use does not reasonable interfere with Tenant's occupancy.

Section 8.2. Tenant, at Tenant's cost and expense, and upon payment of the Pylon Sign Charge, shall have the right, subject however to the prior written consent of Landlord, to locate a sign advertising Tenant upon the pylon structure, if Landlord elects to erect any such pylon structure. Notwithstanding anything herein to the contrary, Landlord shall in all cases retain the right and power to relocate Tenant's sign located upon such pylon structure, if any, to another location on such pylon structure, to be determined by Landlord, in the sole and absolute discretion of Landlord. The cost of installation, the cost of bringing electrical service to Tenant's sign located upon the pylon structure, the sign itself and any cost incurred by Landlord in repairing or maintaining such sign shall all be the sole cost and expense of Tenant, and Tenant shall indemnify and hold harmless Landlord with respect to any claim, charge, expense, or liability for same. Under no circumstances whatsoever will Tenant be allowed to remove such sign from the pylon structure without the prior written consent of Landlord. The placement of any such sign upon the pylon stricture, and the design and construction criteria therefor shall be governed by such rules, regulations and requirements as Landlord may, from time to time, promulgate. Upon expiration or earlier termination of this Lease and sign advertising Tenant upon the pylon structure (if Landlord elects to erect any such structure) shall remain upon the pylon structure and be surrendered with the premises and become the property of Landlord without credit or compensation to Tenant, unless Landlord requires removal of such sign, in which event Landlord shall remove the same at Tenant's expense, and Tenant shall pay to Landlord upon demand, the cost of removing Tenant's sign from the pylon structure.

## ARTICLE IX
## UTILITIES

Section 9.1. Tenant agrees to pay additional rent, as hereinafter provided, in an amount equal to "Tenant's Share" of all "Utility Costs" (as such quoted terms are hereinafter defined) adjusted from time to time, pursuant to the provisions hereinafter state.

The phrase "Utility Costs" as used herein shall mean all water, gas, electricity and other utilities used in the Demised Premises.

If the utilities are presently separately metered (not submetered) directly to the Demised Premises, then in such event Tenant shall pay all Utility Costs directly to the supplier of any such utilities separately metered (or submetered), and will save and hold Landlord harmless from any charge or liability for same.

11

Tenant shall if requested by Landlord, and at Tenant's sole cost, expense, risk and liability, install a submeter or submeters for the calculation of all utility services furnished to the Demised Premises and Tenant shall pay all such utility costs directly to the supplier of such service separately submetered and Tenant will save and hold Landlord harmless from any such charge or liability for the same, or alternatively, if required by Landlord, Tenant shall pay all such utility charges directly to Landlord.

The phrase "Tenant's Share" as applied to Utility Cost shall refer to the sum calculated by Landlord on an equitable basis to be the cost of Tenant's share of the Utility cost with respect to any such utilities which are submetered to Tenant in common with other occupants of the Shopping Center.

Monthly, during the first year of the term of this Lease, Tenant will pay to Landlord the Estimated CAM Charge (as such term is defined in Article 1 of the Lease) monthly in advance, payable at the same time and place as the Rental is paid, except, however, if the Lease Term does no begin on the first day of a calendar month, Tenant shall pay a pro rata portion of such sum for such partial month. Periodically, during the term of this Lease, Landlord shall have the right to estimate Tenant's Share of CAM Costs for the next fiscal period (determined by Landlord) of the term of this Lease, whereupon Tenant shall pay Landlord such amount as may be so indicated by Landlord in the same manner as the Estimated CAM Charge.

Section 9.2. No interruption or malfunction of any utility services shall constitute an eviction or disturbance of Tenant's use and possession of the Demised Premises or a breach by Landlord of any of its obligation hereunder or render Landlord liable for damages or entitle Tenant to be relieved from any of its obligations hereunder (including the obligation to pay rent) or grant Tenant right of set-off or recoupment.

Section 9.3. In addition, Tenant shall be solely responsible for and pay to Landlord, within ten (10) days after receipt of Landlord's statement therefore, all costs and expenses incurred by Landlord, including without limitation, fines, fees charges and repair, replacement or installation costs, which result from Tenant's or Tenant's business operations and are incurred by Landlord because of federal, state, county or municipal legislation, or rules or regulations relating to environmental control; provided, however, that in the event Tenant is ordered directly by any governmental authority to comply with any such federal, state, county or municipal legislation, rules or regulation, Tenant shall proceed promptly and expeditiously to fully comply with such order and Tenant shall be solely responsible for, and shall bear all costs and expenses incurred in connection with Tenant's compliance.

ARTICLE X
INDEMNITY, PUBLIC LIABILITY, BUILDER'S RISK
AND OTHER INSURANCE

Section 10.1. Landlord shall not be liable to Tenant or to Tenant or to Tenant's employees, agents or visitors, or to any other person whomsoever, for any injury to person or damage to property on or about the Demised Premises or the Common Area cause by negligence or misconduct of Tenant, its employees, contractors, subtenants, licensees, and concessionaires; customers, invitees, or other Tenants of the Shopping Center, or of any other person entering the Shopping Center under express or implied invitation of Tenant or arising out of any breach or default by Tenant in the performance of its obligations hereunder, or arising out of or from any injury to or death of any person or persons or damage to or destruction of the property of any person or persons occurring or about the Demised Premises or on the sidewalks adjacent thereto, and Tenant hereby agrees to indemnify Landlord and hold him harmless from any loss, damages, expense (including, without limitation, attorney's fees and court costs), or claims arising out of such damage or injury. Tenant agrees to use and occupy the Demised Premises and place its fixtures, equipment, merchandise and other property therein at its own risk and hereby releases Landlord and its agents from all claims for any damage or injury to the full extent permitted by law.

Section 10.2. Tenant shall procure and maintain throughout the term of this Lease a policy or policies of insurance, at its sole cost and expense, insuring Tenant (and naming Landlord as a co-insured) against any and all liability for injury to or death or a person or persons, and for damage to or destruction of property occasioned by or arising out of or in connection with the use or occupancy of the Demised Premises, or by the condition of the Demised Premises, the limits of such policy or policies to be in an amount not less that $100,000.00 in respect of injuries to or death of any one person, and in the not less than $300,000.00 in respect of any one accident or disaster, and in an amount not less than $50,000.00 in respect of property damaged or destroyed, or with such other limits as may be required by Landlord, and to be written by an insurance company or companies satisfactory to Landlord. Tenant shall obtain a written obligation on the part of each insurance company to notify Landlord at least ten (10) days prior to cancellation of such insurance. Such policies or duly executed certificates of insurance shall be prior to Tenant's occupancy of the Demised Premises, delivered to Landlord and renewals thereof as required shall be delivered to Landlord at least thirty (30) days prior to the expiration of the respective policy terms.

Section 10.3. During the period Tenant may be remodeling or making alterations to the Demised Premises, all builders' risk insurance shall be maintained by Tenant in the amount no less than the total improvement cost. Said builder's risk insurance and liability insurance policies shall name Landlord as a co-insured with Tenant and shall be non-cancelable with respect to Landlord, except after ten (10) days written notice from the insurance company. Certificates of such insurance shall be deposited by Tenant with Landlord prior to commencing any remodeling or alteration work.

34

Section 10.4. Tenant agrees at all times at its expense to keep its merchandise, fixtures and other property situated within the Demised Premises insured against fire, with extended coverage, to the extent of at least eight percent (80%0 of the value thereof. Tenant further agrees that, at all times, when a "boiler", as that term is defined for the purposes of boiler insurance is located within the Demised Premises, it will carry at its expense boiler insurance with policy limits of not less than $100,000.00 insuring both Landlord and Tenant against loss or liability caused by the operation or malfunction of such boiler. Tenant shall also carry at its own cost and expense plate glass insurance and flood insurance insuring both Landlord and Tenant against loss or liability arising as a result thereof. Such insurance shall be carried with companies satisfactory to Landlord, and shall be in form satisfactory to Landlord. Tenant shall obtain a written obligation of each insurance company to notify Landlord at least ten (10) days prior to cancellation of such insurance. Such policies or duly executed certificates of insurance shall be delivered to Landlord prior to the commencement of Tenant's occupancy hereunder and renewals thereof as required shall be delivered to Landlord at least thirty (30) days prior to the expiration of the respective policy terms. The proceeds payable to Tenant on account of such insurance shall not be used, except with the consent of Landlord, for any purpose other than the repair or replacement of merchandise, fixture and other property situated within the Demised Premises.

Section 10.5. If Tenant should fail to comply with the foregoing requirements relating to insurance, Landlord may declare Tenant in default of the Lease or obtain such insurance and Tenant shall pay to Landlord on demand as additional rent hereunder the premium cost thereof plus interest, at the then highest lawful contract rate Tenant is authorized to pay under the laws of the State of Texas or the laws of the United States of America, from the date of payment by Landlord until repaid by Tenant.

## ARTICLE XI
## NON-LIABILITY FOR CERTAIN DAMAGES

Section 11.1. Landlord and Landlord's agents and employees shall not be liable to Tenant for any injury or death to person or damage or destruction to property sustained by Tenant or any person claiming through Tenant resulting from the Demised Premises or any other portions of the Shopping Center becoming out of repair or by defect in or failure of equipment, pipes or wiring, or by broken glass, or by the backing up of drains, or by gas, water, steam, electricity, or oil leaking, escaping or flowing into the Demised premises, no shall Landlord be liable to Tenant for any loss or damage that may be occasioned by or through the acts or omission of other Tenants of the Shopping Center or of any other persons whomsoever.

## ARTICLE XII
## FIRE OR OTHER CASUALTY

Section 12.1. Tenant shall give immediate written notice to Landlord of any damage caused to the Demised Premises by fire, or other casualty.

Section 12.2. If at any time during the lease term, (I) all or any portion of the Demised Premises shall be damaged or destroyed by fire or other casualty, or (ii) the Building in which the Demised Premises are located shall be destroyed or rendered untenantable to an extent in excess of 25% of the floor area thereof, then in any such eventuality Landlord shall have the election to terminate this Lease or to repair and restore the Demised Premises to substantially the condition in which they existed immediately prior to such damage or destruction.

Section 12.3. In the event that this Lease is terminated as herein permitted, Landlord shall refund to Tenant the prepaid rent, if any (unaccrued as of the date of damage or destruction), less any sum then owing Landlord by Tenant.

Section 12.4. In any of the aforesaid circumstances, Rental shall abate proportionately during the period and to the extent that the Demised Premises are in the opinion of Landlord unfit for use by Tenant in the ordinary conduct of its business. If Landlord has elected to repair and restore the Leased Premises, this Lease shall continue in full force and effect and such repairs will be made within a reasonable time thereafter, subject to "excusable delays" as hereinabove defined. If Landlord has elected to repair and reconstruct the Demised Premises, then, at the election of Landlord (exercised by notice to Tenant prior to or within thirty (30) days following Landlord's completion of such repair and reconstruction) the Lease Term shall be extended by a period of time equal to the period of such repair and reconstruction.

Section 12.5. In any circumstances where Landlord elects to repair and restore the premises, this Lease shall continue in full force and effect, and such repairs will be made within a reasonable time thereafter, subject to "excusable delays" as hereinabove referred to. In any circumstances where Landlord elects to repair and restore the Demised Premises, Landlord shall not be required to repair any injury or damage by fire or other cause to, or to make any repairs or replacements of any leasehold improvements, fixtures or other personal property of Tenant. In any circumstances where Landlord elects to repair and restore the Demised Premises, Landlord shall not be required to expend for such repairs and restoration any sum in excess of the amount actually collected by Landlord from any insurance policies then in effect. In the event any insurance proceeds are collected by any party holding a lien on Landlord's interest in the Demised Premises or the Shopping Center, such proceeds shall not be deemed to have been collected by

13

Landlord and shall not be available for repair of the Demised Premises whether or not payment to such lien holder is with the approval of Landlord.

Section 12.6. Tenant agrees that during the period of reconstruction or repair of the Demised Premises it will continue the operating of its business within the Demised Premises to the extent practicable.

Section 12.7. Notwithstanding the provisions of Article XIII of this Lease, Tenant agrees that if at any time during the term of this Lease all or any portion of the Demised Premises, the Building in which the Demised Premises are located or any part of the Common Area of the Shopping Center shall be damaged or destroyed by fire or other casualty caused in whole or in part by any act or omission of Tenant, Tenant's employees, licensees, invitees, contractors or concessionaires and Landlord elects to repair and restore said damage, Tenant shall Pay to Landlord upon demand, the amount that Landlord is obligated to pay under any Deductible Clause provided in any insurance policy covering such loss or casualty up to the full amount of said deductible. Tenant's failure to pay said deductible to Landlord within five (5) days from receipt by Tenant of written notice from Landlord of the amount of said deductible shall constitute a default by Tenant of its obligations hereunder and Landlord shall be entitled to pursue any of the remedies provided in this Lease or which are available at law or in equity.

## ARTICLE XIII
## SUBROGATION

Section 13.1. To the extent that Landlord and Tenant may legally so agree, and to the extent that any insurance coverage by Landlord and/or Tenant will not be invalidated thereby, it is agreed and understood that where either party hereto may sustain a loss or damage against which such party is protected by an existing policy or policies of insurance, the party hereto sustaining such loss or damage hereby waives and releases any and all claims, demands and causes of action which it might have against the other party hereto to the extent and amount that such loss is covered by the claimants insurance, irrespective of whether or not such damage or loss is occasioned by the negligence of the respective parties hereto, or either of them, their respective agents, servants, employees, guests or invitees, it being the intention of the parties that no insurance company with which either such party maintains insurance in effect may be subrogated to the rights or causes of action which such party may have against the other party hereto.

## ARTICLE XIV
## CONDEMNATION

Section 14.1. If there shall be taken during the term of this Lease all of the Demised Premises, by any authority having the power of condemnation, then and in that event, the term of this Lease shall cease and terminate, and the date of such termination shall be, at Landlord's election, the earlier of either the date upon which possession shall be tendered to such authority by Landlord or the date upon which possession is taken by such authority. If a lesser part of the Demised Premises should be so taken, Landlord may elect to terminate this Lease or to continue this Lease in effect, but if Landlord elects to continue this Lease in effect, the Rental shall be reduced in proportion to the area of the Demised Premises so taken. Immediately upon the taking of possession of the portion of the Demised Premises taken by the condemning authority above. When any such reduction in Rental has been computed by Landlord, Landlord shall notify Tenant as to the amount of such Rental and such sum shall be due and payable by Tenant to Landlord in accordance with the provisions of Article IV relating to the time and manner of Tenant's payment of Rental. At the request of Landlord, Tenant will execute a letter or other memorandum setting forth the amount of such Rental payable by Tenant. In the event that Landlord has elected to continue this Lease in effect, then upon Landlord's collection of the entire sum due and payable by such authority to Landlord by the way of compensation and damages, Landlord shall restore the remaining portion of the Demised Premises so as to constitute such portion an enclosed building, with such nature of building improvements and facilities as Landlord furnished to Tenant at or prior to commencement of the Lease Term, provided that Landlord shall not be obligated to expend of such restoration any sums in excess of the amount actually received by Landlord from the condemning authority. Such restoration work shall be performed by Landlord within a reasonable period of time with reasonable allowances for "excusable delays" (as hereinabove defined). Neither the restoration work, if any, by Landlord with respect to the Demised Premises nor the restoration work, if any, by Landlord with respect to any other portion of the Shopping Center shall constitute an eviction or disturbance of Tenant's use and possession of the Demised Premises or Shopping Center or a breach by Landlord of any of its obligations hereunder or render Landlord liable for damages or entitle Tenant to be relieved from any of its obligations hereunder (with the exception of the aforesaid proportionate reduction in Rental) or grant Tenant any right of off-set or recoupment. In the event that any condemnation proceeds, whether by way of compensation or damages, are collected by any party holding a lien on Landlord's interest in the Demised Premises, such proceeds shall not be deemed to have been collected by Landlord, whether or no the payment to such lien holder is with the approval of Landlord.

Section 14.2. Whether or not any portion of the Demised Premises may be taken by such authority, Landlord may nevertheless elect to terminate this Lease or to continue this Lease in effect in the event any portion of any building in the Shopping Center or more than ten percent (10%) of the Common Area of the Shopping Center be taken by such authority.

Section 14.3. All sums awarded or agreed upon between Landlord and the condemning authority for the taking of the fee or the leasehold interest, whether as damages or as compensation, will be the property of Landlord. Tenant hereby assigns to Landlord all proceeds, whether by way of compensation or damages, otherwise payable to Tenant for the leasehold interest by reason of such taking. Tenant further grants to Landlord the exclusive authority to negotiate with such authority for payment both with respect to the interest of Landlord and the interest of Tenant in the Demised Premises and Tenant agrees that the authority having the power of eminent domain shall cause all checks and drafts issued by it in connection with any such taking of the fee or leasehold estate whether as compensation or as damages, to be issued payable to the order of Landlord above or payable to the order of Landlord and "landlord's Mortgagee" (as hereinafter defined). Upon the request of Landlord, Tenant agrees to forthwith execute such instrument or instruments as Landlord may reasonable request for the purpose of evidencing the cessation of Tenant's interest in such portion of the Demised Premises as is taken by such authority and the continued effectiveness of this Lease as to the balance of the Demised Premises not taken. Any amount specifically awarded or agreed upon by the Tenant and the condemning authority for the taking of Tenant's "Unattached, Movable, Trade Fixtures" shall be the property of Tenant.

Section 14.4. If this Lease should be terminated under any provision of this Article XIV, all Rental and all other sums due and payable by Tenant hereunder shall be payable up to the date that possession taken by the taking authority, and Landlord will refund to Tenant an equitable portion of any such Rental and other sums paid in advance but not yet earned by such date.

Section 14.5. In the event that any authority having the power of condemnation requests that Landlord convey to such authority all or any portion of the Shopping Center or all or any portion of the Demised Premises, Landlord shall have the right to make a voluntary conveyance to such authority of all or any portion of the Shopping Center or all or any portion of the Demised Premises whether or not proceedings have been filed by such authority; and in the event of any such voluntary conveyance, it shall nevertheless for all purposes hereunder be deemed that there has been a taking by such authority of the property voluntarily conveyed by Landlord. Accordingly, all of the provisions of Sections 14.1, 14.2, 14.3, and 14.4 hereof shall be applicable notwithstanding such voluntary conveyance.

ARTICLE XV
ASSIGNMENT AND SUBLETTING

Section 15.1. Tenant shall not assign or in any manner transfer this Lease or any estate or interest therein or sublet the Demised Premises or any part thereof without the prior written consent of Landlord. Such consent shall not be unreasonably withheld. Consent by Landlord to one (1) or more assignments or subletting shall not operate as a waiver of Landlord's rights as to any subsequent assignments and subletting. Notwithstanding any assignment or subletting, Tenant shall at all times remain fully responsible and liable for the payment of the Rental herein specified and for compliance with all of its other obligations under this Lease. The term "sublet" shall be deemed to include the granting of licenses, concessions, and any other right of occupancy of any portion of the Demised Premises. Any attempt to do any of the foregoing shall be void and of no effect.

If Tenant is a corporation, then any transfer of this Lease from Tenant by merger, consolidation or dissolution or any change in ownership or power to vote a majority of the voting stock in Tenant outstanding at the time of execution of this instrument shall constitute an assignment for purposes of this Lease. For all purposes of this Section 15.1, the term "voting stock" shall refer to shares of stock regularly entitled to vote for the election of directors of the corporation involved.

If Tenant is a general partnership having one or more corporations as partners or if Tenant is a limited partnership having one or more corporations as general partners, the provisions of the preceding paragraph shall apply to each of such corporations as if such corporation alone had been the Tenant hereunder.

If Tenant is a general partnership, then the transfer of a majority of the partnership interest of Tenant as existing at the time of execution of this instrument shall constitute an assignment for purposes of this Lease (or at any future time). If Tenant is a limited partnership, then the assignment of all or any portion of the interest of a general partner of Tenant shall constitute an assignment for the purpose of this Lease.

Section 15.2. Notwithstanding that the prior written consent of Landlord to any of the aforesaid transactions may have been obtained, the following shall apply: (1) In the event of an assignment, contemporaneously with the granting Landlord's aforesaid consent, Tenant shall cause the assignee to expressly assume in writing and agree to perform all of the covenants, duties, and obligations of Tenant hereunder and such assignee shall be jointly and severally liable therefor along with Tenant; Tenant shall further cause such assignee to grant Landlord an express first and prior contract lien and security interest (and execute one or more Uniform Commercial Code Financing Statements) in the manner hereinafter stated as applicable to Tenant; (2) a signed counterpart of all instruments relative thereto (executed by all parties to such transaction with the exception of Landlord) shall be submitted by Tenant to Landlord prior to or contemporaneously with the request for Landlord's written consent thereto (it being understood that no such instrument shall be effective without the written consent of Landlord); (3) Tenant shall subordinate to Landlord's statutory lien and Landlord's aforesaid contract lien and security interest, any liens or other rights which Tenant may claim with respect to any fixtures, equipment, goods, wares, merchandise or other

15

37

property owned by or leased to the proposed assignee, or sublessee or other party intending to occupy the Demised Premises; (4) no usage of the Demised Premises different from the usage herein provided to be made by Tenant shall be permitted, and all other terms and provisions of this Lease shall continue to apply after any such assignment or subleasing; (5) in any case where Landlord consents to an assignment, subleasing, grant of a concession or license or mortgage, pledge or hypothecation of the leasehold or sublease of the Demised Premises, the undersigned Tenant will nevertheless remain directly and primarily liable for the performance of all of the covenants, duties and obligations of Tenant hereunder (including, without limitation, the obligation to pay all rental and other sums herein provided to be paid), and Landlord shall be permitted to enforce the provisions of this instrument against the undersigned Tenant and/or any assignee without demand upon or proceeding in any way against any other person, and (6) in the event that the rental due and payable by a sublessee under any such permitted sublease (or a combination of the rental payable under such sublease plus any bonus or other consideration therefor or incident thereto) exceeds the hereinabove provided rental payable under this Lease or if with respect to a permitted assignment, permitted license or other transfer by Tenant permitted by Landlord, the consideration payable to Tenant by the assignee, licensee or other transferee exceeds the rental payable under this Lease, the Tenant shall be bound and obligated to pay Landlord all such excess rental and other excess consideration within ten (10) days following receipt thereof by Tenant from such sublessee, assignee, licensee or other transferee, as the case might be.

Section 15.3. Tenant shall not mortgage, pledge or otherwise encumber its interest in this Lease or in the Demised Premises, without written consent of the Landlord and will not be unreasonably withheld, nor may such interest be transferred by operation of law. Any attempt to do any of the foregoing shall be void and of no effect.

Section 15.4. If this Lease be assigned or if the Demised Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge or hypothecation of the leasehold interest or grant of any concession or license within the Demised Premises or if the Demised Premises be occupied in whole or in part by anyone other than Tenant without the prior written consent of Landlord, Landlord may nevertheless collect rental from the assignee, sublessee, mortgagee, pledge, party to whom the leasehold interest was hypothecated, concessionaire or licensee or other occupant and apply the net amount collected to the rental payable hereunder, but no such transaction or collection of rental or application thereof by Landlord shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties and obligations hereunder.

ARTICLE XVI
TAX AND INSURANCE COSTS

Section 16.1. The Tenant agrees to pay as additional rent, as hereinafter provided, an amount equal to "Tenant's Share" of "Taxes" and "Insurance Premiums" (as such quoted terms are hereinafter defined) adjusted from time to time, pursuant to the provisions hereinafter stated.

The phrase "Taxes," as used herein, shall mean all taxes, assessments, impositions, levies, charges, excises, fees, licenses, and other sums (whether now existing or hereafter arising, whether foreseen or unforeseen and whether made under the present system of real estate taxation or some other system), levied, assessed, charged, or imposed by any governmental authority or other taxing authority, or which accrue on the Shopping Center for each calendar year (or portion thereof) during the term of this Lease; including, without limitation, all penalties, interest, and other charges (with respect to taxes) payable by reason of any delay and/or failure or refusal of Tenant to make timely payment as required under this Lease. In no event shall the word "Taxes" be deemed to include any of Landlord's income taxes or the estate, inheritance, or gift taxes of any party of "Landlord."

The phrase "Insurance Premiums" shall mean the total annual insurance premiums which accrue on all fire and extended coverage insurance, boiler insurance, public liability and property damage insurance, rent insurance, and any other insurance which, from time to time, may, at Landlord's election, be carried by Landlord with respect to the Shopping Center during any applicable calendar year or portion thereof) occurring during the term of this Lease; provided, however, in the event, during any such calendar year, all or any part of such coverage is written under a "blanket" policy" or otherwise in such manner that Landlord was not charged a specific insurance premium applicable solely to the Shopping Center, then in such event, the amount considered to be the Insurance Premium with respect to such coverage for such calendar year, shall be that amount which would have been the annual Insurance Premium payable under the rates in effect on the first day of such applicable calendar year for a separate Texas Standard Form insurance policy generally providing such type and amount of coverage (without any deductible amount) with respect to the Shopping Center (considering the type of construction and other relevant matters), irrespective of the fact that Landlord did not actually carry such type policy.

The phrase "Tenant's Share," as applied to Taxes and Insurance Premiums, shall refer to a sum calculated by multiplying the Taxes and Insurance Premiums (as the case may be ) by a fraction, the numerator of which is the floor area (in square feet) of the Demised Premises (as indicated in Article I of this Lease) and the denominator of which is the total Gross Leasable Retail Area within the Shopping Center on the 1st day of January fro the relevant calendar year for which any calculation referred to in this paragraph is being made; provided, however, for any period less than twelve (12) full calendar months with respect to which such calculation is being made, a pro rata portion of the resulting product shall be calculated to determine Tenant's Share.

16

Monthly, during the first year of the term of this Lease, Tenant will pay to Landlord the Estimated Tax and Insurance Charge (as such term is defined in Article I of the Lease), monthly in advance, payable at the same time and place as the Rental is payable, except, however, if the Lease Term does not begin on the first day of a calendar month, Tenant shall pay a pro rata portion of such sum for such partial month. Landlord shall have the right to adjust such monthly estimate on an annual basis, pursuant to the following paragraph hereof.

At the end of each calendar year occurring during the term of this Lease (subsequent to the expiration or other termination of this Lease, if such occurs on a date other than the last day of the calendar year), Landlord shall give Tenant notice of the total amount paid by Tenant for the relevant calendar year together with the actual amount of Tenant's Share of Taxes and Insurance Premiums ("Total Cost") for such calendar year. If the actual amount of Tenant's Share of the Total Cost with respect to such period exceeds the aggregate amount previously paid by Tenant with respect thereto during such period, Tenant shall pay to Landlord the deficiency within fifteen (15) days following notice from Landlord; however, if the aggregate amount previously paid by Tenant with respect thereto exceeds Tenant's Share of the Total Cost for such period, then, at Landlord's election, such surplus (net of any amounts then owing by Tenant to Landlord) shall be credited against the next ensuing installment of any such cost due hereunder by Tenant, or Landlord may refund such net surplus to Tenant. Periodically, during the term of this Lease, Landlord shall have the right to estimate Tenant's Share of Taxes and Insurance Premiums for the next fiscal period (determined by Landlord) of the term of this Lease, whereupon, Tenant shall pay Landlord such amount as may be so indicated by Landlord in the same manner as the Estimated Tax and Insurance Charge.

## ARTICLE XVII
## DEFAULT BY TENANT AND REMEDIES

Section 17.1. The following events shall be deemed to be events of default by Tenant under this Lease:

(1) Tenant shall fail or refuse to pay any installment of Rental, or any monies due and payable to Landlord when due and such failure shall continue for a period of ten (10) days after such due date.

(2) Tenant or any guarantor of Tenant's obligations under this Lease shall become insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors.

(3) The entry of a decree or order by a court having jurisdiction over Tenant or any guarantor of Tenant's obligations hereunder in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable, federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of Tenant or any guarantor of Tenants' obligation hereunder or for any substantial part of either of said party's property, or ordering the winding-up or liquidation of either of said party's affairs.

(4) The commencement by Tenant or any guarantor of Tenant's obligations hereunder of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable, federal or state bankruptcy, insolvency or other similar law, or the consent by either of such parties to the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of any substantial part of the property of Tenant or any guarantor of Tenant's obligations hereunder, or to the taking possession of any such property by any such functionary or the making of any assignment for the benefits of creditors for either Tenant or any guarantor of Tenant's obligations hereunder, or the failure of Tenant or any guarantor of Tenant's obligations hereunder generally to pay its debts and such debts become due, or the taking of corporate action by any corporate Tenant or any corporate guarantor of Tenant's obligations hereunder in furtherance of any of the foregoing.

(5) Tenant shall abandon, desert or vacate any portion of the Demised Premises.

(6) Tenant shall do or permit to be done anything which creates a lien upon the Demised Premises.

(7) Without Landlord's prior written consent, if, Tenant being a general partnership or joint venture, there shall be any change in the membership of such partnership or joint venture subsequent to the execution of this Lease, or if Tenant being a limited partnership, there shall be any change in the general partners subsequent to the execution of this Lease, or if, Tenant being a corporation, there shall be any change in the control of the corporation subsequent to the execution of this Lease.

(8) Tenant shall fail or refuse to comply with any term, provision, or covenant of this Lease, other than the payment of rent, and shall not cure such failure within ~~twenty (20)~~ days after written notice thereof to Tenant, other than the aforementioned events of default specified in (1) thru (7) of this Section 17.1.  *THIRTY (30)*

Upon the occurrence of any of such events of default, Landlord shall have the option to pursue any one or more of the following remedies without any notice or demand whatsoever:

17

A. Terminate this Lease, in which event Tenant shall immediately surrender the Demised Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which he may have for possession or arrearages in rent, enter upon and take possession of the Demised Premises and expel or remove Tenant and any other person who may be occupying said premises or any part hereof, without being liable for prosecution or any claim of damages therefor; and Tenant agrees to pay Landlord on demand the amount of all loss and damage which Landlord may suffer by reason of such termination, whether through inability to relet the Premises on satisfactory terms or otherwise.

B. Enter upon and take possession and expel or remove Tenant and any other person who may be occupying said premises or any part thereof, without being liable for prosecution or any claim for damages therefor, and, if Landlord so elects, relet the premises on such terms as Landlord may deem advisable and receive the rent therefor; and Tenant agrees to pay to Landlord on demand any deficiency that may arise by reason of such reletting.

C. Enter upon the Demised Premises (including altering locks and other security devices) without being liable for prosecution or any claim for damages therefor, and do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in this effecting compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for any damages, resulting to the Tenant from such action whether caused by the negligence of Landlord or otherwise.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law or in equity, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any rent payable to Landlord hereunder or of any damages accruing to Landlord by reason of the violation of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default. In determining the amount of loss or damage which Landlord may suffer by reason of termination of this Lease or the deficiency arising by reason of any reletting of the Demised Premises by Landlord as above provided, allowance shall be made for the expense of repossession and any repairs or remodeling undertaken by Landlord following repossession.

Section 17.2. If, on account of any breach or default by Tenant in Tenant's obligations hereunder, it shall become necessary for Landlord to employ an attorney to defend any of the Landlord's rights or remedies. **Tenant agrees to pay any reasonable attorney's fees incurred by Landlord in such connection.**

Section 17.3. Tenant, contemporaneously with the execution of this Lease, has deposited with Landlord the sum set forth in Article I (o), the receipt of which is hereby acknowledged by Landlord; said deposit being given to secure the faithful performance by the Tenant of all of the terms, covenants, and conditions of this Lease by the Tenant to be kept and performed during the term hereof. Tenant agrees that if the Tenant shall fail to pay the Rental or any other sums due and owing by Tenant to Landlord herein reserved promptly when due, said deposit may, at the option of the Landlord (but Landlord shall not be required to ) be applied to any Rental or any other sums due and unpaid, and if the Tenant violates any of the other terms, covenants and conditions of this Lease, said deposit may be applied to any damages suffered by Landlord as a result of Tenant's default, to the extent of the amount of the damages suffered. Nothing contained in this Article shall in any way diminish or be construed as waiving any of the Landlord's other remedies as provided in this Article XVII, or by law or in equity. Should the entire Default Deposit, or any portion thereof, be appropriated and applied by Landlord for the payment of overdue rent or other sums due and payable to Landlord by Tenant hereunder, then Tenant shall on the written demand of Landlord, forthwith remit to Landlord a sufficient amount in cash to restore said Default Deposit to its original amount, and Tenant's failure to do so within ten (10) days after receipt of such demand shall constitute a breach of this Lease. Should Tenant comply with all of the terms, covenants, and conditions of this Lease and promptly pay all of the Rental herein provided for as it falls due and all other sums payable by Tenant to Landlord hereunder, said Default Deposit shall be returned in full to Tenant at the end of the term of this Lease, within 30 days provided Tenant has notified Landlord in writing of a forwarding address or upon the earlier termination of this Lease less, however, any amounts that may be due from Tenant to Landlord or any amounts that Landlord estimates will be due and owing from Tenant on account of Tenant's Share of the Common Area Maintenance Charge of Tax and Insurance Charge (even though final adjustments thereto are not made by Landlord until the end of the applicable calendar year.) In the event this Lease is terminated prior to the expiration of the stated term as hereinabove provided, in addition to all other remedies provided herein or available at law or in equity, Landlord may use, apply or retain the whole or any part of the security so deposited remaining after applying said deposit to the payment of any Rental due and unpaid and any other sum as to which Tenant is in default, and use, apply or retain the balance of the Default Deposit for payment of any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this Lease, including but not limited to, any damages or deficiency in the reletting of the Demised Premises, whether such damages or deficiency accrued before or after summary proceedings or other re-entry by Landlord. Landlord shall have the right to commingle said Default Deposit with other funds of the Landlord. Landlord may deliver the funds deposited hereunder by Tenant to the purchaser of Landlord's interest in the Demised Premises in the event that such interest is sold, and thereupon Landlord shall be discharged from further liability with respect to such deposit. Notwithstanding that Landlord may hereafter

18

40

(but shall not be obligated to ) approve any sublease or assignment by Tenant, no assignee or sublessee shall have any right, title or interest in the Default Deposit unless otherwise provided in the sublease or assignment instrument executed by Landlord to evidence its permission to such transaction. No such assignment or sublease, however, shall alter, affect or modify any of the rights of Landlord with respect to the Default Deposit. Tenant's rights hereunder with respect to the Default Deposit shall not in any other manner be assigned, transferred, pledged, mortgaged or encumbered by Tenant without the prior written consent of Landlord, and any attempt by Tenant to do so shall be void and of no effect. In the event of the Bankruptcy of Tenant (or said transferee) or other debtor-creditor proceedings, the Default Deposit may be applied by Landlord as an off-set against any obligation of Tenant (or said transferee due and owing of Landlord. In the event this Lease should be terminated as provided in any construction addendum attached hereto, Landlord may retain the Default Deposit as liquidated damages for its cost of preparing and revising the plans and specifications and/or other administrative costs incurred prior to such termination.

Section 17.4. In the event that Landlord elects to repossess the Demised Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord at Houston, Harris County, Texas, all rent and other indebtedness accrued to the date of such repossession, plus rent required to be paid by Tenant to Landlord during the remainder of the Lease term until the date of expiration of the term diminished by any net sums thereafter received by Landlord through reletting the Demised Premises during said period (after deducting expenses incurred by Landlord as provided herein). In no event shall Tenant be entitled to any excess of any rent obtained by reletting over and above the rent herein reserved. Actions to collect amounts due by Tenant as provided in this Section 17.4 may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until expiration of the Lease Term.

Section 17.5. In case of an event of default, Tenant shall also be liable for and shall pay to Landlord, at Houston, Harris County, Texas, in addition to any sum provided to be paid above: broker's fees incurred by Landlord in connection with reletting the whole or any part of the Demised Premises; the costs of removing and storing Tenant's or other occupant's property; the costs of repairing, altering, remodeling or otherwise putting the Demised Premises into condition acceptable to a new tenant or tenants; and all reasonable expenses incurred by Landlord in enforcing Landlord's remedies or the State of Texas, whichever is applicable. Past due rent and other past due payments shall bear interest from maturity at the then highest lawful contract rate which Tenant is authorized to pay under the applicable laws of the United States.

Section 17.6. N/A

Section 17.7. In the event of termination or repossession of the Demised Premises for a default, Landlord shall not have any obligation to relet or attempt to relet the Demised Premises, or any portion thereof, or to collect rental after reletting; and in the event of reletting, Landlord may relet the whole or any portion of the Demised Premises for any period, to any tenant and for any use and purpose.

Section 17.8. If Tenant should fail to make any payment or cure any default hereunder within the time herein permitted, Landlord, without being under any obligation to do so and without thereby waiving such default, may make such payment and/or remedy such other default for the account of Tenant (and enter the Demised Premises for such purpose), and Tenant shall be obligated to, and hereby agrees, to pay Landlord, upon demand, all costs, expenses and disbursements (including reasonable attorney's fees) incurred by Landlord in taking such remedial action.

Section 17.9. In the event that Landlord shall have taken possession of the Demised Premises pursuant to the authority herein granted, then Landlord shall have the right to keep in place and use all of the furniture, fixtures and equipment at the Demised Premises, including that which is owned by or leased to Tenant, at all times prior to any foreclosure thereon by Landlord or repossession thereby by any lessor thereof or third party having a lien thereon. Landlord shall also have the right to remove from the Demised Premises (without the necessity of obtaining a distress warrant, writ of sequestration or other legal process) all or any portion of such furniture, fixtures, equipment and other property located thereon and place same in storage at any premises within the county in which the Demised Premises is located, or at any other place reasonable convenient to Landlord; and in such event, Tenant shall be liable to Landlord for all costs incurred by Landlord in connection with such removal and storage and shall indemnify and hold Landlord harmless from all loss, damages, cost, expense and liability in connection with such removal and storage, Landlord shall also have the right to relinquish possession of all or any portion of such furniture, fixtures, equipment and other property to any person ("Claimant") claiming to be entitled to possession thereof who presents to Landlord a copy of any instrument represented to Landlord by Claimant to have been executed by Tenant (or any predecessor of Tenant) granting Claimant the right under various circumstances to take possession of such furniture, fixtures, equipment or other property, without the necessity on the part of Landlord to inquire into the authenticity of said instrument copy of Tenant's (or Tenant's predecessor's) signature thereon and without the necessity of Landlord's making any nature of investigation or inquiry as to the validity of the factual or legal basis upon which Claimant purports to act; and Tenant agrees to indemnify and hold Landlord harmless from all cost, expense, loss damage and liability incident to Landlord's relinquishment of possession of all or any portion of such furniture, fixtures, equipment or other property to Claimant. The rights of Landlord herein stated shall be in addition to any and all other rights which Landlord has or may hereafter have at law or in equity; and Tenant stipulates and agrees that the rights herein granted Landlord are commercially reasonable.

19

41

Section 17.10. To secure the payment of all Rental and any other sums due and to become due hereunder and the faithful performance of this Lease by Tenant, Tenant hereby gives to Landlord an express first and prior contract lien and security interest on all property (including fixtures, equipment, and chattels which may be placed in the Demised Premises, and also upon all proceeds of any such property, and also upon all proceeds of any insurance which may accrue to Tenant by reason of destruction of or damage to any such property and also upon all of Tenant's interests as Tenant and rights options to purchase fixtures, equipment, and chattels placed in the Demised Premises (in the case of fixtures, equipment and chattels leased to Tenant which are placed in the Demised Premises). All exemption laws are hereby waived in favor of said lien and security interest. This lien and security interest is given in addition to the Landlord's statutory lien and shall be cumulative thereto. This lien may be foreclosed with or without court proceedings by public or private sale, provided Landlord gives Tenant at least ten (10) days notice of the time and place of said sale; and Landlord shall have the right to become the purchaser, upon being the highest bidder at such sale. Contemporaneously with the execution of this Lease (and if requested hereafter by Landlord), Tenant shall execute and deliver to Landlord Texas Uniform Commercial Code Financing Statements in sufficient form so that when property filed, the security interest hereby given shall thereupon be perfected. If requested hereafter by Landlord, Tenant shall also execute and deliver to Landlord Texas Uniform Commercial Code Financing Statement Change instruments in sufficient form to reflect any proper amendment of, modification in or continuation or extension of the aforesaid contract lien and security interest hereby granted. Landlord shall, in addition to all of its rights hereunder, also have all of the rights and remedies of a secured party under the Texas Uniform Commercial Code (the Texas Business and Commerce Code).

Section 17.11. In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rent due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have a reasonable period, but in no event less than thirty (30) days, in which to cure any such default, provided, however, if Landlord's default is of such a nature that it cannot reasonable be cured within said thirty (30) day period then Landlord will not be deemed to be in default hereunder if Landlord has promptly commenced to cure said default and is diligently attempting to cure the same. Unless and until Landlord fails to so cure any default after such notice, Tenant shall not have any remedy or cause of action by reason thereof. All obligations of Landlord hereunder will be construed as covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its possession of the Shopping Center and not thereafter.

ARTICLE XVIII
HOLDING OVER

Section 18.1. If Tenant should remain in possession of the Demised Premises after the expiration of the term of this Lease, without the execution of a new lease, then Tenant shall be deemed to be occupying the Demised Premises as a tenant from month-to-month, subject to all the covenants and obligations of this Lease and at a rental equal to two hundred percent (200%) of the Rental herein provided (computed on a monthly basis rather than the other periodic basis hereinabove provided), and including also two hundred percent (200%) of all other sums payable hereunder. If any property not belonging to Landlord remains at the Demised Premises after the expiration of the term of this Lease, Tenant hereby authorizes Landlord to make such disposition of such property as Landlord may desire without liability for compensation or damages to Tenant in the event that such property is the property of Tenant; and in the event that such property is the property of someone other than Tenant, Tenant agrees to indemnify and hold Landlord harmless from all suits, actions, liability, loss, damages and expenses in connection with or incident to any removal, exercise or dominion over and/or disposition of such property by Landlord.

ARTICLE XIX
LANDLORD'S MORTGAGE

Section 19.1. This Lease is expressly subject, subordinate and inferior to any mortgage, deed of trust, security agreement or other lien or encumbrance whatever resulting from any method of financing or refinancing, presently or henceforth placed upon the land and/or improvements comprising the Shopping Center and any future expansion thereof or additions thereto, and to all advances of money or other value heretofore or hereafter made upon the security thereof; provided, however, the foregoing provisions of this Article XIX to the contrary notwithstanding, if, Landlord or the holder of any such mortgage, deed of trust, security agreement or other lien or encumbrance shall elect to make this Lease superior, then this Lease shall be deemed superior to any such mortgage, deed of trust, security agreement or other lien or encumbrance. Without limiting the generality or effect of the foregoing provisions of this Article XIX, Tenant covenants and agrees promptly upon request of Landlord within 10 days to execute and deliver, in a recordable form provided by Landlord, and acknowledgment of subordination or superiority of the Lease, as the case may be according to the election made by Landlord or the holder of such mortgage, deed of trust, security agreement or other lien or encumbrance as hereinabove provided (and upon any failure of Tenant to acknowledge such subordination or superiority as aforesaid, Landlord is hereby irrevocably vested with full power and authority to act on Tenant's behalf); however, notwithstanding that this Lease may be (or made to be) superior to such mortgage, deed of trust or other security agreement or other lien or encumbrance, the provisions of such mortgage, deed of trust beneficiary or secured party with respect to proceeds arising from an eminent domain taking (including a voluntary conveyance by Landlord) and/or arising from insurance payable by reason of damage to or destruction of the Demised Premises shall be

20

42

prior and superior to any contrary provisions contained in this instrument with respect to the payment or usage thereof.

Subject to the foregoing provisions of this Article XIX, Landlord reserved the right, without notice to or consent of the Tenant, to assign this Lease and/or any and all rents hereunder as security for the payment or any mortgage loan, deed of trust loan or other method of financing or refinancing.

Section 19.2. For purposes of this Article, the term "Landlord's Mortgagee" means any party holding a mortgage or deed of trust on the Demised Premises or any part thereof or all or any portion of the Shopping Center. A lien held by a Landlord's Mortgagee on the Demised Premises or any portion thereof or Shopping Center or any portion thereof is herein referred to as a "Landlord's Mortgage".

Section 19.3. If the Demised Premises are at any time during the term of this Lease subject to a Landlord's Mortgage then, in any instance in which Tenant gives notice to Landlord alleging default be Landlord in performance of any covenant or obligation under this Lease, Tenant will also simultaneously give a copy of such notice to Landlord's Mortgagee (at the post office address as to which such Landlord's Mortgagee shall have given Tenant notice) and the Landlord's Mortgagee shall have the right (but no obligation) to cure or remedy such default of Landlord during the same item that is permitted to Landlord hereunder for the remedying or curing of such default, plus an additional period of thirty (30) days; and Tenant will accept such curative or remedial action taken by a Landlord's Mortgagee with the same effect as if such action had been taken by Landlord, and Tenant shall not seek damages from Landlord or any other relief or exercise or attempt to exercise any remedies by reason of any such default of Landlord if Landlord's Mortgagee shall have cured or remedied such default within the time allowed herein (including the aforesaid additional thirty (30) day period) or is then attempting to foreclose its lien upon or obtain possession of the Shopping Center.

If the Demised Premises are at any time during the term of this Lease subject to a Landlord's Mortgage and Landlord's Mortgagee shall have foreclosed under its Landlord's Mortgage or received a conveyance of the mortgaged property (covered by its Landlord's Mortgage) in lieu of foreclosure of shall have taken possession of such mortgaged property or is collection rent from such mortgaged property pursuant to a rent assignment, then covenants of Landlord in this Lease which pertain to property lying beyond the boundaries of such mortgaged property shall have no force or effect as against Landlord's Mortgagee (and Tenant may not, in the event of any violation of any of such covenants by Landlord, abate rent, terminate this Lease, recover damages from Landlord's Mortgagee or exercise any other remedy against Landlord's Mortgagee); however, Tenant shall nevertheless retain, as Tenant's sole and exclusive remedy against Landlord, Tenant's right of action for damages on account of such violation as provided for under Section 17.11 of this Lease.

Section 19.4. Landlord and Tenant each covenant and agree that so long as there is in effect any collateral assignment of Landlord's rights under this Lease to any Landlord's Mortgagee, none of the following actions shall be taken without the prior written consent of Landlord's Mortgagee in each instance (except as may be permitted in any Landlord's Mortgage):

(a) This Lease will not be modified, altered or amended in any way, unless in writing by both parties;

(b) Landlord and Tenant will not agree to a cancellation of this Lease, nor will Tenant surrender its rights hereunder to Landlord (except in instances where in the right to do so is expressly granted to Tenant under the other terms and provisions of this Lease);

(c) Landlord will not convey its fee interest in the Demised Premises to Tenant in a manner which will result in merger, nor take any other action which would result in merger, of Landlord's estate in the Demised Premises with Tenant's leasehold under this Lease, unless, at the time of such conveyance, Tenant assumes in writing any unpaid balance owing and to become owing to any Landlord's Mortgagee which is secured by a collateral assignment of this Lease; but this does not prohibit an assignment of Landlord's estate to Tenant by assignment specifically made subject to this Lease; and

(d) Tenant will not prepay and Landlord will not accept prepayment of any installment or payment of Rental more than thirty (30) days in advance of the due date thereof.

The provisions of this Section shall be for the benefit of Landlord, Tenant and each Landlord's Mortgagee, and shall be enforceable by any one or more of such parties.

Section 19.5. Tenant shall execute and deliver to Landlord, at such time or times as Landlord may request, an estoppel certificate stating:

(a) Whether or not the Lease is in full force and effect;

(b) Whether or not the Lease has been modified or amended in any respect, and submitting copies of such modification or amendments, if any;

21

43

(c) Whether or not there are any existing defaults under this Lease to the knowledge of the party executing the Certificate, and specifying the nature of such defaults, if any; and

(d) Such other information as may be reasonable requested.

The aforesaid certificate(s) shall be delivered to Landlord promptly upon receipt of a written request therefor, but in no event more than five (5) days following receipt of such request. Failure by Tenant to timely deliver such information pursuant to such request and upon failure of Tenant to deliver aforesaid certificate, Landlord is hereby irrevocably vested with full power and authority to act on Tenant's behalf or, at Landlord's option, shall constitute an event of default hereunder and entitle Landlord to exercise any remedies permitted under the terms of this Lease without the necessity of further notice to Tenant (notwithstanding any prevision to the contrary contained in Article XVII).

Section 19.6. If in connection with Landlord obtaining a Landlord's Mortgage, Landlord's Mortgagee shall request reasonable modifications in this Lease as a condition of Landlord's Mortgagee to provide Landlord's Mortgage, Tenant will not unreasonable withhold, delay, or defer its consent thereto; provided, that such modifications do not increase the obligations of Tenant hereunder or materially affect the leasehold interest created hereby, or the use or enjoyment of the Demised Premises by the Tenant.

Section 19.7. If Landlord herein does not own the fee to any portion of the property which constitutes the Shopping Center, but instead holds only a leasehold interest therein under a ground lease, then in such event, this instrument shall be a sublease agreement subject and subordinate to the underlying ground lease. If this Lease should be terminated as a result of termination of the said underlying ground lease (regardless of the reason for termination of such underlying ground lease), Tenant shall have no right or claim against Landlord by reason thereof. This Lease is made by Landlord and accepted by Tenant subject to any and all matters of record affecting the Demised Premises or the Shopping Center.

ARTICLE XX
MERCHANTS ASSOCIATION

Section 20.1.    N/A

ARTICLE XXI
NOTICES

Section 21.1. Wherever any notice is required or permitted hereunder such notice shall be in writing. Any notice or document required or permitted to be delivered hereunder shall be deemed to be delivered whether actually received or not when deposited in the United States Mail, postage prepaid, Certified Mail, Return Receipt Requested, addressed to the parties hereto at the respective addresses set out in Section 1.1(c) and 1.1(f) above, or at such other addresses as they may hereafter specify by written notice delivered in accordance herewith.

ARTICLE XXII
OPTION

Section 22.1. Contingent upon Tenant satisfying all of the following conditions, (the "Condition") Tenant is hereby granted an option to extend the Lease Term, as set forth in Article I(k) (the "Primary Term") for an additional five (5) year period (60) months (the "Extension Term"), the Conditions being that: (i) Tenant shall have fully performed all of its covenants, duties and obligations hereunder during the Primary Term; and (ii) Tenant shall have given written notice to Landlord not less than one hundred eighty (180) days prior to the expiration of the Primary Term of Tenant's exercise of such option. (iii) The renewal rate of the extended term will be at the then prevailing market rate.

Section 22.2. Time is of the essence in the exercise of this option and should Tenant fail to exercise this option by timely notice or fail to satisfy the Conditions, this option shall lapse and be of no further force or effect.

Section 22.3. In the event that Tenant satisfies all of the Conditions and effectively exercises the option herein granted, then Landlord and Tenant shall execute a new Lease in form and content satisfactory in all respects to both Landlord and Tenant except: (a) Tenant shall have no further right to renew or extend the Lease Term after the expiration or other termination of the Extension Term; and (b) the Rental for said option term shall be at a rate to be negotiated between Landlord and Tenant and mutually satisfactory to both parties. In the event that Landlord and Tenant have not agreed as to the rental rate for the option term on or before the expiration date of the Primary Term of this Lease, then either party may terminate the option granted hereby by written notice delivered to the other party not later than the expiration date of the Primary Term of this Lease.

ARTICLE XXIII
MISCELLANEOUS

Section 23.1. Nothing herein contained shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of a partnership or of a joint venture

22
44

between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts or the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant. The provisions of this instrument relating to the payment of Rental, if any; payable by Tenant hereunder are included solely for the purpose of providing for the payment of rental in excess of the Rental, and providing for a method whereby such additional rental is to be measured, ascertained and paid.

Section 23.2. The captions used in this Lease are for convenience only and do not in any way limit or amplify the terms and provisions hereof.

Section 23.3. Neither acceptance of Rental by Landlord nor failure by Landlord to complain of any action, non-action or default of Tenant shall constitute a waiver as to any breach of any covenant or condition of Tenant contained herein nor waiver of any of Landlord's rights hereunder. No right or remedy of Landlord hereunder or convenant, duty or obligation of Tenant hereunder shall be deemed waived by Landlord unless such waiver be in writing, and signed by Landlord. One or more waivers of any covenant, term or condition of this Lease by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent or approval by either party to or any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

Section 23.4. Whenever a period of time is herein prescribed for action to be taken by Landlord, Landlord shall not be liable or responsible for , and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, was governmental laws, regulations, or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of Landlord. At any time when there is outstanding a mortgage, deed of trust or similar security instrument covering Landlord's interest in the Demised Premises, Tenant may not exercise any remedies of trust or similar security instrument covering Landlord's interest in the Demised Premises, Tenant may not exercise any remedies for default by Landlord hereunder unless and until the holder of the indebtedness secured by such mortgage, deed of trust or similar security instrument shall have received written notice of such default and a reasonable time for curing such default shall thereafter have elapsed.

Section 23.5. All obligations of Landlord and Tenant under the terms of this Lease shall be payable and performable in Houston, Harris County, Texas.

Section 23.6. Landlord hereby covenants and agrees that if Tenant shall perform all of the covenants and agreements herein required to be performed on the part of Tenant, Tenant shall, subject to the terms of this Lease and any mortgages presently or hereafter existing against the Shopping Center, at all times during the continuance of this Lease have the peaceable and quiet enjoyment and Possession of the Demised Premises.

Section 23.7. This Lease contains the entire agreement between the parties, and no agreement shall be effective to change, modify or terminate this Lease in whole or in part unless such agreement is in writing and duly signed by the party against who enforcement of such change, modification or termination is sought.

Section 23.8    N/A. See Article XXV, Additional Miscellaneous

Section 23.9. Tenant agrees that it will from time to time upon request by Landlord execute and deliver to the Landlord a statement in recordable form certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified) and further stating the dates to which rent and other charges payable under this Lease have been paid.

Section 23.10. The laws of the State of Texas shall govern the interpretation, validity, performance, and enforcement of this Lease. If any provision of this Lease should be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Lease shall not be affected thereby.

Section 23.11. The terms, provisions, and covenants contained in this Lease shall apply to , inure to the benefit of and binding upon the parties hereto and their respective heirs, successors in interest and legal representatives except as otherwise herein expressly provided.

Section 23.12. With respect to terminology in this Lease, each number (singular or plural) shall include all numbers, and each gender (male, female or neuter) shall include all genders.

Section 23.13. In any circumstances where Landlord is permitted to enter upon the Demised Premises during the Lease Term, whether for the purpose of curing any default of Tenant, repairing damage resulting from fire or other casualty or an eminent domain taking or is otherwise permitted hereunder or by law to go upon the Demised Premises, no such entry shall constitute an eviction or disturbance of Tenant's use and possession of the Demised Premises or a breach by Landlord of any of its obligations hereunder or render Landlord liable for damages for loss of business or otherwise or entitle Tenant to be relieved from any of its obligation hereunder or grant Tenant any right of set-off or recoupment or other remedy; and in connection with any such entry incident to performance of repairs, replacements, maintenance or construction, all of the aforesaid provisions shall be applicable notwithstanding that Landlord may elect to

23

45

take building materials in, to or upon the Demised Premises that may be required or utilized in connection with such entry by Landlord.

Section 23.14. In the event Landlord commences any proceedings against Tenant for non-payment of Rental or any other sum due and payable by Tenant hereunder, Tenant will not interpose any counterclaim or other claim against Landlord of whatever nature or description in any such proceedings, Landlord and Tenant stipulate and agree that, in addition to any other lawful remedy of Landlord, Upon motion of Landlord, such counterclaim or other claim asserted by Tenant shall be severed out of the proceedings instituted by Landlord and Landlord may proceed to final judgment separately and apart from and without consolidation with or reference to the status of such counterclaim or any other claim asserted by Tenant.

Section 23.15. Tenant stipulates and acknowledges that the existence of any breach or threatened breach of any covenant, duty or obligation of Tenant herein contained would constitute a severe impediment to the ability of Landlord to operate the Shopping Center and to receive the benefits contemplated by this Lease; that the existence of such breach or threatened breach will cause irreparable damage to Landlord for which there would not be an adequate remedy at law and for which no other equitable remedy would be adequate or available, and accordingly Landlord shall be entitled to enjoin any such breach or threatened breach without the necessity of proving the inadequacy of any legal remedy or irreparable harm. The remedies of Landlord hereunder shall be deemed cumulative and no remedy o Landlord, whether exercised by Landlord or not, shall be deemed to be in exclusion of any other. Except as may be otherwise herein expressly provided, in all circumstances under this Lease where prior consent of one party ("first party") is required before the other party("second party") is authorized to take any particular type of action, the matter of whether to grant such consent shall be within the sole and exclusive judgment and discretion of the first party, and it shall not constitute any nature of breach by the first party hereunder or any defense to the performance of any covenant, duty or obligation of the second party hereunder whether or not the delay or withholding of such consent was prudent or reasonable or based on good cause.

Section 23.16. In all instances where Tenant is required hereunder to pay any sum or do any act at a particular indicated time or within an indicated period, it is understood that time is of the essence.

Section 23.17. The obligation of Tenant to pay all rent and other sums hereunder provided to be paid by Tenant and the obligation of Tenant to perform Tenant's other covenants and duties hereunder constitutes independent, unconditional obligations to be performed at all times provided for hereunder, save and except only when an abatement thereof or reduction therein is expressly provided for in this Lease and not otherwise. Tenant waives and relinquishes all rights which Tenant might have to claim any nature of lien against or withhold, or deduct from or off-set against any rent and other sums provided hereunder to be paid Landlord by Tenant. Tenant waives and relinquishes any right to assert, either as a claim or as a defense, that Landlord is bound to perform or liable for the non-performance of any implied covenant or implied duty of Landlord not expressly herein set forth.

Section 23.18. Under no circumstances whatsoever shall Landlord ever be liable hereunder for consequential damages or special damages; and all liability of Landlord for damages for breach of any covenant, duty or obligation of Landlord hereunder may be satisfied only out of the interest of Landlord in the Shopping Center existing at the time any such liability is adjudicated in a proceeding as to which the judgment adjudicating such liability is non-appealable and not subject to further review. It is intended that Landlord shall not have any personal liability under this Lease, and in no event shall a judgment for any deficiency be sought, obtained or enforced against any party of Landlord under the terms hereof.

Section 23.19 N/A

Section 23.20. In no event shall Landlord, including any successor or assignee of all or any portion of Landlord's interest in the Shopping Center, be personally liable or accountable with respect to any provision of this Lease. If Landlord shall be in breach or default with respect to any obligation hereunder or otherwise, Tenant agrees to look for satisfaction solely to Landlord's interest in the Shopping Center. The provisions of this Section 23.20 are not intended to, and shall not, limit any right that Tenant might otherwise have to obtain injunctive relief against Landlord or Landlord's successors in interest, or any other action not involving the personal liability of Landlord to respond in monetary damages from assets other than Landlord's interest in the Shopping Center, or any suit or action in connection with enforcement of collection of amount which may become owing or payable under or on account of insurance maintained by Landlord. In the event Landlord transfers this Lease, other than as security for a mortgage, the Landlord (and, in case of any subsequent transfers or conveyances, the then Grantor) shall, upon such transfer be relieved from all liability and obligations hereunder arising after such transfer.

Section 23.21   N/A

Section 23.22.   N/A

Section 23.23. No payment made by Tenant or received by Landlord in an amount less than the amount herein stipulated shall be deemed to be other than on account of the earliest received payment, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rental or any other sum payable hereunder to deemed an accord and satisfaction, and Landlord may accept

46

any such check or payment without prejudice to Landlord's right to recover the balance of such amount from Tenant or to pursue any other remedy in this Lease or by law provided.

Section 23.24. During the term of this Lease Tenant shall not install any pay telephones in or about the Demised Premises or the building (the "Building") of which said premises are a part without the prior written consent of Landlord. Any attempt to install or the actual installation by Tenant of pay telephones in or about the Demised Premises or the Building shall constitute a default by Tenant under this Lease and Landlord may pursue any of the remedies provided in this Lease or available at law or in equity for Tenant's default. In the event Tenant requests Landlord's consent to installation of pay telephones in or about the Demised Premises or the Building, Landlord shall have the right (in addition to its absolute right to refuse to consent thereto) to condition its consent upon payment by Tenant to Landlord of all or any part of the consideration to be received by Tenant from the use and operation of said pay telephone service.

ARTICLE XXIV
ENVIRONMENTAL LAW COMPLIANCE

Section 24.1. The parties acknowledge that there are certain federal, state and local laws, regulations and guidelines relating to or affecting the Demised Premises in the Shopping Center concerning the impact on the environment of construction, remodeling, land use, maintenance and operation of structures in the conduct of business. Lessee will not cause, or permit to be caused, any act or practice, by negligence, omission, or otherwise, that would adversely affect the environment or do anything or permit anything to be done that would violate any of said laws, regulations or guidelines. Any violation of this covenant shall be an event of default under this Lease.

Lessor shall be responsible for any environmental problems in the Demised Premises that originated before Lessee's occupancy. Lessor shall also be responsible for any environmental problem in the Shopping Center common areas not the responsibility of Lessee. Such environmental problems include but are not limited to formaldehyde foam insulation, asbestos, dioxin and radon gas.

Lessor agrees to indemnify and hold Lessee harmless from and against any liability or damage which Lessee may incur by reason of contaminants, hazardous waste or other similar types or forms of hazards as long as such liability was not due to Lessee's fault or negligence. Lessee shall not be required to pay rent for any period in which in its sole judgment, the Premises are not safe to occupy because of an environmental problem not caused by Lessee. If Lessor cannot correct said problem within one hundred twenty (120) days, Lessee, at its option, may cancel this Lease.

25

47

**ADDITIONAL PROVISIONS.**

<u>1st Extension Term</u>

A period of sixty (120) months at the then fair market value

The Conditions which must be met: (a) Tenant shall have fully performed all of its covenants, duties and obligations hereunder during the proceeding Term; and (b) Tenant shall have given written notice to Landlord not less thank one hundred eighty (180) days prior to the expiration of the current Term of Tenant's intention to exercise such option.

EXECUTED this the __28th__ day of April, 2010 (as to LANDLORD) and the __28th__ day of September ,2010__(as to TENANT).


LANDLORD:
MarineCorp International LC

Ayaz Nasser
—President

TENANT:
OUTLAW COUNTRY, L.L.C

President KYLE TONES        TONY MILLER

48

EXHIBIT "A-1"

CYPRESSWOOD SHOPPING CENTER

Being a tract or parcel containing 7.0495 acres of land in the George H. Delesdernier Survey, Abstract 229, Harris County, Texas, and being the remainder of that certain 7.1892 acre tract conveyed to Corum Investment Properties of record in Harris County Clerk's File (H.C.C.F.) No. G823180 and more particularly described by metes and bounds as follows (all bearings are referenced to the Texas State plane Coordinate System, South Central Zone):

BEGINNING at a found 5/8 inch iron rod at the most easterly corner of said 7.1892 acre tract and the most northerly corner of that certain 7.1016 acre tract of record in H.C.C.F. No. H879992 in the southwesterly right-of-way (R.O.W.) line of Kuykendahl Road, 100.00 feet wide;

THENCE, departing said southwesterly R.O.W. line, South 55°43'49" West, 449.15 feet along the line common to said 7.1892 acre tract and said 7.1016 acre tract to a found 5/8 inch iron rod at the most southerly corner of said 7.1892 acre tract and the most westerly corner of said 7.1016 acre tract;

THENCE, North 34°16'11" West, 731.24 feet along the line common to said 7.1892 acre tract and a 9.4153 acre tract of record in H.C.C.F. No. H806216 to a found 5/8 inch iron rod for the most westerly corner of the herein described tract in the southeasterly R.O.W. line of Louetta Road, 100.00 feet wide;

THENCE, North 55°56'02" East, 299.15 feet along said southeasterly R.O.W. line of Louetta Road to a found one inch iron rod at the intersection with the line common to said 7.1892 acre tract and a 0.5514 acre tract of record in H.C.C.F. No. G882804 and corrected under H.C.C.F. Number H384075;

THENCE, departing said southeasterly R.O.W. line, South 34°16'11" East, 140.00 feet along a line common to said 0.5514 acre tract and said 7.1892 acre tract to a found one inch iron rod;

THENCE, continuing along a line common to said 0.5514 acre tract and said 7.1892 acre tract, North 55°56'02" East, 150.00 feet to a found 5/8 inch iron rod in the aforementioned southwesterly R.O.W. line of Kuykendahl Road;

THENCE, South 34°16'11" East, 589.64 feet along said southwesterly R.O.W. line of Kuykendahl Road to the POINT OF BEGINNING and containing 7.0495 acres of land.

EXHIBIT "B"

GUARANTY

FOR VALUE RECEIVED, in consideration for and as an inducement to MarineCorp International LC, ("Landlord") to enter into the foregoing Lease with OUTLAW COUNTRY, L.L.C. ., "(Tenant"), for premises located in the Cypresswood II Shopping Center, the undersigned, Tony Miller, & *Kyle Tones* ("Guarantor") hereby guarantees to Landlord, its legal representatives successors and assigns, the full and faithful performance and observance by Tenant, its successors and assigns, of all terms, covenants, conditions, agreements, restrictions and limitations of the Lease (of the aforementioned premises), including without limitation the payment of all Rent, together with the payment of all costs, attorneys fees and other expenses incurred by Landlord in enforcing such performance and observation.

The Guarantor is an individual, and Guarantor represents that he will receive substantial benefit and consideration as a result of said Lease entered into with Tenant.

Guarantor further covenants that: (1) the liability of the Guarantor is primary, and shall not be subject to deduction for any claim of offset, counterclaim or defense which Tenant may have against Landlord, and Landlord may proceed against guarantor separately or jointly, before, after or simultaneously with any proceeding against Tenant for default; (2) this Guaranty shall not be terminated or impaired in any manner whatsoever by reason of the assertion by the Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease, by reason of any summary or other proceedings against Tenant, or by reason of any extension of time or indulgence granted by Landlord to Tenant; (3) Guarantor expressly waives any requirement of notice of non-payment, non-performance or non-observance, or proof of notice or demand; and (4) this Guaranty shall be absolute and unconditional and shall remain and continue in full force and effect as to any and all renewals, extensions, amendments, additions, assignments, subleases, transfers or other modifications of the Lease. All obligations and liabilities of Guarantor pursuant to this Guaranty shall be binding upon the heirs, personal representatives, successors and assigns of the Guarantor. This Guaranty shall be governed by and construed in accordance with the laws of Texas. This Guaranty will remain in full effect up to and including October 31, 2015.

Dated: 9-28-10

Witness or Attest:

Karen Jordan
Witness   Karen Jordan

Witness   Karen Jordan

Guarantor:

Tony Miller

*Kyle Tones*

Social Security Number

18433 Kuykendahl, Spring, TX 77379
Address and Telephone Number

STATE OF TEXAS
COUNTY OF HARRIS

BEFORE ME, the undersigned authority, on this day personally appeared _Kyle Tones_, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND and seal of office this ___ day of __October__, 2010

Notary Public in and for Harris County, Texas

EXHIBIT "C"

"AS-IS" Except as follows:
Landlord will provide a new air-conditioning unit with a 90 day warranty. In addition , Landlord will make all necessary repairs to the roof.
Landlord will provide a seventeen ($17.73)  dollar and Seventy three PSF Tenant Improvement allowance which will be paid to Contractor as follows:
Upon the signing of a construction contract with Tony Miller , receiving a certificate of insurance naming Landlord and Management Company as additional insured , along with a list of all subcontractors with their certificates of insurance, approved construction plans and all required permits, and the following work is completed: all Plumbing, framing, electrical and security & camera Rough In, Landlord will pay one third of the total allowance.
The second third will be paid upon the presentation of partial complete lien waivers from all subcontractors and the completion of drywalls, bar fabrication, bathroom manufacturing and bathroom fixture installation.
The last payment, less a ten (10%) percent retainer (payable with final sign off of Tenant Improvements, between Landlord and Tenant), will be paid upon receipt of an occupancy permit and all final lien waivers
Landlord shall allow all leasehold improvements with a tenant allowance of $17.73 per RSF.

29·

51

**EXHIBIT "D"**

## TENANT SIGNAGE CRITERIA

## CYPRESSWOOD II SHOPPING CENTER

### PREFACE

These sign criteria are hereby set forth by Zenith Real Estate Services, Inc. as agent MarineCorp, International, LC, a Texas limited liability company ("Landlord") to govern any and all signage by tenants leasing space in the above referenced shopping center.

These criteria serve to protect you, the tenant, from signs of poor quality. They also insure the center's owners and attractive center with coordinated signage that is of good quality.

**Signage Identification - Tenant will be permitted, at his expense, to install a sign on Kuykendahl Street. The sign will be located between the two oak trees directly south of the main pylon. The specifications and exact location subject to final approval by Landlord.**

### REQUIREMENTS - ALLOWANCE - RESTRICTIONS

One of your approved sign contractors should be given a copy of this criteria to serve as the guide in preparing a design and cost estimate for you.

Prior to manufacturing any signage, you or your sign company must submit three copies of the approved sign company's design to the offices of the Landlord. These drawings must clearly show the sign on the building's facade and delineate all construction techniques and materials. It must state the center's name, tenant's name and location of the lease space in the center.

No sign may be erected without first securing the written approval of the Landlord.

The tenant and sign company shall be held liable and shall bear all costs for removal and/or correction of signs, sign installation and damage to building by signs that do not conform to sign criteria as put forth in these specifications and accompanying drawings. This is at the discretion of the center's owner.

All signs are to be constructed and installed at tenant's expense.

All necessary permits for signs and their installation shall be obtained by the tenant or his sign contractor. The City or other governmental agency having jurisdiction over the signage in this center is set forth in the SPECIFICATIONS section of this criteria.

Sign companies must conform to the following criteria.

    1. They must be licensed by the City of Houston under their own name; i.e., Acme Signs listed with the city as A & b Electric is not acceptable.

    2. They must be capable of manufacturing signs according to the basic criteria for that center.

    3. They must be capable of manufacturing signs according to the criteria set forth by the National Electrical code in Article 600 and Chapter 46 of the City of Houston Building Code (Houston Sign code).

    4. Sign companies which are acceptable by the Landlord and who meet all of the above requirements are:

        a. Federal Sign        c. Texas Sign Source        e. Neon Electric Corporation

        b. Coast Graphics & Signs    d. Advanced Signing

### FASCIA SIGNAGE

All tenants must have an exterior illuminated sign that conforms to these sign criteria.

All signs are to be located on the shopping center's facade. Signs shall be in the form of individual full metal channel letters, internally illuminated, and mounted on a full metal raceway which is attached to the building's facade.

The overall maximum length of a sign shall not exceed 80% of the lease frontage.

30

/52

1/8 scale



79' out/out

office
8'10"
Storage
8,5"
3o
Walk-In Cooler
8'
20'
6'
Roll Up Door
5,6
3o
3o
Elect Room
9-5
5,6
9'
3o
11'
5'
4"
7o
womens Rest Rooms
25'
8'6
9
3o
12'11"
Bathroom
9'
7o
6'4½
5'1" closet
3o
8'
Hall way

Stage
24'4
15
9'4
Mews Rest Room
21'8
12
office
16
19'3
6'4½
10'6"
O'S Booth
12'1
12'6
3o
3o
3o
12'11"

Dance Floor
70'
35'

Bar
50'
10'
22'

Bar
50'
10'
26'

141 out/out
3o
Sana closet
11'
5,6
3o

22'4
76'6"
3o
4'
4'
3o
4'
6'
3o 3o
1'
53

Tenant must use a clean, readable letter style. Tenant letters may vary between a minimum of 20" high and a maximum of 36" high; subject to the limitations set forth under the specifications of the center. Sign letters are to be 5" deep.

Raceway shall contain all secondary wiring and transformers. Raceways dimensions shall be determined by letter height as follows:

| LETTER HEIGHT | RACEWAY DIMENSIONS |
| --- | --- |
| 20" - 24" | 8"h X 7"d |
| 25" - 30" (where allowed) | 9"h X 7"d |
| 31" - 36" (where allowed) | 10"h X 7"d |

Signs are to be mounted on the facade as set forth in the specifications for this center below. SEE DRAWING A.

## CONSTRUCTION SPECIFICATIONS

Fabricated metal letter backs and returns are to be constructed of .063 gauge aluminum with interrupted Halyard electric welding, or .040 gauge aluminum with returns pop riveted to the back of the letter with on pop rivets visible. Raceway to be of similar construction.

"Channel Lume" type, channel letters utilizing "Armor Ply" plywood as letter backs are prohibited for use on the shopping center's facade.

The individual letters are to be either Iron Enamel over steel or Baked Enamel over aluminum. The interior of all letters are to be painted white.

    Note: These letters may take six to eight weeks to fabricate and install. Raceway to be of similar construction.

Letters 24" high and larger shall have two rows of 13mm neon. Letters smaller then 24" shall have single row 13mm neon.

Neon shall be 6500 K with 30 m.a. transformers.

All letters shall have a plexiglas face of 3/16" thick plexiglas. The plexiglas shall be retained with a 1" "Jewel Lite", or equal, acrylic over metal trim molding.

All fasteners, screws, bolts and spacers used in the fabrication of signs shall be nonferrous and/or noncorrosive.

1.     LETTER HEIGHT:       _____

2.     PLEXIGLAS COLOR:    _____

3.     NEON COLOR:        _____

4.     LETTER RETURN COLOR:  _____

5.     TRIM CAP COLOR:     _____

6.     RACEWAY COLOR:    _____

7.     LOCATION ON FASCIA:   _____

8.     FASCIA MATERIAL:    _____

The governmental agency with jurisdiction over the permitting and operation of signage at Cypresswood II Shopping Center is the City of Houston.

## INSTALLATION

The sign will be attached to the building facade by having the raceway attached to the facade as per attached "Drawing A".

Wiring from the letters shall pass first through conduit through facade to electrical service provided by the tenant from the tenant's electrical panel. Where facade is penetrated for mounting and conduit, it shall be sealed to be made watertight. This is the responsibility of the sign contractor. SEE DRAWING B ATTACHED.

## PROHIBITED SIGNAGE

Flashing, occulting or moving signs are prohibited.

31

54

Sign text shall consist of store name only.  Description of service, products or trade names is prohibited.

Box type of signs is prohibited.

Banner flags or pennants are prohibited.

Trailer, marquee type signs are prohibited.  Any such signs installed on the premises of this center will be removed by Landlord at Tenant's expense.

**PYLON SIGN CRITERIA**

The criteria for all pylon signs are as follows (unless a pylon supplement sheet is attached):

    a.  Face material for signs smaller than 35 sq. ft. will be flat 3/16" lexan with back sprayed copy.

    b.  Face material for signs greater than 36 sq. ft. will be flex face with heat transfer copy.

    c.  Lighting to be by 7800 m.a. high output fluorescent lighting.

    d.  Colors to be dark bronze background with white copy.

    e.  Copy on sign to consist of name of store only.

    f.  Position of sign on pylon must be approved by owner.

**PYLON SIGN PRICES ACCORDING TO SIZES**

The maintenance agreement on the pylon sign is detailed below according to the size of the sign.

    a.  24 s.f. or less – No Charge to Tenant, in exchange for a Personal Guaranty.

    b.  24 to 48 s.f. = ~~$75.00 per month.~~  *NO CHARGE*

    c.  Over 48 s.f. = ~~$100.00 per month.~~  *NO CHARGE*

Maintenance includes:  replacement of all lamps, ballasts, sockets, and wiring; crane service; annual cleaning of individual signs; and bi-annual painting of steel.

32

## EXHIBIT "E"

## OPTION TO EXTEND LEASE

Contingent upon Tenant satisfying all of the required conditions, (the "Conditions") Tenant is hereby granted One (1) separate Option Period (the "Extension Terms") to extend the Lease Term, as set forth in Article I, 1.1(h) (the "Primary Term"), as follows:

### 1st Extension Term

A period of sixty (120) months at the then fair market value

The Conditions which must be met: (a) Tenant shall have fully performed all of its covenants, duties and obligations hereunder during the proceeding Term; and (b) Tenant shall have given written notice to Landlord not less thank one hundred eighty (180) days prior to the expiration of the current Term of Tenant's intention to exercise such option.

33

56

EXHIBIT "F"

OPTION TO TERMINATE LEASE

N/A

34

57

**EXHIBIT "G"**

Between MarineCorp International (Landlord) and THE CHOPPER GROUP L.L.C.. (Tenant)

1. See Exhibit "C", items 1-2
2. See Exhibit "D", Preface section
3. See Exhibit "C", item 3
4. Upon signing this lease agreement the tenant will not forfeit any individual or corporate rights as guaranteed by the State of Texas or the Federal Government.
5. See Article 1, item h, and item u. See Exhibit "C", item 4
6.

35

58

**TAB D**

# STANDARD LEASE CONTRACT

### CYPRESSWOOD II SHOPPING CENTER
### SPRING, HARRIS COUNTY, TEXAS

### BACKWOODS COUNTRY CLUB, L.L.C. as TENANT

| Article | Caption | Page |
|---|---|---|
| Article I | Summary of Basic Lease Provisions and Certain Defined Terms | 2 |
| Article II | Granting Clause | 4 |
| Article III | Construction And Acceptance of Premises | 5 |
| Article IV | Rental and Percentage Rental | 6 |
| Article V | Common Area | 7 |
| Article VI | Use and Care of Premises | 9 |
| Article VII | Maintenance and Repair of Premises; Alterations, Landlord's Right of Access | 11 |
| Article VIII | Signs; Store Fronts; Roof | 14 |
| Article IX | Utilities | 15 |
| Article X | Indemnity, Public Liability, Builder's Risk, and Other Insurance | 16 |
| Article XI | Non-Liability for Certain Damages | 17 |
| Article XII | Fire or Other Casualty | 17 |
| Article XIII | Subrogation | 18 |
| Article XIV | Condemnation | 19 |
| Article XV | Assignment and Subletting | 20 |
| Article XVI | Tax and Insurance Costs | 21 |
| Article XVII | Default by Tenant and Remedies | 22 |
| Article XVIII | Holding Over | 27 |
| Article XIX | Landlord's Mortgagee | 27 |
| Article XX | Merchants Association | 30 |
| Article XXI | Notices | 30 |
| Article XXII | Option | 30 |
| Article XXIII | Miscellaneous | 30 |
| Article XXIV | Environmental Law Compliance | 33 |
| Article XXV | Additional Miscellaneous | 34 |

1

Ex. "B" 59

# STANDARD LEASE CONTRACT

## ARTICLE I

### SUMMARY OF BASIC LEASE PROVISIONS AND CERTAIN DEFINED TERMS

Section 1.1  When used herein, the following terms shall have the indicated meanings:

a. DATE OF LEASE: (Reference Only)                    September 20, 2010

b. LANDLORD:                                          MarineCorp International Ltd

c. ADDRESS OF LANDLORD:                               2900 Wilcrest, Suite 100
                                                      Houston, Texas 77042

d. SHOPPING CENTER: Cypresswood II a commercial shopping center which is located upon the lot, tract, or parcel of land situated in Harris County, Texas, as more particularly described in Exhibit "A-1" attached hereto, together with such additions and extensions as Landlord may from time to time designate as included within the Shopping Center.

e. TENANT:                                            BACKWOODS COUNTRY CLUB, LLC

                                                      DL #:
                                                      SS #: ███████
                                                      DL #: 29057982

f. TENANT'S ADDRESS:                                  18443Kuykendahl
                                                      Spring, Texas 77379
                                              Phone #:

   NOTICE ADDRESS:                                    Same_____

                                              Phone #: _____

   BILLING ADDRESS:                                   Same_____

                                              Phone #: _____

g. TENANT'S TRADE NAME:        Same, BACKWOODS COUNTRY CLUB, L.L.C

h. DEMISED PREMISES:                                  An area of approximately 10,998 square feet

i. ADDRESS OF DEMISED PREMISES:                       18443 Kuykendahl Road
                                                      Spring, Texas 77379

j. PERMITTED USE:                          Dance and Music Hall

k. LEASE TERM: The term of this lease shall commence on the "Commencement Date", and shall terminate on the last day of the sixty fourth (64) full calendar month thereafter, unless sooner terminated in accordance with the provisions hereinafter set forth.

l. COMMENCEMENT DATE:                                 November 1, 2010

m. EXPIRATION DATE:                                   February 29, 2016

n. ESTIMATED COMPLETION DATE:                         January 31, 2011
   (See Section 3.3)

o. DEFAULT DEPOSIT: (See Section 17.3)                $ 13,289.25

p. PREPAID RENTAL: to be applied to                   $ 10,539.75
   first monthly installments of rental

q. MONTHLY SALES HURDLE:                              N/A_____
   (See Section 4.4)

2

60

r. MONTHLY PERCENTAGE RENTAL:                    N/A_____
   (See Section 4.4)

s. SIGN CHARGES (See Section 8.1 & 8.2)
Pylon Sign Charge                                N/A_____
Under Canopy Sign Charge                         N/A_____
Fascia Sign Deposit                              N/A_____

                                                 November 1-February 29-2011 Free

t. MONTHLY RENTAL:(See Sections 4.1 & 4.2)
$10,539.75 per month for year 1 from March 1, 2011-February 29, 2012
$13,014.30 per month for year 2 from March 1, 2012-February 29, 2013
$13,930.80 per month for year 3 from March 1, 2013-February 29, 2014
$14,847.30 per month for year 4 from March 1, 2014-February 29, 2015
$15,763.80 per month for year 5 from March 1, 2015-February 29, 2016

   Charges
   Rent Start Date: March 1,    | Commencement Date - November 1, 2010 |   2011

u. MONTHLY ESTIMATED COMMON                      $4,179.24 per month
   AREA MAINTENANCE:  (See Section 5.2)          the demised premises.

v. MONTHLY ESTIMATED TAX AND                     Included in the CAM
   INSURANCE CHARGE: (See Section 16.1)

w. MONTHLY REFUSE CHARGE:                        Included in the CAM
   (See Section 6.4)

x. MONTHLY ESTIMATED UTILITY                     Responsibility of Tenant
   CHARGE:  (See Section 9.1)

y. MONTHLY ADVERTISING CHARGE:                   N/A

z. MISCELLANEOUS:                                Included in the CAM

aa. GROSS LEASABLE RETAIL AREA: Presently comprises 46,998 square feet subject to expansion by the construction of additional building, or the reduction of leasable retail area, if any, in the Shopping Center.

bb. GUARANTY: The guaranty attached hereto and made a part hereof as Exhibit "B".

        In the event of any conflict between any Summary of Basic Lease Provisions on the one hand and the balance of this Lease on the other, the latter shall control. Each of the foregoing basic lease provisions and defined terms shall be construed in conjunction with the references thereto contained in the other provisions of this Lease and shall be limited by such other provisions. Each reference in this Lease to any of the foregoing basic lease provisions and defined terms shall be construed to incorporate each term set forth above under such basic lease provision or defined term. ·

                            ARTICLE II
                        GRANTING CLAUSE

        Section 2.1.  In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants and conditions hereof, Landlord hereby demises and leases to Tenant, and Tenant hereby leases from Landlord the Demises Premises as described in Section 1.1(h). The "area" of the Demised Premises when referred to in this Lease shall be computed from the measurements to the exterior of outside walls of the building and to the center of interior demising walls. TO HAVE AND TO HOLD said Demised Premises for a term commencing on the "Commencement Date" and extending for said number of months specified in Section 1.1(k), all upon the terms and conditions set forth in this Lease.

        Section 2.2.  The purpose of the plot plan attached hereto as Exhibit "A" is to set forth the outline of the Demised Premises in relation to the general layout of the Shopping Center, and it is expressly understood and agreed:

   (a) That the general layout of the Shopping Center as set forth thereon is subject to all of the terms and conditions of the Lease, including, without limitation, the provisions regarding future changes, expansion, rules and regulations; and

   (b) That no representation or warranty is made as to the exact location of any other particular building, or as to the time, if ever, that any other buildings and/or store space or spaces may or might be erected and occupied or as to the continued occupancy by other tenants of the Shopping Center of any other building or buildings or store space or spaces, or the purpose for which said other building or buildings and/or store space or spaces may or might be used.

3

Section 2.3. So long as Tenant shall pay the Rental, Estimated Common Area Maintenance Charge, Estimated Tax and Insurance Charge, and all other Sums or other payment due hereunder and shall observe and perform all of the covenants on Tenant's part to be observed and performed hereunder, and Tenant is not in default hereunder, Tenant shall peaceably and quietly hold and enjoy the Demised Premises for the entire term hereof without interruption by Landlord or person or persons lawfully or equitably claiming by, through or under Landlord, subject, nevertheless, to all of the terms and provisions of this Lease and to all of the reservations, restrictions, encumbrances and limitations of record affecting the title to or use of the demised Premises or the property upon which the Shopping Center is situated.

Section 2.4. Notwithstanding the fact that the Lease Term will commence at a date subsequent to the execution of this instrument by Landlord and Tenant, such parties intend that each shall have vested rights immediately upon the signing of this instrument and that this instrument shall be fully binding and in full force and effect from and after execution hereof by Landlord and Tenant. In the event that the lease term shall not have, in fact, commenced within two (2) years from the date hereof (and if this Lease shall not theretofore have been canceled by Landlord as herein permitted), then, in addition to all the other rights and remedies of Landlord set forth herein, this Lease shall thereupon be automatically null and void and of no further force and effect, and neither party shall have any further obligation or liability hereunder.

## ARTICLE III
## CONSTRUCTIONS AND ACCEPTANCE OF PREMISES

Section 3.1. If this Lease is for a portion of the Shopping Center already constructed, Tenant acknowledges that it has, prior to the execution hereof, inspected the Demised Premises, that Landlord's work is completed (expect as may be otherwise expressly provided in Exhibit C attached hereto), and that Tenant has accepted the Demised Premises in its "AS-IS" condition, it being agreed that Landlord shall have no liability or responsibility for defects in the Demised Premises, including latent defects. By occupying the Demised Premises, Tenant shall be deemed to have accepted the same and to have acknowledged that the same fully comply with Landlord's obligations and covenants hereunder, as shown on Exhibit C. **Except for roof repair and Hvac units replaced with an amount equal to 60 tons. Electrical service brought into the space equal 1000 amps.**

Section 3.2. Subject to the provisions contained in Section 3.4 below, if this Lease is for a portion of the Shopping Center to be constructed, Landlord shall construct and deliver to Tenant the Demised Premises substantially in accordance with Landlord's and Tenant's Architectural and Construction Work attached hereto as Exhibit "C".

Section 3.3. Tenant agrees to open the Demised Premises to the public for business within thirty (30) days after the same is ready for occupancy. Except as otherwise provided under Article I of this Lease, the "Commencement Date" of this Lease shall be the earlier to occur of (i) the date thirty (30) days after Landlord has notified Tenant that the Demised Premises are ready for occupancy or (ii) the date upon which Tenant opens the Demised Premises to the p[public for business. In the event the provisions of this Section 3.3 with respect to the establishment of the Commencement Date of this Lease conflict or are otherwise inconsistent with the Commencement Date specified in Article I of this Lease, the provisions of Article III shall govern and control the provisions contained in this Section 3.3, which for all purposes shall be construed to have been superseded by the terms of said Article III. Any occupancy of the Demised Premises by Tenant prior to the Commencement Date shall be subject to all of the terms and provisions of this Lease excepting only those requiring the payment of Rental. Tenant agrees that at the request of Landlord it will, following the Commencement Date, execute and deliver a recordable short form lease containing the basic provisions of this Lease, acknowledging that Tenant has accepted possession, and reciting the exact Commencement Date and termination date of this Lease.

Section 3.4       N/A

Section 3.5. If Landlord shall not be able, by the use of such efforts and means as Landlord, in its exclusive judgment, finds suitable and convenient, to obtain all requisite governmental, quasi-governmental, regulatory authority and other permits, licenses, consents and permissions (collectively called "building permit") relating to Landlord's construction with respect to the Demised Premises or any other requisite consent in connection with such construction., then in any of the aforesaid circumstances, Landlord may terminate this Lease at any time prior to the Commencement Date by giving Tenant written notice thereof. Upon such termination, this Lease will be of no further force or effect, and neither party will have any further obligation or liability hereunder. No expenditure by Tenant or incurring of any liability for merchandise, fixtures, equipment or labor or material or otherwise shall alter or affect the rights of said parties as set forth in this Section 3.5.

Section 3.6. Except as otherwise provided in this Article III above, all construction by Tenant shall be governed by the provisions specified in Article VII hereof, including work to be performed by Tenant as described in Exhibit "C".

Section 3.7. Landlord's obligation to construct and deliver to Tenant the Demised Premises within the time period set forth hereinabove shall be extended by a period of time equal to the total of "excusable delays" (as hereinafter defined). For the purposes of this Section 3.7, the term "excusable delays" shall mean all delays caused by governmental restrictions, strikes, lock-outs, shortages of labor or material, acts

62

## ARTICLE IV
## RENTAL

Section 4.1. All rental shall accrue hereunder from the Commencement Date as defined above, and shall be payable at the place designated for the delivery of notices to Landlord at the time of payment.

Section 4.2. Tenant shall pay to Landlord Rental in monthly installments in the amounts specified in Section 1.1(t) above. The first such monthly installment shall be due and payable on or before the Commencement Date, and installments in the respective amounts specified in Section 1.1(t) shall be due and payable on or before the first day of each succeeding calendar month during the Lease Term; Rental will be considered late after the 10th day of each succeeding calendar month during the Lease Term; Provided that if the Commencement Date should fall on date other than the first day of a calendar month there shall be due and payable on or before such date as Rental for the balance of the calendar month during which such date shall fall, a sum equal to that proportion of the Rental specified for the first calendar month as herein provided, which the number of days from the Commencement Date to the end of the calendar month during which the Commencement Date shall fall bears to the total number of days in such month, and all succeeding installments of the Rental shall be payable in the respective amounts specified in Section 1.1(t) on or before the first day of each succeeding calendar month during the Lease Term; provided, further, that if the Lease Term ends on other than the last day of the month, the last monthly installment shall be reduced proportionately.

Section 4.3. Commencing with the second Lease Year (as hereinafter defined), the Rental shall be automatically adjusted (without the necessity of the execution of any further instrument) after the end of each Lease Year during the term of this Lease in the following manner:

(a) Rental Schedule as per Article I, Section 1.1, item t

Section 4.4. N/A

Section 4.5. All Rental and all other sums hereunder provided to be paid by Tenant shall be due and payable by Tenant without demand, deduction, abatement or off-set except as expressly provided herein.

All other sums and charges of whatsoever nature required to be paid by Tenant to Landlord pursuant to the terms of this Lease constitute additional rent and failure by Tenant to timely pay such other sums or charges may be treated by Landlord as a failure by Tenant to pay the Rental.

In the event of any failure to pay Rental or to make any other payment due Landlord hereunder, in the manner or time provided for herein, and such Rental, or other payment is not made by the tenth (10th) day following the date on which said payment was due, Tenant shall pay to Landlord, in addition to the amounts then due and without prior demand therefore and without any deduction or offsets, an administrative charge in the amount of $50.00 per each occurrence; or 5% of the amount due, whichever is greater.

Acceptance by Landlord of any late rent payment and administrative charge due therefor shall not constitute a waiver of any of Landlord's rights and remedies available in connection with any subsequent failure of Tenant to pay the Rental or to make any other payment due Landlord hereunder in the manner or time provided for herein. If tender of late Rental or any other payment due Landlord hereunder is made, Landlord at its sole discretion, shall have the option to accept the tendered late Rental payment and administrative charge computed as above specified, or to pursue the rights and remedies provided in Article XVII without the necessity of any further notice or demand.

If within any six (6) month period during the term of this Lease, Tenant shall fail for three (3) times to make timely payment to Landlord of any Rental and/or any other payment due Landlord hereunder on the date when due, the Landlord shall have the immediate right, without the necessity of giving any notice of default, to pursue the rights and remedies provided in Article XVII hereof.

Section 4.6 (Insufficient Checks or Payments) Tenants shall pay to Landlord upon demand a fifty and NO/100 Dollar ($50.00) charge for each check tendered to Landlord in payment of Rental (or Percentage Rental) or any other payment due Landlord hereunder which is returned uncollectible to Landlord.

## ARTICLE V
## COMMON AREA

Section 5.1. The "Common Area" of the Shopping Center is that part of the Shopping Center designated by Landlord from time to time for the common use of all tenants, including among other facilities, parking area, sidewalks, signs erected by Landlord advertising or identifying the Shopping Center, under canopy signs, landscaping, seasonal/permanent decorating, curbs, truckways, delivery passages, loading areas, private streets and alleys, lighting facilities, and the like, all of which shall be subject to Landlord's sole management and control and shall be operated and maintained in such manner as Landlord in his discretion shall determine. Landlord reserves the right to change from time to time the dimensions

5

and location of the Common Area, as well as the dimensions, identity and type of any buildings, and to construct additional buildings or additional stories on existing buildings or other improvements in the Shopping Center. Landlord also reserves the right to dedicate portions of the Common Area and other portions of the Shopping Center (excepting only the Demised Premises) for street, park, utility and other public purposes. Tenant, and its employees, customers, subtenants, licensees, and concessionaires shall have the non-exclusive right to use the Common Area as constituted from time to time, such use to be in common with Landlord, other tenants of the Shopping Center and other persons entitled to use the same, and subject to such reasonable rules and regulations governing such use as Landlord may from time to time prescribe. Landlord may elect (without any obligation to do so) to designate from time to time, Tenant employee, subtenant, licensee and concessionaire parking areas. Should Landlord so designate such parking area, then Tenant, its employees, subtenants, licensees and concessionaires may have the non-exclusive use, along with other Tenants and their employees, subtenants, licensees and concessionaires, of only that available space so designated by Landlord for such use and neither Tenant, nor Tenant's employees, subtenants, licensees or concessionaires shall use any other parking space in the Shopping Center. Upon request of Landlord, Tenant will furnish to Landlord a complete list of the license numbers of all automobiles operated by Tenant, its employees, subtenants, licensees or concessionaires. If any automobile or other vehicle owned by Tenant or any of its employees or any of its subtenants, licensees or concessionaires, or any of their respective employed, shall at any time be parked in any part of the Shopping Center, other than the specific areas designated by Landlord from time to time for employee parking, Landlord shall be, and is hereby, authorized to cause such automobile or other vehicle to be removed to such other location, either within or beyond the Shopping Center, and Tenant shall, and does hereby, agree to indemnify Landlord, his employees, and agents, and hold each of them harmless from any and all claims of whatsoever sort which may arise by reason of such removal. Tenant shall not solicit business or display merchandise within the Common Area, or distribute handbills therein, or take any action which would interfere with the rights of other persons to use the Common Area. Landlord may temporarily close any part of the Common Area for such periods of time as may be necessary to prevent the public from obtaining prescriptive rights or to make repairs or alterations.

Section 5.2. Tenant agrees to pay as additional rent, as hereinafter provided, an amount equal to "Tenant's Share" of "Common Area Maintenance Charges" (as such quoted terms are hereinafter defined) adjusted from time to time, pursuant to the provisions hereinafter stated. For purposes of this Lease, the phrase "Common Area Maintenance Charge" shall mean, for each calendar year (or portion thereof) during the term of this Lease, the aggregate of all costs, expenses, and liabilities of every kind or nature paid or incurred by Landlord (to the extent that Landlord regards it as reasonable necessary or appropriate to proved the services and materials hereinafter referred to and to pay the incurred costs, expenses, and liabilities hereinafter referred to ) including appropriate and reasonable reserves in connection with: sweeping, cleaning, removing debris from, maintaining, respiring and repairing the Common Area; lighting the Common Area (including replacement of bulbs and ballast's and repair of light standards); the cost of supplying water, electricity, gas, security, sere disposal and/or garbage pick-up and disposal, if Landlord so elects, providing project identification signs and the repair and maintenance of the pylon and all signs thereon; providing traffic control and watchman service at the Common Area; constructing, maintenance, and repairing and maintaining any on-site or off-site utilities necessary or appropriate for the operation of the Common Area; providing and maintaining planting and landscaping with respect to the Common Area; providing security services with respect to the Common Area; plus all other costs and expenses of every kind or nature paid or incurred by Landlord relative to maintenance, managing, and equipping the Common Area, including, without limitation, management fees for overall management of the Shopping Center, subdivision maintenance fees or dues; property owners association fees or dues, and similar charges, annual charges for reserves established by Landlord for future replacements or improvements to the Common Area (inclusive of periodic new black topping or concreting of the Common Area) included as administrative fee of fifteen (15%) percent of the aggregate of all of the aforesaid costs and expenses and liabilities (including, without limitation, the aforesaid reserve) paid or incurred by Landlord.

The Phrase "Tenant's Share," as applied to the Common Area Maintenance Charges, shall refer to a sum calculated by multiplying the Common Area Maintenance Charges by a fraction, the numerator of which is the floor area (in square feet) of the Demised Premises (as indicated in Article I of this Lease) and the denominator of which for which the calculation referred to in this paragraph is being made; provided, however, for any period of less than twelve (12) full calendar months with respect to which such calculation is being made, a pro rate portion of the resulting product shall be calculated to determine Tenant's share.

Monthly, during the first year of this Lease, Tenant will pay Landlord the Estimated Common Area Maintenance Charge (as indicated in Section 1.1 (u), monthly in advance, payable at the same time and place as the Rental is payable, except, however, if the Lease Term does not begin on the first day of a calendar month. Landlord shall have the right to adjust such monthly estimate on an annual basis, pursuant to the following paragraph.

At the end of each calendar year occurring during the term of this Lease (or subsequent to the expiration or other termination of this Lease, if such occurs on a date other than the last day of a calendar year), Landlord will give Tenant notice of the total amount paid by Tenant for the relevant calendar year together with the actual amount of Tenant's Share of the Common Area Maintenance Charges ("Total Cost") for such calendar year. If the actual amount of Tenant's Share of the Total Cost with respect to such period exceed the aggregate amount previously paid by Tenant with respect thereto during such period, Tenant shall pay to Landlord the deficiency within Thirty (30) days following notice from Landlord; however, if the aggregate amount previously paid by Tenant with respect thereto exceeds Tenant's Share of

6

64

the Total Cost for such period, then at Landlord's election, such surplus (net of any amounts then owing by Tenant to Landlord) shall be credited against the next ensuing installment of any such cost due hereunder by Tenant, or Landlord may refund such net surplus to Tenant. Periodically, during the term of this Lease, Landlord shall have the right to estimate Tenant's Share of Common Area Maintenance Charges for the next fiscal period (determined by Landlord) of the term of this Lease, whereupon, Tenant shall pay Landlord such amounts as may be so indicated by Landlord in the same manner as the Estimated Common Area Maintenance Charge.

Tenant shall have the right for the ninety (90) day period immediately following the end of each calendar year during the term of this Lease, at its sole cost and expense, to audit the cost of Common Area Maintenance Charges at reasonable times during Landlord's regular business hours and at the office of the Landlord upon twenty-four (24) hours advance written notice to the Landlord. In the event Tenant fails either to notify the Landlord in writing of its intent to audit the cost of Common Area Maintenance Charges at least twenty-four (24) hours in advance of the date of its intended audit or to audit Common Area Maintenance Charges within said ninety (90) day period, Tenant shall not thereafter be entitled to audit Common Area Maintenance Charges for the Lease Year in question.

Section 5.3. If there is presently in effect or hereafter adopted any nature of sales tax or use tax or other tax on rents or other sums received by Landlord under this Lease (herein referred to as "Rent Sales Tax"), and in addition to all Rental and other payments to be made by Tenant as provided above, Tenant will also pay Landlord a sum equal to the amount of such Rent Sales Tax. The term "Rent Sales Tax" shall not include income taxes applicable to Landlord.

Section 5.4.     N/A

ARTICLE VI
USE AND CARE OF PREMISES

Section 6.1. The Demised Premises may be used and occupied only for the purpose or purposes specified in Section 1.1(j) above, and for no other purpose or purposes without the prior written consent of Landlord. Tenant shall use in the transaction of business in the Demised Premises the trade name specified in Section 1.1(g) above. Tenant shall not at any time leave the Demised Premises or any part thereof vacant, and it is the essence of this Lease, that Tenant shall in good faith continuously throughout the term of this Lease, during usual business hours, occupy and conduct and carry on in the entire Demised Premises the type of business for which the Demised Premises are leased. Tenant shall operate its business in an efficient, high class and reputable manner and shall, except during reasonable periods, for repairing, cleaning and decorating, keep the premises properly equipped with fixtures, stocked with an adequate supply of merchandise, and open to the public for business with adequate personnel in attendance on all days and during all hours when other tenants of the Shopping Center are generally open for business to the public and as may be determined by the Landlord, except to the extent Tenant may be prohibited from being open for business by applicable law, ordinance or governmental regulation. Without any way expanding the use of the Demised Premises hereinabove expressly limited, Tenant shall not use any portion of the Demised Premises for any purpose in conflict with any exclusive usage rights, now or hereafter existing in favor of some other occupant of the Shopping Center or use the Demised Premises to some purpose substantially duplicating some other usage of premises now or hereafter made in the Shopping Center, without the prior written consent of Landlord.

Tenant shall remain open on regular business days during regular reasonable business hours, but Tenant shall remain open for business not less than the hours of 10:00a.m. until 6:00p.m. Monday through Friday.

Tenant shall warehouse, store and/or stock in the Demised Premises only such goods, wares and merchandise as Tenant intends to offer for sale at retail at, in from or upon the Demised Premises. This shall not preclude occasional emergency transfers of merchandise to other stores of Tenant, if any, not located in the Shopping Center. Tenant shall use for office, clerical and other non-selling purposes only such space of the Demised Premises as is from time to time reasonable required for Tenant's business in the Demised Premises. No overnight lodging shall be permitted on the Demised Premises.

Section 6.2. Tenant shall not, without the Landlord's prior written consent, keep anything within the premises or use the premises for any purpose which increases the insurance premium cost or invalidates any insurance policy carried on the Demised Premises or on other parts of the Shopping Center. If Landlord should consent to such use and occupancy by Tenant, Tenant shall pay on demand as additional rent the additional insurance premiums resulting from such use and occupancy. All property kept, stored, or maintained within the premises by Tenant shall be at Tenant's sole risk.

Section 6.3. Tenant shall not conduct within the Demised Premises any fire, auction, "lost-our-lease", "going out of business", bankruptcy or similar sales or operate within the Demised Premises a cooperative store, a "second hand" store or a "surplus" store. Tenant shall not permit any objectionable or unpleasant odors to emanate from the premises; nor place or permit any radio, television, loud speaker or amplifier on the roof or outside the Demised Premises or where the same can be seen or heard from outside the Demised Premises; nor place any antenna or other projection on the exterior of the Demised Premises; nor take any other action which would constitute a nuisance or would disturb or endanger other tenants of

7

65

the Shopping Center or unreasonable interfere with their use of their respective premises; nor do anything which would tend to injure the reputation of the Shopping Center as may be determined by Landlord.

Section 6.4. Tenant shall take good care of the Demised Premises and keep the same free of rodents and insects at all times. Tenant will not commit any act which is a nuisance or annoyance to Landlord or to other Tenants, or which might, in the exclusive judgment of Landlord, appreciably damage Landlord's goodwill or reputation. Tenant shall keep the Demised Premises, and sidewalks, serviceways, and loading area adjacent to the premises and the Common neat, clean, and free from dirt or rubbish at all times, and shall carefully store in an orderly manner all trash and refuse within the area specified by Landlord or in addition to any other remedies available to Landlord, Landlord shall have the right to do and Tenant shall pay to Landlord the full cost thereof. Landlord shall arrange for the regular pick-up of such trash and refuse included in the CAM expense, in which case Tenant shall use such refuse service and pay the cost of such service as specified in Section 1.1(w). Tenant acknowledges that Landlord shall have the right to increase the charge for refuse service from time to time, and Tenant shall be liable to Landlord therefor. Receiving and delivery of goods and merchandise and removal of refuse and trash shall be made only in the manner and areas prescribed by Landlord and shall be subject to such regulations as Landlord may from time to time prescribe. Tenant shall not operate an incinerator or burn trash or refuse within the Shopping Center area.

Section 6.5. Tenant shall maintain all display windows in a neat and attractive condition and shall keep said display windows and exterior signs lighted from dusk until such time as other tenants of the Shopping Center generally do.

Section 6.6. Tenant shall include the address and identity of its business activities in the Demised Premises in all advertisements made by Tenant in which the address and identity of any similar local business activity of Tenant is mentioned. Use by Tenant in advertising, letterheads or otherwise of the name of the Shopping Center and buildings contained therein, or any distinctive trade name or trademark used by Landlord shall be subject to such restrictions and regulations as Landlord may prescribe from time to time.

Section 6.7. Tenant shall procure at its sole expense any permits and licenses required for the transaction of business in the Demised Premises and otherwise comply with all applicable laws, ordinances, and governmental regulations. Tenant shall also comply with all reasonable rules and regulations regarding sanitation, cleanliness and other matters governing the conduct of business within the Shopping center which Landlord may from time to time prescribe. Tenant will be responsible for causing its employees, customers, subtenants, licensees, and concessionaires to comply with all such laws, ordinances and regulations.

Section 6.8. Tenant will at all times keep all merchandise and displays within the Demised Premises above described, and will not at any time display any merchandise or offer it for sale or (other than during essential loading or unloading operations) permit it to be on any other point outside the Demised Premises, nor will Tenant in any other way use or obstruct such area outside the Demised Premises.

Section 6.9. Tenant, at Tenant's own expense, will furnish and maintain an adequate number of fire extinguishers in good operating condition as may be reasonable required by Landlord, and in any event not less than such number of extinguishers as may be, from time to time, required by applicable statues, laws, ordinances, and codes.

Section 6.10. If Tenant is a restaurant, or if otherwise required by Landlord or any governmental agency having jurisdiction thereof, Tenant shall at its sole cost and expense, install any and all grease traps and/or grease interceptors which Landlord deems necessary or desirable or which any governmental entity having jurisdiction thereof shall deem necessary to handle liquid waste, including grease, oil or any material whatsoever which would or could damage, obstruct or overload any drainage, sewer or other systems. All grease and oil traps and/or interceptors shall be constructed in accordance with the requirements promulgated by any entity having jurisdiction thereof and Tenant shall at its sole cost and expense maintain and make all necessary or required repairs and replacements and maintain said traps and/or interceptors at Tenant's expense without liability to Tenant for any loss or damage by reason of such repairs, maintenance or replacement (and Tenant shall indemnify and hold Landlord harmless therefrom), and Tenant shall pay to Landlord upon demand as additional rental hereunder the cost of such maintenance, repairs or replacements plus interest, at the then highest lawful contract rate which Tenant is authorized to pay under the laws of the State of Texas or the United States of America, whichever is then in effect.

Section 6.11.    N/A

Section 6.12. Tenant hereby stipulates and acknowledges that the attempted or threatened breach of any covenant contained in this Article VI by Tenant would constitute a severe impediment to the ability of Landlord to operate the Shopping Center and to receive the benefits contemplated by this Lease; that the existence of such breach or threatened breach will cause irreparable harm thereto for which there would not be an adequate remedy at law for which no other equitable remedy would be adequate or available and shall entitle Landlord to obtain an injunction prohibiting such breach or attempted breach in addition to all other legal remedies provided hereunder or by law.

8

ARTICLE VII
MAINTENANCE AND REPAIR OF PREMISES;
ALTERATIONS; LANDLORD'S RIGHT OF ACCESS

Section 7.1. Landlord shall keep the foundation, the exterior walls (except plate glass; windows; doors; door closure devices; window and door frames, molding, locks and hardware; and interior painting or other interior treatment of exterior walls), and roof of the Demised Premises in good repair, provided, that Landlord shall not be required to make any repairs occasioned by the act, omission or negligence of Tenant, its employees, subtenants, licensees, contractors and concessionaires; further provided, Landlord shall not be required to make any roof repairs required as a result of maintenance work on Tenant's air conditioning equipment or roof penetrations or perforations required or necessitated by the installation of Tenant's fixtures or the construction or remodeling of the Demised Premises for or by Tenant whether by law, ordinance or otherwise. In the event that the Demised Premises should become in need or repairs required to be made by Landlord hereunder, Tenant shall give immediate written notice thereto to Landlord, and Landlord shall not be responsible in any way for failure to make any such repairs until a reasonable time shall have elapsed after delivery of such written notice which in no event shall be less than thirty (30) days therefrom.

Section 7.2. Tenant will not permit or commit waste and will not injure the Demised Premises, but shall keep the Demised Premises in good, clean condition and shall at its sole cost and expense make all needed repairs and replacements, including, but not limited to air conditioning and heating equipment, electrical equipment and fixtures, doors, moldings, trim, window frames, door frames, closure devices, hardware, and equipment, wiring (including that within the wall or ceiling or under flooring or floor covering),, and plumbing lines (including water lines and gas lines) within walls or ceiling and under flooring and floor covering, and further including replacement of cracked or broken glass, and repairs, replacements and alterations required by any governmental authority, except for repairs and replacements required to be made by Landlord under the provisions of Section 7.1 and Article XII. Tenant shall also make all necessary repairs and replacement of its fixtures required for the proper conduct of its business. Additionally, Tenant shall pay to Landlord upon demand, and without contribution from any other tenant or Landlord, all costs and expenses for the maintenance, repair, replacement and/or construction of any utility lines, including, without limitation, gas lines, sewer lines, water lines and drains, drainage systems, drainage piping, water service pipes, underground water pipes, storm sewer systems or storm sewer piping, sanitary sewer systems and piping and any plumbing equipment, fixtures or appliances servicing the Demised Premises, the Building of which the Demised Premises are a part of the Shopping Center as a result of any obstruction of the flow, clogging, backing-up or other malfunction or disrepair of said systems due to any act or omission of Tenant in its use and/or occupancy of the Demised Premises or the act or omission of any other party holding the Demised Premises by or through Tenant or any other party using or occupying the Demised Premises. If any repairs required to be made by Tenant hereunder are not made within ten (10) days after written notice delivered to Tenant by Landlord, Landlord may at his option make such repairs without liability to Tenant for any loss or damage which may result to its stock or business by reason of such repairs (and Tenant shall indemnify and hold Landlord harmless therefrom), and Tenant shall pay to Landlord upon demand as additional rental hereunder the cost of such repairs plus interest, at the then highest lawful contract rate which Tenant is authorized to pay under the laws of the State of Texas or the United States of America, whichever is then in effect. Upon termination of this lease, Tenant will surrender and deliver up the Demised Premises to Landlord broom- clean and in the same condition in which the Demised Premises existed at the commencement of the term of this Lease, excepting only ordinary wear and tear and damage arising from any cause not required to be repaired by Tenant. Upon termination of this Lease, Tenant will also surrender to Landlord all keys to the Demised Premises at the place stated herein for the payment of rent.

Section 7.3. Tenant shall not make any alterations, additions, or improvements to the Demised Premises without the prior written consent of Landlord, except for the installation of "Unattached, Movable Trade Fixtures" (as hereinafter defined which may be installed without drilling, cutting or otherwise defacing the premises. All alteration, addition, improvements and fixtures (other than "Unattached, Movable Trade Fixtures") which may be made or installed by either party hereto upon the Demised Premises shall remain upon, and be surrendered with, the premises and become the property of Landlord at the termination of this Lease, unless Landlord requests their removal, in which event Tenant shall remove the same and restore the premises to their original condition at Tenant's expense. Any linoleum, carpeting, or other floor covering of similar character installed by Tenant on the Floor of the Demised Premises shall become the property of Landlord, all without credit or compensation to Tenant. Subject to the lien and security interest right of Landlord hereinafter referred to, Tenant may remove "Unattached, Movable Trade Fixtures" (as hereinafter defined) (not including, however, ducts, conduits, wiring, pipes. paneling or other wall covering or floor covering) provided: (1) such removal is made prior to the termination of the term of this Lease; (2) Tenant is not in default in the performance of any obligation or covenant under this Lease at the time of such removal; and (3) such removal may be effected without damage to the Demised Premises and Tenant promptly repairs all damage caused by such removal. For purposes hereof, the phrase "Unattached, Movable Trade Fixtures" means the following: counters, tables, chairs, desks, racks, merchandisers and displays, standards, wall brackets, hand rods, shelves, mirrors, marking equipment, cash registers and other business machines, provided that they are not permanently attached in any way to the floors, walls or ceilings.

All plumbing or electrical wiring connections exposed as a result of the removal of Tenant's "Unattached, Movable Trade Fixtures", or other alterations, additions, fixtures, equipment and property

9.

installed or placed by it in the Demised Premises (id such removal is so requested by Landlord) shall be capped by Tenant in a safe and workmanlike manner.

In the event that Tenant shall have assigned this Lease or subleased the Demised Premises (in whole or in part), but subject to and in accordance with the provisions of Article XV, alterations in the Demised Premises of any scope or extent made (without prior notice to or consent of Tenant) by Landlord or by the party occupying (or contemplating occupancy of) the Demised Premises (with or without the consent of Landlord) shall not have the effect of discharging or otherwise impairing or affecting the continuing liability under this Lease of Tenant or anyone holding under Tenant; provided, however, the foregoing shall not be interpreted as dispensing with the necessity for consent of Landlord to alterations of the Demised Premises under the circumstances in which such consent is required under the other provisions of this Lease.

Section 7.4.   All construction work done by Tenant within the Demised Premises shall be performed in a good and workmanlike manner, satisfactory to Landlord and in compliance with all governmental requirements and applicable building codes, and at such times and in such manner as to cause a minimum of interference with other construction in progress and with the transaction of business in the Shopping Center.   Without limitation on the generality of the foregoing Landlord shall have the right to require that such work is performed during hours when the Shopping Center is not open for business, and in accordance with other rules and regulations which Landlord may from time to time prescribe.  Labor and material used in the installation of Tenant's equipment, furniture and fixtures, and in any other work on the Demised Premises performed by Tenant, will be subject to Landlord's prior written approval. Such written approval shall not be unreasonably withheld or unduly delayed.  With respect to any contract for any such labor or materials, Tenant acts as principal and not as the agent of Landlord, and Tenant shall give written notification to any contractor engaged by Tenant for construction of imp movements on or within the Demised Premises that Tenant is no the agent of Landlord but is acting as principal in its own behalf, and Tenant shall furnish a copy of said notice to Landlord prior to commencement of any work on or within the Demised Premises.   Tenant agrees to indemnify and hold Landlord harmless for all claims (including costs and expenses of defending against such claims) arising or alleged to arise from any act or omission of Tenant or Tenant's agents, employed, contractors, subcontractors, laborers, materialmen or invitees or arising from bodily injury or property damage occurring or alleged to have occurred incident to Tenant's work at the Demised Premises, Tenant shall not have authority to place any lien upon the Demised Premises or any interest therein or in any way to bind Landlord; and no action or failure to act by Landlord shall constitute a ratification by Landlord of Tenant's contract for construction of improvements on or within the Demised Premises; and any attempt to do so shall be void and of no effect.  Landlord expressly disclaims liability for the cost of labor performed for or materials furnished to Tenant.  All costs for such construction performed shall be paid promptly to prevent the assertion of any liens for labor or materials.  If, because of any actual or alleged act or omission of Tenant, or any contractor of Tenant or any such contractor's subcontractor or any laborer performing labor or materialmen furnishing materials at or for the Demised Premises or by reason of any specially fabricated material whether or not placed at the Demises Premises, any lien, affidavit, charge or order for the payment of money shall be filed against Landlord, the Demised Premises or any portion thereof or interest therein, whether or not such lien, affidavit, charge or order is valid or enforceable, Tenant shall, at its own cost and expense, cause same to be discharged of record by payment, bonding or otherwise no later than fifteen (15) days after notice to Tenant of the filing thereof, but in all events prior to the foreclosure thereof.  Tenant shall, if requested by Landlord, furnish payment and performance bonds or other security satisfactory to Landlord against any such loss, liability or damage.  Whenever Tenant proposes to do any construction work within the Demised Premises, it shall first furnish to Landlord plans and specifications in such detail as Landlord may request o covering all such work.. Tenant must have Landlord's prior written approval of such plans and specifications prior to the commencement of any construction.

Section 7.5.   Landlord (and any Mortgagee or Deed of Trust beneficiary as to the Demised Premises) with advanced notification, shall have the right to enter upon the Demised Premises at any time for the purpose of inspecting the same or of making repairs or additions to the Demised Premises, or of making repairs, alterations, or additions to adjacent premises, or of showing the Demised Premises to prospective purchasers, lessees, or lenders.

Section 7.6.   Any penetrations or perforations through the roof of the Demised Premises necessitated or required by the installation of Tenant's fixtures or the construction or remodeling of the Demised Premises for or by Tenant shall be first approved in writing by Landlord and shall be performed by a contractor, sub-contractor, mechanic or repairman approved in writing by Landlord.

Section 7.7.   Tenant shall pay the full amount of all taxes, assessments, impositions, levies, charges, excises, fees, licenses and other sums levied, assessed, charged or imposed by any governmental authority or other taxing authority  upon Tenant's leasehold interest under this Lease and all alterations, additions, fixtures (including "Unattached, Movable Trade Fixtures), inventory and other property installed or placed or permitted at the Demised Premises by Tenant.   Within thirty (30) days after notice from Landlord, Tenant shall furnish Landlord a true copy of receipts evidencing such payment received by Tenant from the Governmental authority or other taxing authority assessing such charges.

10

68

Tenant will also pay all insurance premiums assessed or levied upon any alterations, additions, fixtures or property installed in the Demised Premises by the Tenant and all insurance related to Tenant's use, occupancy and operations within the Demised Premises and the Shopping Center.

ARTICLE VIII
SIGNS; STORE FRONTS; ROOF

Section 8.1. Tenant shall not, without Landlord's prior written consent (a) make any changes to the store front or (b) install outside the interior surface of the perimeter walls of the Demised Premises any lighting or awnings, or any decorations or paintings or (c) install any drapes, blinds, shades or other coverings on display window or door lettering, placards, decorations or advertising media of any type which can be viewed from outside of the Demised Premises, excepting only dignified displays of customary type for its display windows. Tenant must pay for the installation of an exterior sign and the same shall conform in all respects to the sign criteria established by Landlord for the Shopping Center and BE SUBJECT TO LANDLORD'S PRIOR WRITTEN APPROVAL. If required by Landlord, Tenant shall also install an under canopy sign and the same shall conform in all respects to the sign criteria established by Landlord for the Shopping Center and be subject to Landlord's prior written approval; provided, however, Landlord may elect, at the expense of Tenant, to install any such exterior sign, and Tenant shall pay the Under Canopy Sign Charge (set forth in Article I) and indemnify and save Landlord harmless from the cost and expense thereof. If requested by Landlord, Tenant shall cause Tenant's exterior sign to be "hooked-up" to the existing electrical connection and be placed on a time clock and photoelectric cell device such that the electricity illuminating such sign shall keep Tenant's electric signs on from dusk until 11:00 p.m. every day during the lease term. The failure of Tenant to install any such exterior sign within ninety (90) days of the date hereof shall constitute a default by Tenant hereunder and entitle Landlord to exercise any remedies permitted under the term of this Lease without the necessity of further notice to Tenant (notwithstanding any provision to the contrary contained in Article XVII). All signs installed shall be kept in good condition and in proper operating order at all times and (except for the fascia sign) shall become the property of Landlord at the termination of this Lease. Upon the expiration or earlier termination of this Lease, Tenant shall remove the fascia sign and restore the surface, to which said sign was attached, to its original condition at Tenant's expense. In the event Tenant fails to remove the fascia sign within three(3) days from the expiration or earlier termination of this Lease, said sign shall become the property of Landlord without any credit or compensation to Tenant, and Landlord may (but shall not be obligated to) remove and store or dispose of said sign and Tenant shall be liable to Landlord for all costs incurred by Landlord in connection with such removal and storage or disposal and Tenant shall indemnify and hold Landlord harmless from all loss, damage, costs, expenses and liability in connection with such removal, storage or disposal. Use of the roof is reserved to the Landlord, and Landlord may install upon the roof equipment, signs, antenna, displays and other objects and may construct additional stories above the Demised Premises, provided such use does not reasonable interfere with Tenant's occupancy.

Section 8.2. Tenant, at Tenant's cost and expense, and upon payment of the Pylon Sign Charge, shall have the right, subject however to the prior written consent of Landlord, to locate a sign advertising Tenant upon the pylon structure, if Landlord elects to erect any such pylon structure. Notwithstanding anything herein to the contrary, Landlord shall in all cases retain the right and power to relocate Tenant's sign located upon such pylon structure, if any, to another location on such pylon structure, to be determined by Landlord, in the sole and absolute discretion of Landlord. The cost of installation, the cost of bringing electrical service to Tenant's sign located upon the pylon structure, the sign itself and any cost incurred by Landlord in repairing or maintaining such sign shall all be the sole cost and expense of Tenant, and Tenant shall indemnify and hold harmless Landlord with respect to any claim, charge, expense, or liability for same. Under no circumstances whatsoever will Tenant be allowed to remove such sign from the pylon structure without the prior written consent of Landlord. The placement of any such sign upon the pylon structure, and the design and construction criteria therefor shall be governed by such rules, regulations and requirements as Landlord may, from time to time, promulgate. Upon expiration or earlier termination of this Lease and sign advertising Tenant upon the pylon structure (if Landlord elects to erect any such structure) shall remain upon the pylon structure and be surrendered with the premises and become the property of Landlord without credit or compensation to Tenant, unless Landlord requires removal of such sign, in which event Landlord shall remove the same at Tenant's expense, and Tenant shall pay to Landlord upon demand, the cost of removing Tenant's sign from the pylon structure.

ARTICLE IX
UTILITIES

Section 9.1. Tenant agrees to pay additional rent, as hereinafter provided, in an amount equal to "Tenant's Share" of all "Utility Costs" (as such quoted terms are hereinafter defined) adjusted from time to time, pursuant to the provisions hereinafter state.

The phrase "Utility Costs" as used herein shall mean all water, gas, electricity and other utilities used in the Demised Premises.

If the utilities are presently separately metered (not submetered) directly to the Demised Premises, then in such event Tenant shall pay all Utility Costs directly to the supplier of any such utilities separately metered (or submetered), and will save and hold Landlord harmless from any charge or liability for same.

11

69

Tenant shall if requested by Landlord, and at Tenant's sole cost, expense, risk and liability, install a submeter or submeters for the calculation of all utility services furnished to the Demised Premises and Tenant shall pay all such utility costs directly to the supplier of such service separately submetered and Tenant will save and hold Landlord harmless from any such charge or liability for the same, or alternatively, if required by Landlord, Tenant shall pay all such utility charges directly to Landlord.

The phrase "Tenant's Share" as applied to Utility Cost shall refer to the sum calculated by Landlord on an equitable basis to be the cost of Tenant's share of the Utility cost with respect to any such utilities which are submetered to Tenant in common with other occupants of the Shopping Center.

Monthly, during the first year of the term of this Lease, Tenant will pay to Landlord the Estimated CAM Charge (as such term is defined in Article 1 of the Lease) monthly in advance, payable at the same time and place as the Rental is paid, except, however, if the Lease Term does no begin on the first day of a calendar month, Tenant shall pay a pro rata portion of such sum for such partial month. Periodically, during the term of this Lease, Landlord shall have the right to estimate Tenant's Share of CAM Costs for the next fiscal period (determined by Landlord) of the term of this Lease, whereupon Tenant shall pay Landlord such amount as may be so indicated by Landlord in the same manner as the Estimated CAM Charge.

Section 9.2. No interruption or malfunction of any utility services shall constitute an eviction or disturbance of Tenant's use and possession of the Demised Premises or a breach by Landlord of any of its obligation hereunder or render Landlord liable for damages or entitle Tenant to be relieved from any of its obligations hereunder (including the obligation to pay rent) or grant Tenant right of set-off or recoupment.

Section 9.3. In addition, Tenant shall be solely responsible for and pay to Landlord, within ten (10) days after receipt of Landlord's statement therefore, all costs and expenses incurred by Landlord, including without limitation, fines, fees charges and repair, replacement or installation costs, which result from Tenant's or Tenant's business operations and are incurred by Landlord because of federal, state, county or municipal legislation, or rules or regulations relating to environmental control; provided, however, that in the event Tenant is ordered directly by any governmental authority to comply with any such federal, state, county or municipal legislation, rules or regulation, Tenant shall proceed promptly and expeditiously to fully comply with such order and Tenant shall be solely responsible for, and shall bear all costs and expenses incurred in connection with Tenant's compliance.

## ARTICLE X
## INDEMNITY, PUBLIC LIABILITY, BUILDER'S RISK
## AND OTHER INSURANCE

Section 10.1. Landlord shall not be liable to Tenant or to Tenant or to Tenant's employees, agents or visitors, or to any other person whomsoever, for any injury to person or damage to property on or about the Demised Premises or the Common Area cause by negligence or misconduct of Tenant, its employees, contractors, subtenants, licensees, and concessionaires, customers, invitees, or other Tenants of the Shopping Center, or of any other person entering the Shopping Center under express or implied invitation of Tenant or arising out of any breach or default by Tenant in the performance of its obligations hereunder, or arising out of or from any injury to or death of any person or persons or damage to or destruction of the property of any person or persons occurring or about the Demised Premises or on the sidewalks adjacent thereto, and Tenant hereby agrees to indemnify Landlord and hold him harmless from any loss, damages, expense (including, without limitation, attorney's fees and court costs), or claims arising out of such damage or injury. Tenant agrees to use and occupy the Demised Premises and place its fixtures, equipment, merchandise and other property therein at its own risk and hereby releases Landlord and its agents from all claims for any damage or injury to the full extent permitted by law.

Section 10.2. Tenant shall procure and maintain throughout the term of this Lease a policy or policies of insurance, at its sole cost and expense, insuring Tenant (and naming Landlord as a co-insured) against any and all liability for injury to or death or a person or persons, and for damage to or destruction of property occasioned by or arising out of or in connection with the use or occupancy of the Demised Premises, or by the condition of the Demised Premises, the limits of such policy or policies to be in an amount not less that $100,000.00 in respect of injuries to or death of any one person, and in the not less than $300,000.00 in respect of any one accident or disaster, and in an amount not less than $50,000.00 in respect of property damaged or destroyed, or with such other limits as may be required by Landlord, and to be written by an insurance company or companies satisfactory to Landlord. Tenant shall obtain a written obligation on the part of each insurance company to notify Landlord at least ten (10) days prior to cancellation of such insurance. Such policies or duly executed certificates of insurance shall be prior to Tenant's occupancy of the Demised Premises, delivered to Landlord and renewals thereof as required shall be delivered to Landlord at least thirty (30) days prior to the expiration of the respective policy terms.

Section 10.3. During the period Tenant may be remodeling or making alterations to the Demised Premises, all builders' risk insurance shall be maintained by Tenant in the amount no less than the total improvement cost. Said builder's risk insurance and liability insurance policies shall name Landlord as a co-insured with Tenant and shall be non-cancelable with respect to Landlord, except after ten (10) days written notice from the insurance company. Certificates of such insurance shall be deposited by Tenant with Landlord prior to commencing any remodeling or alteration work.

12

70

Section 10.4.  Tenant agrees at all times at its expense to keep its merchandise, fixtures and other property situated within the Demised Premises insured against fire, with extended coverage, to the extent of at least eight percent (80%0 of the value thereof.  Tenant further agrees that, at all times, when a "boiler", as that term is defined for the purposes of boiler insurance is located within the Demised Premises, it will carry at its expense boiler insurance with policy limits of not less than $100,000.00 insuring both Landlord and Tenant against loss or liability caused by the operation or malfunction of such boiler.  Tenant shall also carry at its own cost and expense plate glass insurance and flood insurance insuring both Landlord and Tenant against loss or liability arising as a result thereof.  Such insurance shall be carried with companies satisfactory to Landlord, and shall be in form satisfactory to Landlord.  Tenant shall obtain a written obligation of each insurance company to notify Landlord at least ten (10) days prior to cancellation of such insurance.  Such policies or duly executed certificates of insurance shall be delivered to Landlord prior to the commencement of Tenant's occupancy hereunder and renewals thereof as required shall be delivered to Landlord at least thirty (30) days prior to the expiration of the respective policy terms.  The proceeds payable to Tenant on account of such insurance shall not be used, except with the consent of Landlord, for any purpose other than the repair or replacement of merchandise, fixture and other property situated within the Demised Premises.

Section 10.5.   If Tenant should fail to comply with the foregoing requirements relating to insurance, Landlord may declare Tenant in default of the Lease of obtain such insurance and Tenant shall pay to Landlord on demand as additional rent hereunder the premium cost thereof plus interest, at the then highest lawful contract rate Tenant is authorized to pay under the laws of the State of Texas or the laws of the United States of America, from the date of payment by Landlord until repaid by Tenant.

**ARTICLE XI**
**NON-LIABILITY FOR CERTAIN DAMAGES**

Section 11.1.  Landlord and Landlord's agents and employees shall not be liable to Tenant for any injury or death to person or damage or destruction to property sustained by Tenant or any person claiming through Tenant resulting from the Demised Premises or any other portions of the Shopping Center becoming out of repair or by defect in or failure of equipment, pipes or wiring, or by broken glass, or by the backing up of drains, or by gas, water, steam, electricity, or oil leaking, escaping or flowing into the Demised premises, no shall Landlord be liable to Tenant for any loss or damage that may be occasioned by or through the acts or omission of other Tenants of the Shopping Center or of any other persons whomsoever.

**ARTICLE XII**
**FIRE OR OTHER CASUALTY**

Section 12.1.  Tenant shall give immediate written notice to Landlord of any damage caused to the Demised Premises by fire, or other casualty.

Section 12.2.  If at any time during the lease term, (I) all or any portion of the Demised Premises shall be damaged or destroyed by fire or other casualty, or (ii) the Building in which the Demised Premises are located shall be destroyed or rendered untenantable to an extent in excess of 25% of the floor area thereof, then in any such eventuality Landlord shall have the election to terminate this Lease or to repair and restore the Demised Premises to substantially the condition in which they existed immediately prior to such damage or destruction.

Section 12.3.  In the event that this Lease is terminated as herein permitted, Landlord shall refund to Tenant the prepaid rent, if any (unaccrued as of the date of damage or destruction), less any sum then owing Landlord by Tenant.

Section 12.4.  In any of the aforesaid circumstances, Rental shall abate proportionately during the period and to the extent that the Demised Premises are in the opinion of Landlord unfit for use by Tenant in the ordinary conduct of its business.  If Landlord has elected to repair and restore the Leased Premises, this Lease shall continue in full force and effect and such repairs will be made within a reasonable time thereafter, subject to "excusable delays" as hereinabove defined.  If Landlord has elected to repair and reconstruct the Demised Premises, then, at the election of Landlord (exercised by notice to Tenant prior to or within thirty (30) days following Landlord's completion of such repair and reconstruction) the Lease Term shall be extended by a period of time equal to the period of such repair and reconstruction.

Section 12.5.  In any circumstances where Landlord elects to repair and restore the premises, this Lease shall continue in full force and effect, and such repairs will be made within a reasonable time thereafter, subject to "excusable delays" as hereinabove referred to.  In any circumstances where Landlord elects to repair and restore the Demised Premises, Landlord shall not be required to repair any injury or damage by fire or other cause to, or to make any repairs or replacements of any leasehold improvements, fixtures or other personal property of Tenant.  In any circumstances where Landlord elects to repair and restore the Demised Premises, Landlord shall not be required to expend for such repairs and restoration any sum in excess of the amount actually collected by Landlord from any insurance policies then in effect.  In the event any insurance proceeds are collected by any party holding a lien on Landlord's interest in the Demised Premises or the Shopping Center, such proceeds shall not be deemed to have been collected by

13

71

Landlord and shall not be available for repair of the Demised Premises whether or not payment to such lien holder is with the approval of Landlord.

Section 12.6. Tenant agrees that during the period of reconstruction or repair of the Demised Premises it will continue the operating of its business within the Demised Premises to the extent practicable.

Section 12.7. Notwithstanding the provisions of Article XIII of this Lease, Tenant agrees that if at any time during the term of this Lease all or any portion of the Demised Premises, the Building in which the Demised Premises are located or any part of the Common Area of the Shopping Center shall be damaged or destroyed by fire or other casualty caused in whole or in part by any act or omission of Tenant, Tenant's employees, licensees, invitees, contractors or concessionaires and Landlord elects to repair and restore said damage, Tenant shall Pay to Landlord upon demand, the amount that Landlord is obligated to pay under any Deductible Clause provided in any insurance policy covering such loss or casualty up to the full amount of said deductible. Tenant's failure to pay said deductible to Landlord within five (5) days from receipt by Tenant of written notice from Landlord of the amount of said deductible shall constitute a default by Tenant of its obligations hereunder and Landlord shall be entitled to pursue any of the remedies provided in this Lease or which are available at law or in equity.

## ARTICLE XIII
## SUBROGATION

Section 13.1. To the extent that Landlord and Tenant may legally so agree, and to the extent that any insurance coverage by Landlord and/or Tenant will not be invalidated thereby, it is agreed and understood that where either party hereto may sustain a loss or damage against which such party is protected by an existing policy or policies of insurance, the party hereto sustaining such loss or damage hereby waives and releases any and all claims, demands and causes of action which it might have against the other party hereto to the extent and amount that such loss is covered by the claimants insurance, irrespective of whether or not such damage or loss is occasioned by the negligence of the respective parties hereto, or either of them, their respective agents, servants, employees, guests or invitees, it being the intention of the parties that no insurance company with which either such party maintains insurance in effect may be subrogated to the rights or causes of action which such party may have against the other party hereto.

## ARTICLE XIV
## CONDEMNATION

Section 14.1. If there shall be taken during the term of this Lease all of the Demised Premises, by any authority having the power of condemnation, then and in that event, the term of this Lease shall cease and terminate, and the date of such termination shall be, at Landlord's election, the earlier of either the date upon which possession shall be tendered to such authority by Landlord or the date upon which possession is taken by such authority. If a lesser part of the Demised Premises should be so taken, Landlord may elect to terminate this Lease or to continue this Lease in effect, but if Landlord elects to continue this Lease in effect, the Rental shall be reduced in proportion to the area of the Demised Premises so taken. Immediately upon the taking of possession of the portion of the Demised Premises taken by the condemning authority above. When any such reduction in Rental has been computed by Landlord, Landlord shall notify Tenant as to the amount of such Rental and such sum shall be due and payable by Tenant to Landlord in accordance with the provisions of Article IV relating to the time and manner of Tenant's payment of Rental. At the request of Landlord, Tenant will execute a letter or other memorandum setting forth the amount of such Rental payable by Tenant. In the event that Landlord has elected to continue this Lease in effect, then upon Landlord's collection of the entire sum due and payable by such authority to Landlord by the way of compensation and damages, Landlord shall restore the remaining portion of the Demised Premises so as to constitute such portion an enclosed building, with such nature of building improvements and facilities as Landlord furnished to Tenant at or prior to commencement of the Lease Term, provided that Landlord shall not be obligated to expend of such restoration any sums in excess of the amount actually received by Landlord from the condemning authority. Such restoration work shall be performed by Landlord within a reasonable period of time with reasonable allowances for "excusable delays" (as hereinabove defined). Neither the restoration work, if any, by Landlord with respect to the Demised Premises nor the restoration work, if any, by Landlord with respect to any other portion of the Shopping Center shall constitute an eviction or disturbance of Tenant's use and possession of the Demised Premises or Shopping Center or a breach by Landlord of any of its obligations hereunder or render Landlord liable for damages or entitle Tenant to be relieved from any of its obligations hereunder (with the exception of the aforesaid proportionate reduction in Rental) or grant Tenant any right of off-set or recoupment. In the event that any condemnation proceeds, whether by way of compensation or damages, are collected by any party holding a lien on Landlord's interest in the Demised Premises, such proceeds shall not be deemed to have been collected by Landlord, whether or no the payment to such lien holder is with the approval of Landlord.

Section 14.2. Whether or not any portion of the Demised Premises may be taken by such authority, Landlord may nevertheless elect to terminate this Lease or to continue this Lease in effect in the event any portion of any building in the Shopping Center or more than ten percent (10%) of the Common Area of the Shopping Center be taken by such authority.

14

72

Section 14.3. All sums awarded or agreed upon between Landlord and the condemning authority for the taking of the fee or the leasehold interest, whether as damages or as compensation, will be the property of Landlord. Tenant hereby assigns to Landlord all proceeds, whether by way of compensation or damages, otherwise payable to Tenant for the leasehold interest by reason of such taking. Tenant further grants to Landlord the exclusive authority to negotiate with such authority for payment both with respect to the interest of Landlord and the interest of Tenant in the Demised Premises and Tenant agrees that the authority having the power of eminent domain shall cause all checks and drafts issued by it in connection with any such taking of the fee or leasehold estate whether as compensation or as damages, to be issued payable to the order of Landlord above or payable to the order of Landlord and "landlord's Mortgagee" (as hereinafter defined). Upon the request of Landlord, Tenant agrees to forthwith execute such instrument or instruments as Landlord may reasonable request for the purpose of evidencing the cessation of Tenant's interest in such portion of the Demised Premises as is taken by such authority and the continued effectiveness of this Lease as to the balance of the Demised Premises not taken. Any amount specifically awarded or agreed upon by the Tenant and the condemning authority for the taking of Tenant's "Unattached, Movable, Trade Fixtures" shall be the property of Tenant.

Section 14.4. If this Lease should be terminated under any provision of this Article XIV, all Rental and all other sums due and payable by Tenant hereunder shall be payable up to the date that possession taken by the taking authority, and Landlord will refund to Tenant an equitable portion of any such Rental and other sums paid in advance but not yet earned by such date.

Section 14.5. In the event that any authority having the power of condemnation requests that Landlord convey to such authority all or any portion of the Shopping Center or all or any portion of the Demised Premises, Landlord shall have the right to make a voluntary conveyance to such authority of all or any portion of the Shopping Center or all or any portion of the Demised Premises whether or not proceedings have been filed by such authority; and in the event of any such voluntary conveyance, it shall nevertheless for all purposes hereunder be deemed that there has been a taking by such authority of the property voluntarily conveyed by Landlord. Accordingly, all of the provisions of Sections 14.1, 14.2, 14.3, and 14.4 hereof shall be applicable notwithstanding such voluntary conveyance.

ARTICLE XV
ASSIGNMENT AND SUBLETTING

Section 15.1. Tenant shall not assign or in any manner transfer this Lease or any estate or interest therein or sublet the Demised Premises or any part thereof without the prior written consent of Landlord. Such consent shall not be unreasonably withheld. Consent by Landlord to one (1) or more assignments or subletting shall not operate as a waiver of Landlord's rights as to any subsequent assignments and subletting. Notwithstanding any assignment or subletting, Tenant shall at all times remain fully responsible and liable for the payment of the Rental herein specified and for compliance with all of its other obligations under this Lease. The term "sublet" shall be deemed to include the granting of licenses, concessions, and any other right of occupancy of any portion of the Demised Premises. Any attempt to do any of the foregoing shall be void and of no effect.

If Tenant is a corporation, then any transfer of this Lease from Tenant by merger, consolidation or dissolution or any change in ownership or power to vote a majority of the voting stock in Tenant outstanding at the time of execution of this instrument shall constitute an assignment for purposes of this Lease. For all purposes of this Section 15.1, the term "voting stock" shall refer to shares of stock regularly entitled to vote for the election of directors of the corporation involved.

If Tenant is a general partnership having one or more corporations as partners or if Tenant is a limited partnership having one or more corporations as general partners, the provisions of the preceding paragraph shall apply to each of such corporations as if such corporation alone had been the Tenant hereunder.

If Tenant is a general partnership, then the transfer of a majority of the partnership interest of Tenant as existing at the time of execution of this instrument shall constitute an assignment for purposes of this Lease (or at any future time). If Tenant is a limited partnership, then the assignment of all or any portion of the interest of a general partner of Tenant shall constitute an assignment for the purpose of this Lease.

Section 15.2. Notwithstanding that the prior written consent of Landlord to any of the aforesaid transactions may have been obtained, the following shall apply: (1) In the event of an assignment, contemporaneously with the granting Landlord's aforesaid consent, Tenant shall cause the assignee to expressly assume in writing and agree to perform all of the covenants, duties, and obligations of Tenant hereunder and such assignee shall be jointly and severally liable therefor along with Tenant; Tenant shall further cause such assignee to grant Landlord an express first and prior contract lien and security interest (and execute one or more Uniform Commercial Code Financing Statements) in the manner hereinafter stated as applicable to Tenant; (2) a signed counterpart of all instruments relative thereto (executed by all parties to such transaction with the exception of Landlord) shall be submitted by Tenant to Landlord prior to or contemporaneously with the request for Landlord's written consent thereto (it being understood that no such instrument shall be effective without the written consent of Landlord); (3) Tenant shall subordinate to Landlord's statutory lien and Landlord's aforesaid contract lien and security interest, any liens or other rights which Tenant may claim with respect to any fixtures, equipment, goods, wares, merchandise or other

15

73

property owned by or leased to the proposed assignee, or sublessee or other party intending to occupy the Demised Premises; (4) no usage of the Demised Premises different from the usage herein provided to be made by Tenant shall be permitted, and all other terms and provisions of this Lease shall continue to apply after any such assignment or subleasing; (5) in any case where Landlord consents to an assignment, subleasing, grant of a concession or license or mortgage, pledge or hypothecation of the leasehold or sublease of the Demised Premises, the undersigned Tenant will nevertheless remain directly and primarily liable for the performance of all of the covenants, duties and obligations of Tenant hereunder (including, without limitation, the obligation to pay all rental and other sums herein provided to be paid), and Landlord shall be permitted to enforce the provisions of this instrument against the undersigned Tenant and/or any assignee without demand upon or proceeding in any way against any other person, and (6) in the event that the rental due and payable by a sublessee under any such permitted sublease (or a combination of the rental payable under such sublease plus any bonus or other consideration therefor or incident thereto) exceeds the hereinabove provided rental payable under this Lease or if with respect to a permitted assignment, permitted license or other transfer by Tenant permitted by Landlord, the consideration payable to Tenant by the assignee, licensee or other transferee exceeds the rental payable under this Lease, the Tenant shall be bound and obligated to pay Landlord all such excess rental and other excess consideration within ten (10) days following receipt thereof by Tenant from such sublessee, assignee, licensee or other transferee, as the case might be.

Section 15.3. Tenant shall not mortgage, pledge or otherwise encumber its interest in this Lease or in the Demised Premises, without written consent of the Landlord and will not be unreasonably withheld, nor may such interest be transferred by operation of law. Any attempt to do any of the foregoing shall be void and of no effect.

Section 15.4. If this Lease be assigned or if the Demised Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge or hypothecation of the leasehold interest or grant of any concession or license within the Demised Premises or if the Demised Premises be occupied in whole or in part by anyone other than Tenant without the prior written consent of Landlord, Landlord may nevertheless collect rental from the assignee, sublessee, mortgagee, pledge, party to whom the leasehold interest was hypothecated, concessionaire or licensee or other occupant and apply the net amount collected to the rental payable hereunder, but no such transaction or collection of rental or application thereof by Landlord shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties and obligations hereunder.

ARTICLE XVI
TAX AND INSURANCE COSTS

Section 16.1. The Tenant agrees to pay as additional rent, as hereinafter provided, an amount equal to "Tenant's Share" of "Taxes" and "Insurance Premiums" (as such quoted terms are hereinafter defined) adjusted from time to time, pursuant to the provisions hereinafter stated.

The phrase "Taxes," as used herein, shall mean all taxes, assessments, impositions, levies, charges, excises, fees, licenses, and other sums (whether now existing or hereafter arising, whether foreseen or unforeseen and whether made under the present system of real estate taxation or some other system), levied, assessed, charged, or imposed by any governmental authority or other taxing authority, or which accrue on the Shopping Center for each calendar year (or portion thereof) during the term of this Lease; including, without limitation, all penalties, interest, and other charges (with respect to taxes) payable by reason of any delay and/or failure or refusal of Tenant to make timely payment as required under this Lease. In no event shall the word "Taxes" be deemed to include any of Landlord's income taxes or the estate, inheritance, or gift taxes of any party of "Landlord."

The phrase "Insurance Premiums" shall mean the total annual insurance premiums which accrue on all fire and extended coverage insurance, boiler insurance, public liability and property damage insurance, rent insurance, and any other insurance which, from time to time, may, at Landlord's election, be carried by Landlord with respect to the Shopping Center during any applicable calendar year or portion thereof occurring during the term of this Lease; provided, however, in the event, during any such calendar year, all or any part of such coverage is written under a "blanket policy" or otherwise in such manner that Landlord was not charged a specific insurance premium applicable solely to the Shopping Center, then in such event, the amount considered to be the Insurance Premium with respect to such coverage for such calendar year, shall be that amount which would have been the annual Insurance Premium payable under the rates in effect on the first day of such applicable calendar year for a separate Texas Standard Form insurance policy generally providing such type and amount of coverage (without any deductible amount) with respect to the Shopping Center (considering the type of construction and other relevant matters), irrespective of the fact that Landlord did not actually carry such type policy.

The phrase "Tenant's Share," as applied to Taxes and Insurance Premiums, shall refer to a sum calculated by multiplying the Taxes and Insurance Premiums (as the case may be ) by a fraction, the numerator of which is the floor area (in square feet) of the Demised Premises (as indicated in Article I of this Lease) and the denominator of which is the total Gross Leasable Retail Area within the Shopping Center on the 1st day of January fro the relevant calendar year for which any calculation referred to in this paragraph is being made; provided, however, for any period less than twelve (12) full calendar months with respect to which such calculation is being made, a pro rata portion of the resulting product shall be calculated to determine Tenant's Share.

16

74

Monthly, during the first year of the term of this Lease, Tenant will pay to Landlord the Estimated Tax and Insurance Charge (as such term is defined in Article 1 of the Lease), monthly in advance, payable at the same time and place as the Rental is payable, except, however, if the Lease Term does not begin on the first day of a calendar month, Tenant shall pay a pro rata portion of such sum for such partial month. Landlord shall have the right to adjust such monthly estimate on an annual basis, pursuant to the following paragraph hereof.

At the end of each calendar year occurring during the term of this Lease (subsequent to the expiration or other termination of this Lease, if such occurs on a date other than the last day of the calendar year), Landlord shall give Tenant notice of the total amount paid by Tenant for the relevant calendar year together with the actual amount of Tenant's Share of Taxes and Insurance Premiums ("Total Cost") for such calendar year. If the actual amount of Tenant's Share of the Total Cost with respect to such period exceeds the aggregate amount previously paid by Tenant with respect thereto during such period, Tenant shall pay to Landlord the deficiency within fifteen (15) days following notice from Landlord; however, if the aggregate amount previously paid by Tenant with respect thereto exceeds Tenant's Share of the Total Cost for such period, then, at Landlord's election, such surplus (net of any amounts then owing by Tenant to Landlord) shall be credited against the next ensuing installment of any such cost due hereunder by Tenant, or Landlord may refund such net surplus to Tenant. Periodically, during the term of this Lease, Landlord shall have the right to estimate Tenant's Share of Taxes and Insurance Premiums for the next fiscal period (determined by Landlord) of the term of this Lease, whereupon, Tenant shall pay Landlord such amount as may be so indicated by Landlord in the same manner as the Estimated Tax and Insurance Charge.

**ARTICLE XVII**
**DEFAULT BY TENANT AND REMEDIES**

Section 17.1. The following events shall be deemed to be events of default by Tenant under this Lease:

(1) Tenant shall fail or refuse to pay any installment of Rental, or any monies due and payable to Landlord when due and such failure shall continue for a period of ten (10) days after such due date.

(2) Tenant or any guarantor of Tenant's obligations under this Lease shall become insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors.

(3) The entry of a decree or order by a court having jurisdiction over Tenant or any guarantor of Tenant's obligations hereunder in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable, federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of Tenant or any guarantor of Tenants' obligation hereunder or for any substantial part of either of said party's property, or ordering the winding-up or liquidation of either of said party's affairs.

(4) The commencement by Tenant or any guarantor of Tenant's obligations hereunder of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable, federal or state bankruptcy, insolvency or other similar law, or the consent by either of such parties to the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of any substantial part of the property of Tenant or any guarantor of Tenant's obligations hereunder, or to the taking possession of any such property by any such functionary or the making of any assignment for the benefits of creditors for either Tenant or any guarantor of Tenant's obligations hereunder, or the failure of Tenant or any guarantor of Tenant's obligations hereunder generally to pay its debts and such debts become due, or the taking of corporate action by any corporate Tenant or any corporate guarantor of Tenant's obligations hereunder in furtherance of any of the foregoing.

(5) Tenant shall abandon, desert or vacate any portion of the Demised Premises.

(6) Tenant shall do or permit to be done anything which creates a lien upon the Demised Premises.

(7) Without Landlord's prior written consent, if, Tenant being a general partnership or joint venture, there shall be any change in the membership of such partnership or joint venture subsequent to the execution of this Lease, or if Tenant being a limited partnership, there shall be any change in the general partners subsequent to the execution of this Lease, or if, Tenant being a corporation, there shall be any change in the control of the corporation subsequent to the execution of this Lease.

(8) Tenant shall fail or refuse to comply with any term, provision, or covenant of this Lease, other than the payment of rent, and shall not cure such failure within **thirty (30)** days after written notice thereof to Tenant, other than the aforementioned events of default specified in (1) thru (7) of this Section 17.1.

Upon the occurrence of any of such events of default, Landlord shall have the option to pursue any one or more of the following remedies without any notice or demand whatsoever:

17

75

A. Terminate this Lease, in which event Tenant shall immediately surrender the Demised Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which he may have for possession or arrearages in rent, enter upon and take possession of the Demised Premises and expel or remove Tenant and any other person who may be occupying said premises or any part hereof, without being liable for prosecution or any claim of damages therefor; and Tenant agrees to pay Landlord on demand the amount of all loss and damage which Landlord may suffer by reason of such termination, whether through inability to relet the Premises on satisfactory terms or otherwise.

B. Enter upon and take possession and expel or remove Tenant and any other person who may be occupying said premises or any part thereof, without being liable for prosecution or any claim for damages therefor, and, if Landlord so elects, relet the premises on such terms as Landlord may deem advisable and receive the rent therefor; and Tenant agrees to pay to Landlord on demand any deficiency that may arise by reason of such reletting.

C. Enter upon the Demised Premises (including altering locks and other security devices) without being liable for prosecution or any claim for damages therefor, and do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in this effecting compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for any damages, resulting to the Tenant from such action whether caused by the negligence of Landlord or otherwise.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law or in equity, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any rent payable to Landlord hereunder or of any damages accruing to Landlord by reason of the violation of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default. In determining the amount of loss or damage which Landlord may suffer by reason of termination of this Lease or the deficiency arising by reason of any reletting of the Demised Premises by Landlord as above provided, allowance shall be made for the expense of repossession and any repairs or remodeling undertaken by Landlord following repossession.

Section 17.2. If, on account of any breach or default by Tenant in Tenant's obligations hereunder, it shall become necessary for Landlord to employ an attorney to defend any of the Landlord's rights or remedies. **Tenant agrees to pay any reasonable attorney's fees incurred by Landlord in such connection.**

Section 17.3. Tenant, contemporaneously with the execution of this Lease, has deposited with Landlord the sum set forth in Article I (o), the receipt of which is hereby acknowledged by Landlord; said deposit being given to secure the faithful performance by the Tenant of all of the terms, covenants, and conditions of this Lease by the Tenant to be kept and performed during the term hereof. Tenant agrees that if the Tenant shall fail to pay the Rental or any other sums due and owing by Tenant to Landlord herein reserved promptly when due, said deposit may, at the option of the Landlord (but Landlord shall not be required to ) be applied to any Rental or any other sums due and unpaid, and if the Tenant violates any of the other terms, covenants and conditions of this Lease, said deposit may be applied to any damages suffered by Landlord as a result of Tenant's default, to the extent of the amount of the damages suffered. Nothing contained in this Article shall in any way diminish or be construed as waiving any of the Landlord's other remedies as provided in this Article XVII, or by law or in equity. Should the entire Default Deposit, or any portion thereof, be appropriated and applied by Landlord for the payment of overdue rent or other sums due and payable to Landlord by Tenant hereunder, then Tenant shall on the written demand of Landlord, forthwith remit to Landlord a sufficient amount in cash to restore said Default Deposit to its original amount, and Tenant's failure to do so within ten (10) days after receipt of such demand shall constitute a breach of this Lease. Should Tenant comply with all of the terms, covenants, and conditions of this Lease and promptly pay all of the Rental herein provided for as it falls due and all other sums payable by Tenant to Landlord hereunder, said Default Deposit shall be returned in full to Tenant at the end of the term of this Lease, within 30 days provided Tenant has notified Landlord in writing of a forwarding address or upon the earlier termination of this Lease less, however, any amounts that may be due from Tenant to Landlord or any amounts that Landlord estimates will be due and owing from Tenant on account of Tenant's Share of the Common Area Maintenance Charge of Tax and Insurance Charge (even though final adjustments thereto are not made by Landlord until the end of the applicable calendar year.) In the event this Lease is terminated prior to the expiration of the stated term as hereinabove provided, in addition to all other remedies provided herein or available at law or in equity, Landlord may use, apply or retain the whole or any part of the security so deposited remaining after applying said deposit to the payment of any Rental due and unpaid and any other sum as to which Tenant is in default, and use, apply or retain the balance of the Default Deposit for payment of any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this Lease, including but not limited to, any damages or deficiency in the reletting of the Demised Premises, whether such damages or deficiency accrued before or after summary proceedings or other re-entry by Landlord. Landlord shall have the right to commingle said Default Deposit with other funds of the Landlord. Landlord may deliver the funds deposited hereunder by Tenant to the purchaser of Landlord's interest in the Demised Premises in the event that such interest is sold, and thereupon Landlord shall be discharged from further liability with respect to such deposit. Notwithstanding that Landlord may hereafter

76

(but shall not be obligated to ) approve any sublease or assignment by Tenant, no assignee or sublessee shall have any right, title or interest in the Default Deposit unless otherwise provided in the sublease or assignment instrument executed by Landlord to evidence its permission to such transaction. No such assignment or sublease, however, shall alter, affect or modify any of the rights of Landlord with respect to the Default Deposit. Tenant's rights hereunder with respect to the Default Deposit shall not in any other manner be assigned, transferred, pledged, mortgaged or encumbered by Tenant without the prior written consent of Landlord, and any attempt by Tenant to do so shall be void and of no effect. In the event of the Bankruptcy of Tenant (or said transferee) or other debtor-creditor proceedings, the Default Deposit may be applied by Landlord as an off-set against any obligation of Tenant (or said transferee due and owing of Landlord. In the event this Lease should be terminated as provided in any construction addendum attached hereto, Landlord may retain the Default Deposit as liquidated damages for its cost of preparing and revising the plans and specifications and/or other administrative costs incurred prior to such termination.

Section 17.4. In the event that Landlord elects to repossess the Demised Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord at Houston, Harris County, Texas, all rent and other indebtedness accrued to the date of such repossession, plus rent required to be paid by Tenant to Landlord during the remainder of the Lease term until the date of expiration of the term diminished by any net sums thereafter received by Landlord through reletting the Demised Premises during said period (after deducting expenses incurred by Landlord as provided herein). In no event shall Tenant be entitled to any excess of any rent obtained by reletting over and above the rent herein reserved. Actions to collect amounts due by Tenant as provided in this Section 17.4 may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until expiration of the Lease Term.

Section 17.5. In case of an event of default, Tenant shall also be liable for and shall pay to Landlord, at Houston, Harris County, Texas, in addition to any sum provided to be paid above: broker's fees incurred by Landlord in connection with reletting the whole or any part of the Demised Premises; the costs of removing and storing Tenant's or other occupant's property; the costs of repairing, altering, remodeling or otherwise putting the Demised Premises into condition acceptable to a new tenant or tenants; and all reasonable expenses incurred by Landlord in enforcing Landlord's remedies or the State of Texas, whichever is applicable. Past due rent and other past due payments shall bear interest from maturity at the then highest lawful contract rate which Tenant is authorized to pay under the applicable laws of the United States.

Section 17.6. N/A

Section 17.7. In the event of termination or repossession of the Demised Premises for a default, Landlord shall not have any obligation to relet or attempt to relet the Demised Premises, or any portion thereof, or to collect rental after reletting; and in the event of reletting, Landlord may relet the whole or any portion of the Demised Premises for any period, to any tenant and for any use and purpose.

Section 17.8. If Tenant should fail to make any payment or cure any default hereunder within the time herein permitted, Landlord, without being under any obligation to do so and without thereby waiving such default, may make such payment and/or remedy such other default for the account of Tenant (and enter the Demised Premises for such purpose), and Tenant shall be obligated to, and hereby agrees, to pay Landlord, upon demand, all costs, expenses and disbursements (including reasonable attorney's fees) incurred by Landlord in taking such remedial action.

Section 17.9. In the event that Landlord shall have taken possession of the Demised Premises pursuant to the authority herein granted, then Landlord shall have the right to keep in place and use all of the furniture, fixtures and equipment at the Demised Premises, including that which is owned by or leased to Tenant, at all times prior to any foreclosure thereon by Landlord or repossession thereby by any lessor thereof or third party having a lien thereon. Landlord shall also have the right to remove from the Demised Premises (without the necessity of obtaining a distress warrant, writ of sequestration or other legal process) all or any portion of such furniture, fixtures, equipment and other property located thereon and place same in storage at any premises within the county in which the Demised Premises is located, or at any other place reasonable convenient to Landlord; and in such event, Tenant shall be liable to Landlord for all costs incurred by Landlord in connection with such removal and storage and shall indemnify and hold Landlord harmless from all loss, damages, cost, expense and liability in connection with such removal and storage, Landlord shall also have the right to relinquish possession of all or any portion of such furniture, fixtures, equipment and other property to any person ("Claimant") claiming to be entitled to possession thereof who presents to Landlord a copy of any instrument represented to Landlord by Claimant to have been executed by Tenant (or any predecessor of Tenant) granting Claimant the right under various circumstances to take possession of such furniture, fixtures, equipment or other property, without the necessity on the part of Landlord to inquire into the authenticity of said instrument copy of Tenant's (or Tenant's predecessor's) signature thereon and without the necessity of Landlord's making any nature of investigation or inquiry as to the validity of the factual or legal basis upon which Claimant purports to act; and Tenant agrees to indemnify and hold Landlord harmless from all cost, expense, loss damage and liability incident to Landlord's relinquishment of possession of all or any portion of such furniture, fixtures, equipment or other property to Claimant. The rights of Landlord herein stated shall be in addition to any and all other rights which Landlord has or may hereafter have at law or in equity; and Tenant stipulates and agrees that the rights herein granted Landlord are commercially reasonable.

77

Section 17.10. To secure the payment of all Rental and any other sums due and to become due hereunder and the faithful performance of this Lease by Tenant, Tenant hereby gives to Landlord an express first and prior contract lien and security interest on all property (including fixtures, equipment, and chattels which may be placed in the Demised Premises, and also upon all proceeds of any such property, and also upon all proceeds of any insurance which may accrue to Tenant by reason of destruction of or damage to any such property and also upon all of Tenant's interests as Tenant and rights options to purchase fixtures, equipment, and chattels placed in the Demised Premises (in the case of fixtures, equipment and chattels leased to Tenant which are placed in the Demised Premises). All exemption laws are hereby waived in favor of said lien and security interest. This lien and security interest is given in addition to the Landlord's statutory lien and shall be cumulative thereto. This lien may be foreclosed with or without court proceedings by public or private sale, provided Landlord gives Tenant at least ten (10) days notice of the time and place of said sale; and Landlord shall have the right to become the purchaser, upon being the highest bidder at such sale. Contemporaneously with the execution of this Lease (and if requested hereafter by Landlord), Tenant shall execute and deliver to Landlord Texas Uniform Commercial Code Financing Statements in sufficient form so that when property filed, the security interest hereby given shall thereupon be perfected. If requested hereafter by Landlord, Tenant shall also execute and deliver to Landlord Texas Uniform Commercial Code Financing Statement Change instruments in sufficient form to reflect any proper amendment of, modification in or continuation or extension of the aforesaid contract lien and security interest hereby granted. Landlord shall, in addition to all of its rights hereunder, also have all of the rights and remedies of a secured party under the Texas Uniform Commercial Code (the Texas Business and Commerce Code).

Section 17.11. In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rent due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have a reasonable period, but in no event less than thirty (30) days, in which to cure any such default, provided, however, if Landlord's default is of such a nature that it cannot reasonable be cured within said thirty (30) day period then Landlord will not be deemed to be in default hereunder if Landlord has promptly commenced to cure said default and is diligently attempting to cure the same. Unless and until Landlord fails to so cure any default after such notice, Tenant shall not have any remedy or cause of action by reason thereof. All obligations of Landlord hereunder will be construed as covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its possession of the Shopping Center and not thereafter.

## ARTICLE XVIII
## HOLDING OVER

Section 18.1. If Tenant should remain in possession of the Demised Premises after the expiration of the term of this Lease, without the execution of a new lease, then Tenant shall be deemed to be occupying the Demised Premises as a tenant from month-to-month, subject to all the covenants and obligations of this Lease and at a rental equal to **one hundred fifty percent (150%)** of the Rental herein provided (computed on a monthly basis rather than the other periodic basis hereinabove provided), and including also **one hundred fifty percent (150%)** of all other sums payable hereunder. If any property not belonging to Landlord remains at the Demised Premises after the expiration of the term of this Lease, Tenant hereby authorizes Landlord to make such disposition of such property as Landlord may desire without liability for compensation or damages to Tenant in the event that such property is the property of Tenant; and in the event that such property is the property of someone other than Tenant, Tenant agrees to indemnify and hold Landlord harmless from all suits, actions, liability, loss, damages and expenses in connection with or incident to any removal, exercise or dominion over and/or disposition of such property by Landlord.

## ARTICLE XIX
## LANDLORD'S MORTGAGE

Section 19.1. This Lease is expressly subject, subordinate and inferior to any mortgage, deed of trust, security agreement or other lien or encumbrance whatever resulting from any method of financing or refinancing, presently or henceforth placed upon the land and/or improvements comprising the Shopping Center and any future expansion thereof or additions thereto, and to all advances of money or other value heretofore or hereafter made upon the security thereof; provided, however, the foregoing provisions of this Article XIX to the contrary notwithstanding, if, Landlord or the holder of any such mortgage, deed of trust, security agreement or other lien or encumbrance shall elect to make this Lease superior, then this Lease shall be deemed superior to any such mortgage, deed of trust, security agreement or other lien or encumbrance. Without limiting the generality or effect of the foregoing provisions of this Article XIX, Tenant covenants and agrees promptly upon request of Landlord within 10 days to execute and deliver, in a recordable form provided by Landlord, and acknowledgment of subordination or superiority of the Lease, as the case may be according to the election made by Landlord or the holder of such mortgage, deed of trust, security agreement or other lien or encumbrance as hereinabove provided (and upon any failure of Tenant to acknowledge such subordination or superiority as aforesaid, Landlord is hereby irrevocably vested with full power and authority to act on Tenant's behalf); however, notwithstanding that this Lease may be (or made to be) superior to such mortgage, deed of trust or other security agreement or other lien or encumbrance, the provisions of such mortgage, deed of trust beneficiary or secured party with respect to proceeds arising from an eminent domain taking (including a voluntary conveyance by Landlord) and/or arising from insurance payable by reason of damage to or destruction of the Demised Premises shall be

20



prior and superior to any contrary provisions contained in this instrument with respect to the payment or usage thereof.

Subject to the foregoing provisions of this Article XIX, Landlord reserved the right, without notice to or consent of the Tenant, to assign this Lease and/or any and all rents hereunder as security for the payment or any mortgage loan, deed of trust loan or other method of financing or refinancing.

Section 19.2. For purposes of this Article, the term "Landlord's Mortgagee" means any party holding a mortgage or deed of trust on the Demised Premises or any part thereof or all or any portion of the Shopping Center. A lien held by a Landlord's Mortgagee on the Demised Premises or any portion thereof or Shopping Center or any portion thereof is herein referred to as a "Landlord's Mortgage".

Section 19.3. If the Demised Premises are at any time during the term of this Lease subject to a Landlord's Mortgage then, in any instance in which Tenant gives notice to Landlord alleging default be Landlord in performance of any covenant or obligation under this Lease, Tenant will also simultaneously give a copy of such notice to Landlord's Mortgagee (at the post office address as to which such Landlord's Mortgagee shall have given Tenant notice) and the Landlord's Mortgagee shall have the right (but no obligation) to cure or remedy such default of Landlord during the same item that is permitted to Landlord hereunder for the remedying or curing of such default, plus an additional period of thirty (30) days; and Tenant will accept such curative or remedial action taken by a Landlord's Mortgagee with the same effect as if such action had been taken by Landlord, and Tenant shall not seek damages from Landlord or any other relief or exercise or attempt to exercise any remedies by reason of any such default of Landlord if Landlord's Mortgagee shall have cured or remedied such default within the time allowed herein (including the aforesaid additional thirty (30) day period) or is then attempting to foreclose its lien upon or obtain possession of the Shopping Center.

If the Demised Premises are at any time during the term of this Lease subject to a Landlord's Mortgage and Landlord's Mortgagee shall have foreclosed under its Landlord's Mortgage or received a conveyance of the mortgaged property (covered by its Landlord's Mortgage) in lieu of foreclosure of shall have taken possession of such mortgaged property or is collection rent from such mortgaged property pursuant to a rent assignment, then covenants of Landlord in this Lease which pertain to property lying beyond the boundaries of such mortgaged property shall have no force or effect as against Landlord's Mortgagee (and Tenant may not, in the event of any violation of any of such covenants by Landlord, abate rent, terminate this Lease, recover damages from Landlord's Mortgagee or exercise any other remedy against Landlord's Mortgagee); however, Tenant shall nevertheless retain, as Tenant's sole and exclusive remedy against Landlord, Tenant's right of action for damages on account of such violation as provided for under Section 17.11 of this Lease.

Section 19.4. Landlord and Tenant each covenant and agree that so long as there is in effect any collateral assignment of Landlord's rights under this Lease to any Landlord's Mortgagee, none of the following actions shall be taken without the prior written consent of Landlord's Mortgagee in each instance (except as may be permitted in any Landlord's Mortgage):

(a) This Lease will not be modified, altered or amended in any way, unless in writing by both parties;

(b) Landlord and Tenant will not agree to a cancellation of this Lease, nor will Tenant surrender its rights hereunder to Landlord (except in instances where in the right to do so is expressly granted to Tenant under the other terms and provisions of this Lease);

(c) Landlord will not convey its fee interest in the Demised Premises to Tenant in a manner which will result in merger, nor take any other action which would result in merger, of Landlord's estate in the Demised Premises with Tenant's leasehold under this Lease, unless, at the time of such conveyance, Tenant assumes in writing any unpaid balance owing and to become owing to any Landlord's Mortgagee which is secured by a collateral assignment of this Lease; but this does not prohibit an assignment of Landlord's estate to Tenant by assignment specifically made subject to this Lease; and

(d) Tenant will not prepay and Landlord will not accept prepayment of any installment or payment of Rental more than thirty (30) days in advance of the due date thereof.

The provisions of this Section shall be for the benefit of Landlord, Tenant and each Landlord's Mortgagee, and shall be enforceable by any one or more of such parties.

Section 19.5. Tenant shall execute and deliver to Landlord, at such time or times as Landlord may request, an estoppel certificate stating:

(a) Whether or not the Lease is in full force and effect;

(b) Whether or not the Lease has been modified or amended in any respect, and submitting copies of such modification or amendments, if any;

21

79

(c) Whether or not there are any existing defaults under this Lease to the knowledge of the party executing the Certificate, and specifying the nature of such defaults, if any; and

(d) Such other information as may be reasonable requested.

The aforesaid certificate(s) shall be delivered to Landlord promptly upon receipt of a written request therefor, but in no event more than five (5) days following receipt of such request. Failure by Tenant to timely deliver such information pursuant to such request and upon failure of Tenant to deliver aforesaid certificate, Landlord is hereby-irrevocably vested with full power and authority to act on Tenant's behalf or, at Landlord's option, shall constitute an event of default hereunder and entitle Landlord to exercise any remedies permitted under the terms of this Lease without the necessity of further notice to Tenant (notwithstanding any prevision to the contrary contained in Article XVII).

Section 19.6. If in connection with Landlord obtaining a Landlord's Mortgage, Landlord's Mortgagee shall request reasonable modifications in this Lease as a condition of Landlord's Mortgagee to provide Landlord's Mortgage, Tenant will not unreasonable withhold, delay, or defer its consent thereto; provided, that such modifications do not increase the obligations of Tenant hereunder or materially affect the leasehold interest created hereby, or the use or enjoyment of the Demised Premises by the Tenant.

Section 19.7. If Landlord herein does not own the fee to any portion of the property which constitutes the Shopping Center, but instead holds only a leasehold interest therein under a ground lease, then in such event, this instrument shall be a sublease agreement subject and subordinate to the underlying ground lease. If this Lease should be terminated as a result of termination of the said underlying ground lease (regardless of the reason for termination of such underlying ground lease), Tenant shall have no right or claim against Landlord by reason thereof. This Lease is made by Landlord and accepted by Tenant subject to any and all matters of record affecting the Demised Premises or the Shopping Center.

ARTICLE XX
MERCHANTS ASSOCIATION

Section 20.1. N/A

ARTICLE XXI
NOTICES

Section 21.1. Wherever any notice is required or permitted hereunder such notice shall be in writing. Any notice or document required or permitted to be delivered hereunder shall be deemed to be delivered whether actually received or not when deposited in the United States Mail, postage prepaid, Certified Mail, Return Receipt Requested, addressed to the parties hereto at the respective addresses set out in Section 1.1(c) and 1.1(f) above, or at such other addresses as they may hereafter specify by written notice delivered in accordance herewith.

ARTICLE XXII
OPTION

Section 22.1. Contingent upon Tenant satisfying all of the following conditions, (the "Condition") Tenant is hereby granted an option to extend the Lease Term, as set forth in Article I(k) (the "Primary Term") for an additional five (5) year period (60) months (the "Extension Term"), the Conditions being that: (i) Tenant shall have fully performed all of its covenants, duties and obligations hereunder during the Primary Term; and (ii) Tenant shall have given written notice to Landlord not less than one hundred eighty (180) days prior to the expiration of the Primary Term of Tenant's exercise of such option. (iii) The renewal rate of the extended term will be at the then prevailing market rate.

Section 22.2. Time is of the essence in the exercise of this option and should Tenant fail to exercise this option by timely notice or fail to satisfy the Conditions, this option shall lapse and be of no further force or effect.

Section 22.3. In the event that Tenant satisfies all of the Conditions and effectively exercises the option herein granted, then Landlord and Tenant shall execute a new Lease in form and content satisfactory in all respects to both Landlord and Tenant except: (a) Tenant shall have no further right to renew or extend the Lease Term after the expiration or other termination of the Extension Term; and (b) the Rental for said option term shall be at a rate to be negotiated between Landlord and Tenant and mutually satisfactory to both parties. In the event that Landlord and Tenant have not agreed as to the rental rate for the option term on or before the expiration date of the Primary Term of this Lease, then either party may terminate the option granted hereby by written notice delivered to the other party not later than the expiration date of the Primary Term of this Lease.

ARTICLE XXIII
MISCELLANEOUS

Section 23.1. Nothing herein contained shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of a partnership or of a joint venture

22

80

between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts or the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant. The provisions of this instrument relating to the payment of Rental, if any, payable by Tenant hereunder are included solely for the purpose of providing for the payment of rental in excess of the Rental, and providing for a method whereby such additional rental is to be measured, ascertained and paid.

Section 23.2. The captions used in this Lease are for convenience only and do not in any way limit or amplify the terms and provisions hereof.

Section 23.3. Neither acceptance of Rental by Landlord nor failure by Landlord to complain of any action, non-action or default of Tenant shall constitute a waiver as to any breach of any covenant or condition of Tenant contained herein nor waiver of any of Landlord's rights hereunder. No right or remedy of Landlord hereunder or convenant, duty or obligation of Tenant hereunder shall be deemed waived by Landlord unless such waiver be in writing, and signed by Landlord. One or more waivers of any covenant, term or condition of this Lease by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent or approval by either party to or any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

Section 23.4. Whenever a period of time is herein prescribed for action to be taken by Landlord, Landlord shall not be liable or responsible for , and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, was governmental laws, regulations, or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of Landlord. At any time when there is outstanding a mortgage, deed of trust or similar security instrument covering Landlord's interest in the Demised Premises, Tenant may not exercise any remedies of trust or similar security instrument covering Landlord's interest in the Demised Premises, Tenant may not exercise any remedies for default by Landlord hereunder unless and until the holder of the indebtedness secured by such mortgage, deed of trust or similar security instrument shall have received written notice of such default and a reasonable time for curing such default shall thereafter have elapsed.

Section 23.5. All obligations of Landlord and Tenant under the terms of this Lease shall be payable and performable in Houston, Harris County, Texas.

Section 23.6. Landlord hereby covenants and agrees that if Tenant shall perform all of the covenants and agreements herein required to be performed on the part of Tenant, Tenant shall, subject to the terms of this Lease and any mortgages presently or hereafter existing against the Shopping Center, at all times during the continuance of this Lease have the peaceable and quiet enjoyment and Possession of the Demised Premises.

Section 23.7. This Lease contains the entire agreement between the parties, and no agreement shall be effective to change, modify or terminate this Lease in whole or in part unless such agreement is in writing and duly signed by the party against who enforcement of such change, modification or termination is sought.

Section 23.8     N/A. See Article XXV, Additional Miscellaneous

Section 23.9. Tenant agrees that it will from time to time upon request by Landlord execute and deliver to the Landlord a statement in recordable form certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified) and further stating the dates to which rent and other charges payable under this Lease have been paid.

Section 23.10.   The laws of the State of Texas shall govern the interpretation, validity, performance, and enforcement of this Lease. If any provision of this Lease should be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Lease shall not be affected thereby.

Section 23.11. The terms, provisions, and covenants contained in this Lease shall apply to , inure to the benefit of and binding upon the parties hereto and their respective heirs, successors in interest and legal representatives except as otherwise herein expressly provided.

Section 23.12. With respect to terminology in this Lease, each number (singular or plural) shall include all numbers, and each gender (male, female or neuter) shall include all genders.

Section 23.13. In any circumstances where Landlord is permitted to enter upon the Demised Premises during the Lease Term, whether for the purpose of curing any default of Tenant, repairing damage resulting from fire or other casualty or an eminent domain taking or is otherwise permitted hereunder or by law to go upon the Demised Premises, no such entry shall constitute an eviction or disturbance of Tenant's use and possession of the Demised Premises or a breach by Landlord of any of its obligations hereunder or render Landlord liable for damages for loss of business or otherwise or entitle Tenant to be relieved from any of its obligation hereunder or grant Tenant any right of set-off or recoupment or other remedy; and in connection with any such entry incident to performance of repairs, replacements, maintenance or construction, all of the aforesaid provisions shall be applicable notwithstanding that Landlord may elect to

23

81

take building materials in, to or upon the Demised Premises that may be required or utilized in connection with such entry by Landlord.

Section 23.14. In the event Landlord commences any proceedings against Tenant for non-payment of Rental or any other sum due and payable by Tenant hereunder, Tenant will not interpose any counterclaim or other claim against Landlord of whatever nature or description in any such proceedings, Landlord and Tenant stipulate and agree that, in addition to any other lawful remedy of Landlord, Upon motion of Landlord, such counterclaim or other claim asserted by Tenant shall be severed out of the proceedings instituted by Landlord and Landlord may proceed to final judgment separately and apart from and without consolidation with or reference to the status of such counterclaim or any other claim asserted by Tenant.

Section 23.15. Tenant stipulates and acknowledges that the existence of any breach or threatened breach of any covenant, duty or obligation of Tenant herein contained would constitute a severe impediment to the ability of Landlord to operate the Shopping Center and to receive the benefits contemplated by this Lease; that the existence of such breach or threatened breach will cause irreparable damage to Landlord for which there would not be an adequate remedy at law and for which no other equitable remedy would be adequate or available, and accordingly Landlord shall be entitled to enjoin any such breach or threatened breach without the necessity of proving the inadequacy of any legal remedy or irreparable harm. The remedies of Landlord hereunder shall be deemed cumulative and no remedy o Landlord, whether exercised by Landlord or not, shall be deemed to be in exclusion of any other. Except as may be otherwise herein expressly provided, in all circumstances under this Lease where prior consent of one party ("first party") is required before the other party("second party") is authorized to take any particular type of action, the matter of whether to grant such consent shall be within the sole and exclusive judgment and discretion of the first party; and it shall not constitute any nature of breach by the first party hereunder or any defense to the performance of any covenant, duty or obligation of the second party hereunder whether or not the delay or withholding of such consent was prudent or reasonable or based on good cause.

Section 23.16. In all instances where Tenant is required hereunder to pay any sum or do any act at a particular indicated time or within an indicated period, it is understood that time is of the essence.

Section 23.17. The obligation of Tenant to pay all rent and other sums hereunder provided to be paid by Tenant and the obligation of Tenant to perform Tenant's other covenants and duties hereunder constitutes independent, unconditional obligations to be performed at all times provided for hereunder, save and except only when an abatement thereof or reduction therein is expressly provided for in this Lease and not otherwise. Tenant waives and relinquishes all rights which Tenant might have to claim any nature of lien against or withhold, or deduct from or off-set against any rent and other sums provided hereunder to be paid Landlord by Tenant. Tenant waives and relinquishes any right to assert, either as a claim or as a defense, that Landlord is bound to perform or liable for the non-performance of any implied covenant or implied duty of Landlord not expressly herein set forth.

Section 23.18. Under no circumstances whatsoever shall Landlord ever be liable hereunder for consequential damages or special damages; and all liability of Landlord for damages for breach of any covenant, duty or obligation of Landlord hereunder may be satisfied only out of the interest of Landlord in the Shopping Center existing at the time any such liability is adjudicated in a proceeding as to which the judgment adjudicating such liability is non-appealable and not subject to further review. It is intended that Landlord shall not have any personal liability under this Lease, and in no event shall a judgment for any deficiency be sought, obtained or enforced against any party of Landlord under the terms hereof.

Section 23.19 N/A

Section 23.20. In no event shall Landlord, including any successor or assignee of all or any portion of Landlord's interest in the Shopping Center, be personally liable or accountable with respect to any provision of this Lease. If Landlord shall be in breach or default with respect to any obligation hereunder or otherwise, Tenant agrees to look for satisfaction solely to Landlord's interest in the Shopping Center. The provisions of this Section 23.20 are not intended to, and shall not, limit any right that Tenant might otherwise have to obtain injunctive relief against Landlord or Landlord's successors in interest, or any other action not involving the personal liability of Landlord to respond in monetary damages from assets other than Landlord's interest in the Shopping Center, or any suit or action in connection with enforcement of collection of amount which may become owing or payable under or on account of insurance maintained by Landlord. In the event Landlord transfers this Lease, other than as security for a mortgage, the Landlord (and, in case of any subsequent transfers or conveyances, the then Grantor) shall, upon such transfer be relieved from all liability and obligations hereunder arising after such transfer.

Section 23.21    N/A

Section 23.22.    N/A

Section 23.23. No payment made by Tenant or received by Landlord in an amount less than the amount herein stipulated shall be deemed to be other than on account of the earliest received payment, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rental or any other sum payable hereunder to deemed an accord and satisfaction, and Landlord may accept

24

82

any such check or payment without prejudice to Landlord's right to recover the balance of such amount from Tenant or to pursue any other remedy in this Lease or by law provided.

Section 23.24. During the term of this Lease Tenant shall not install any pay telephones in or about the Demised Premises or the building (the "Building") of which said premises are a part without the prior written consent of Landlord. Any attempt to install or the actual installation by Tenant of pay telephones in or about the Demised Premises or the Building shall constitute a default by Tenant under this Lease and Landlord may pursue any of the remedies provided in this Lease or available at law or in equity for Tenant's default. In the event Tenant requests Landlord's consent to installation of pay telephones in or about the Demised Premises or the Building, Landlord shall have the right (in addition to its absolute right to refuse to consent thereto) to condition its consent upon payment by Tenant to Landlord of all or any part of the consideration to be received by Tenant from the use and operation of said pay telephone service.

## ARTICLE XXIV
## ENVIRONMENTAL LAW COMPLIANCE

Section 24.1. The parties acknowledge that there are certain federal, state and local laws, regulations and guidelines relating to or affecting the Demised Premises in the Shopping Center concerning the impact on the environment of construction, remodeling, land use, maintenance and operation of structures in the conduct of business. Lessee will not cause, or permit to be caused, any act or practice, by negligence, omission, or otherwise, that would adversely affect the environment or do anything or permit anything to be done that would violate any of said laws, regulations or guidelines. Any violation of this covenant shall be an event of default under this Lease.

Lessor shall be responsible for any environmental problems in the Demised Premises that originated before Lessee's occupancy. Lessor shall also be responsible for any environmental problem in the Shopping Center common areas not the responsibility of Lessee. Such environmental problems include but are not limited to formaldehyde foam insulation, asbestos, dioxin and radon gas.

Lessor agrees to indemnify and hold Lessee harmless from and against any liability or damage which Lessee may incur by reason of contaminants, hazardous waste or other similar types or forms of hazards as long as such liability was not due to Lessee's fault or negligence. Lessee shall not be required to pay rent for any period in which in its sole judgment, the Premises are not safe to occupy because of an environmental problem not caused by Lessee. If Lessor cannot correct said problem within one hundred twenty (120) days, Lessee, at its option, may cancel this Lease.

ADDITIONAL PROVISIONS.

**1st Extension Term**

A period of sixty (120) months at the then fair market value

      The Conditions which must be met:  (a) Tenant shall have fully performed all of its covenants, duties and obligations hereunder during the proceeding Term; and (b) Tenant shall have given written notice to Landlord not less thank one hundred eighty (180) days prior to the expiration of the current Term of Tenant's intention to exercise such option.

**EXECUTED** this the ~~28th~~ 28 Sept. day of April, 2010 (as to LANDLORD) and the 28th day of September ,2010__(as to TENANT).

LANDLORD:
MarineCorp International  LC

Ayaz Nasser.
President

TENANT:
OUTLAW COUNTRY, L.L.C

President

ANTHONY MILLER     KYLE TONES

EXHIBIT "A-1"

CYPRESSWOOD SHOPPING CENTER

Being a tract or parcel containing 7.0495 acres of land in the George H. Delesdernier Survey, Abstract 229, Harris County, Texas, and being the remainder of that certain 7.1892 acre tract conveyed to Corum Investment Properties of record in Harris County Clerk's File (H.C.C.F.) No. G823180 and more particularly described by metes and bounds as follows (all bearings are referenced to the Texas State plane Coordinate System, South Central Zone):

BEGINNING at a found 5/8 inch iron rod at the most easterly corner of said 7.1892 acre tract and the most northerly corner of that certain 7.1016 acre tract of record in H.C.C.F. No. H879992 in the southwesterly right-of-way (R.O.W.) line of Kuykendahl Road, 100.00 feet wide;

THENCE, departing said southwesterly R.O.W. line, South 55°43'49" West, 449.15 feet along the line common to said 7.1892 acre tract and said 7.1016 acre tract to a found 5/8 inch iron rod at the most southerly corner of said 7.1892 acre tract and the most westerly corner of said 7.1016 acre tract;

THENCE, North 34°16'11" West, 731.24 feet along the line common to said 7.1892 acre tract and a 9.4153 acre tract of record in H.C.C.F. No. H806216 to a found 5/8 inch iron rod for the most westerly corner of the herein described tract in the southeasterly R.O.W. line of Louetta Road, 100.00 feet wide;

THENCE, North 55°56'02" East, 299.15 feet along said southeasterly R.O.W. line of Louetta Road to a found one inch iron rod at the intersection with the line common to said 7.1892 acre tract and a 0.5514 acre tract of record in H.C.C.F. No. G882804 and corrected under H.C.C.F. Number H384075;

THENCE, departing said southeasterly R.O.W. line, South 34°16'11" East, 140.00 feet along a line common to said 0.5514 acre tract and said 7.1892 acre tract to a found one inch iron rod;

THENCE, continuing along a line common to said 0.5514 acre tract and said 7.1892 acre tract, North 55°56'02" East, 150.00 feet to a found 5/8 inch iron rod in the aforementioned southwesterly R.O.W. line of Kuykendahl Road;

THENCE, South 34°16'11" East, 589.64 feet along said southwesterly R.O.W. line of Kuykendahl Road to the POINT OF BEGINNING and containing 7.0495 acres of land.

27

85

EXHIBIT "B"

GUARANTY

FOR VALUE RECEIVED, in consideration for and as an inducement to MarineCorp International LC, ("Landlord") to enter into the foregoing Lease with OUTLAW COUNTRY, L.L.C.
., "(Tenant"), for premises located in the Cypresswood II Shopping Center, the undersigned, Tony Miller, *Kyle Tones* ("Guarantor") hereby guarantees to Landlord, its legal representatives successors and assigns, the full and faithful performance and observance by Tenant, its successors and assigns, of all terms, covenants, conditions, agreements, restrictions and limitations of the Lease (of the aforementioned premises), including without limitation the payment of all Rent, together with the payment of all costs, attorneys fees and other expenses incurred by Landlord in enforcing such performance and observation.

The Guarantor is an individual, and Guarantor represents that he will receive substantial benefit and consideration as a result of said Lease entered into with Tenant.

Guarantor further covenants that: (1) the liability of the Guarantor is primary, and shall not be subject to deduction for any claim of offset, counterclaim or defense which Tenant may have against Landlord, and Landlord may proceed against guarantor separately or jointly, before, after or simultaneously with any proceeding against Tenant for default; (2) this Guaranty shall not be terminated or impaired in any manner whatsoever by reason of the assertion by the Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease, by reason of any summary or other proceedings against Tenant, or by reason of any extension of time or indulgence granted by Landlord to Tenant; (3) Guarantor expressly waives any requirement of notice of non-payment, non-performance or non-observance, or proof of notice or demand; and (4) this Guaranty shall be absolute and unconditional and shall remain and continue in full force and effect as to any and all renewals, extensions, amendments, additions, assignments, subleases, transfers or other modifications of the Lease. All obligations and liabilities of Guarantor pursuant to this Guaranty shall be binding upon the heirs, personal representatives, successors and assigns of the Guarantor. This Guaranty shall be governed by and construed in accordance with the laws of Texas. This Guaranty will remain in full effect up to and including October 31, 2015.

Dated: 9-28-10

Witness or Attest: 

Witness   Karen Jordan

Witness   Karen Jordan

Guarantor:

Tony Miller

Kyle Tones

Social Security Number

18433 Kuykendahl, Spring, TX 77379
Address and Telephone Number

STATE OF TEXAS
COUNTY OF HARRIS

BEFORE   ME,   the   undersigned   authority,   on   this   day   personally   appeared Kyle Tones , known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND and seal of office this ___12th___ day of __October__ , 2010

Notary Public in and for Harris County, Texas

CINDY REEVES
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires
DECEMBER 18, 2010

28

86

EXHIBIT "B"

GUARANTY

FOR VALUE RECEIVED, in consideration for and as an inducement to MarineCorp International LC, ("Landlord") to enter into the foregoing Lease with BACKWOODS COUNTRY CLUB, L.L.C. ., "(Tenant"), for premises located in the Cypresswood II Shopping Center, the undersigned, Anthony Miller and Kyle Tones ("Guarantor") hereby guarantees to Landlord, its legal representatives successors and assigns, the full and faithful performance and observance by Tenant, its successors and assigns, of all terms, covenants, conditions, agreements, restrictions and limitations of the Lease (of the aforementioned premises), including without limitation the payment of all Rent, together with the payment of all costs, attorneys fees and other expenses incurred by Landlord in enforcing such performance and observation.

The Guarantor is an individual, and Guarantor represents that he will receive substantial benefit and consideration as a result of said Lease entered into with Tenant.

Guarantor further covenants that: (1) the liability of the Guarantor is primary, and shall not be subject to deduction for any claim of offset, counterclaim or defense which Tenant may have against Landlord, and Landlord may proceed against guarantor separately or jointly, before, after or simultaneously with any proceeding against Tenant for default; (2) this Guaranty shall not be terminated or impaired in any manner whatsoever by reason of the assertion by the Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease, by reason of any summary or other proceedings against Tenant, or by reason of any extension of time or indulgence granted by Landlord to Tenant; (3) Guarantor expressly waives any requirement of notice of non-payment, non-performance or non-observance, or proof of notice or demand; and (4) this Guaranty shall be absolute and unconditional and shall remain and continue in full force and effect as to any and all renewals, extensions, amendments, additions, assignments, subleases, transfers or other modifications of the Lease. All obligations and liabilities of Guarantor pursuant to this Guaranty shall be binding upon the heirs, personal representatives, successors and assigns of the Guarantor. This Guaranty shall be governed by and construed in accordance with the laws of Texas. This Guaranty will remain in full effect up to and including October 31, 2015.

Dated: 10-27-10

Witness or Attest:

_Karen Jordan_
Witness  Karen Jordan

_____
Witness

Guarantor:

_Tony Miller_            _Kyle Tomes_
Tony Miller               Kyle Tomes

████████ Social Security Number ████████

18433 Kuykendahl, Spring, TX 77379
Address and Telephone Number

STATE OF TEXAS
COUNTY OF HARRIS

BEFORE     ME,    the    undersigned    authority,    on    this    day    personally    appeared
_Tony Miller_____, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND and seal of office this _____ . day of _October_, 2010

_Cindy Reeves_
Notary Public in and for Harris County, Texas

CINDY REEVES
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires
DECEMBER 18, 2010

28

87

**EXHIBIT "C"**

**"AS-IS" Except as follows:**
Landlord will provide a new air-conditioning unit with a 90 day warranty. In addition , Landlord will make all necessary repairs to the roof.

Landlord will provide a seventeen ($17.73) dollar and Seventy three PSF Tenant Improvement allowance which will be paid to Contractor as follows:

Upon the signing of a construction contract with Tony Miller , receiving a certificate of insurance naming Landlord and Management Company as additional insured , along with a list of all subcontractors with their certificates of insurance, approved construction plans and all required permits, and the following work is completed: all Plumbing, framing, electrical and security & camera Rough In, Landlord will pay one third of the total allowance.

The second third will be paid upon the presentation of partial complete lien waivers from all subcontractors and the completion of drywalls, bar fabrication, bathroom manufacturing and bathroom fixture installation.

The last payment, less a ten (10%) percent retainer (payable with final sign off of Tenant Improvements, between Landlord and Tenant), will be paid upon receipt of an occupancy permit and all final lien waivers

Landlord shall allow all leasehold improvements with a tenant allowance of $17.73 per RSF.

29

EXHIBIT "D"

## TENANT SIGNAGE CRITERIA

## CYPRESSWOOD II SHOPPING CENTER

### PREFACE

These sign criteria are hereby set forth by Zenith Real Estate Services, Inc. as agent MarineCorp, International, LC, a Texas limited liability company ("Landlord") to govern any and all signage by tenants leasing space in the above referenced shopping center.

These criteria serve to protect you, the tenant, from signs of poor quality. They also insure the center's owners and attractive center with coordinated signage that is of good quality.

**Signage Identification - Tenant will be permitted, at his expense, to install a sign on Kuykendahl Street. The sign will be located between the two oak trees directly south of the main pylon. The specifications and exact location subject to final approval by Landlord.**

### REQUIREMENTS - ALLOWANCE - RESTRICTIONS

One of your approved sign contractors should be given a copy of this criteria to serve as the guide in preparing a design and cost estimate for you.

Prior to manufacturing any signage, you or your sign company must submit three copies of the approved sign company's design to the offices of the Landlord. These drawings must clearly show the sign on the building's facade and delineate all construction techniques and materials. It must state the center's name, tenant's name and location of the lease space in the center.

No sign may be erected without first securing the written approval of the Landlord.

The tenant and sign company shall be held liable and shall bear all costs for removal and/or correction of signs, sign installation and damage to building by signs that do not conform to sign criteria as put forth in these specifications and accompanying drawings. This is at the discretion of the center's owner.

All signs are to be constructed and installed at tenant's expense.

All necessary permits for signs and their installation shall be obtained by the tenant or his sign contractor. The City or other governmental agency having jurisdiction over the signage in this center is set forth in the SPECIFICATIONS section of this criteria.

Sign companies must conform to the following criteria.

    1. They must be licensed by the City of Houston under their own name; i.e., Acme Signs listed with the city as A & b Electric is not acceptable.

    2. They must be capable of manufacturing signs according to the basic criteria for that center.

    3. They must be capable of manufacturing signs according to the criteria set forth by the National Electrical code in Article 600 and Chapter 46 of the City of Houston Building Code (Houston Sign code).

    4. Sign companies which are acceptable by the Landlord and who meet all of the above requirements are:

        a. Federal Sign        c. Texas Sign Source        e. Neon Electric Corporation

        b. Coast Graphics & Signs    d. Advanced Signing

### FASCIA SIGNAGE

All tenants must have an exterior illuminated sign that conforms to these sign criteria.

All signs are to be located on the shopping center's facade. Signs shall be in the form of individual full metal channel letters, internally illuminated, and mounted on a full metal raceway which is attached to the building's facade.

The overall maximum length of a sign shall not exceed 80% of the lease frontage.

30

89

Tenant must use a clean, readable letter style. Tenant letters may vary between a minimum of 20" high and a maximum of 36" high; subject to the limitations set forth under the specifications of the center. Sign letters are to be 5" deep.

Raceway shall contain all secondary wiring and transformers. Raceways dimensions shall be determined by letter height as follows:

| LETTER HEIGHT | RACEWAY DIMENSIONS |
|---|---|
| 20" - 24" | 8"h X 7"d |
| 25" - 30" (where allowed) | 9"h X 7"d |
| 31" - 36" (where allowed) | 10"h X 7"d |

Signs are to be mounted on the facade as set forth in the specifications for this center below. SEE DRAWING A.

## CONSTRUCTION SPECIFICATIONS

Fabricated metal letter backs and returns are to be constructed of .063 gauge aluminum with interrupted Halyard electric welding, or .040 gauge aluminum with returns pop riveted to the back of the letter with on pop rivets visible. Raceway to be of similar construction.

"Channel Lume" type, channel letters utilizing "Armor Ply" plywood as letter backs are prohibited for use on the shopping center's facade.

The individual letters are to be either Iron Enamel over steel or Baked Enamel over aluminum. The interior of all letters are to be painted white.

Note: These letters may take six to eight weeks to fabricate and install. Raceway to be of similar construction.

Letters 24" high and larger shall have two rows of 13mm neon. Letters smaller then 24" shall have single row 13mm neon.

Neon shall be 6500 K with 30 m.a. transformers.

All letters shall have a plexiglas face of 3/16" thick plexiglas. The plexiglas shall be retained with a 1" "Jewel Lite", or equal, acrylic over metal trim molding.

All fasteners, screws, bolts and spacers used in the fabrication of signs shall be nonferrous and/or noncorrosive.

1. LETTER HEIGHT: _____

2. PLEXIGLAS COLOR: _____

3. NEON COLOR: _____

4. LETTER RETURN COLOR: _____

5. TRIM CAP COLOR: _____

6. RACEWAY COLOR: _____

7. LOCATION ON FASCIA: _____

8. FASCIA MATERIAL: _____

The governmental agency with jurisdiction over the permitting and operation of signage at Cypresswood II Shopping Center is the City of Houston.

## INSTALLATION

The sign will be attached to the building facade by having the raceway attached to the facade as per attached "Drawing A".

Wiring from the letters shall pass first through conduit through facade to electrical service provided by the tenant from the tenant's electrical panel. Where facade is penetrated for mounting and conduit, it shall be sealed to be made watertight. This is the responsibility of the sign contractor. SEE DRAWING B ATTACHED.

## PROHIBITED SIGNAGE

Flashing, occulting or moving signs are prohibited.

.31

90

Sign text shall consist of store name only. <u>Description of service, products or trade names are prohibited.</u>

Box type of signs are prohibited.

Banner flags or pennants are prohibited.

Trailer, marquee type signs are prohibited. Any such signs installed on the premises of this center will be removed by Landlord at Tenant's expense.

## PYLON SIGN CRITERIA

The criteria for all pylon signs is as follows (unless a pylon supplement sheet is attached):

    a. Face material for signs smaller than 35 sq. ft. will be flat 3/16" lexan with back sprayed copy.

    b. Face material for signs greater than 36 sq. ft. will be flex face with heat transfer copy.

    c. Lighting to be by 7800 m.a. high output fluorescent lighting.

    d. Colors to be dark bronze background with white copy.

    e. Copy on sign to consist of name of store only.

    f. Position of sign on pylon must be approved by owner.

## PYLON SIGN PRICES ACCORDING TO SIZES

The maintenance agreement on the pylon sign is detailed below according to the size of the sign.

    a. 24 s.f. or less = **No Charge to Tenant, in exchange for a Personal Guaranty.**

    b. 24 to 48 s.f. = No charge to Tenant

    c. Over 48 s.f. = No charge to Tenant

<u>Maintenance includes</u>: replacement of all lamps, ballasts, sockets, and wiring; crane service; annual cleaning of individual signs; and bi-annual painting of steel.

32

91

## EXHIBIT "E"

## OPTION TO EXTEND LEASE

Contingent upon Tenant satisfying all of the required conditions, (the "Conditions") Tenant is hereby granted One (1) separate Option Period (the "Extension Terms") to extend the Lease Term, as set forth in Article I, 1.1(h) (the "Primary Term"), as follows:

### 1st Extension Term

A period of sixty (120) months at the then fair market value

The Conditions which must be met: (a) Tenant shall have fully performed all of its covenants, duties and obligations hereunder during the proceeding Term; and (b) Tenant shall have given written notice to Landlord not less thank one hundred eighty (180) days prior to the expiration of the current Term of Tenant's intention to exercise such option.

33

**EXHIBIT "F"**

**OPTION TO TERMINATE LEASE**

N/A

34

93

**EXHIBIT "G"**

Between MarineCorp International (Landlord) and THE CHOPPER GROUP L.L.C.. (Tenant)

1. See Exhibit "C", items 1-2
2. See Exhibit "D", Preface section
3. See Exhibit "C", item 3
4. Upon signing this lease agreement the tenant will not forfeit any individual or corporate rights as guaranteed by the State of Texas or the Federal Government.
5. See Article 1, item h, and item u. See Exhibit "C", item 4
6.

94

1/8 scale



95

## FIRST AMENDMENT TO LEASE AGREEMENT

This FIRST AMENDMENT TO LEASE AGREEMENT ("First Amendment") is made and entered into this 1st day of November, 2011 by and between MarineCorp International Ltd (the "Landlord") and Outlaw Country, LLC ("Tenant").

Whereas, Landlord and Tenant hereby confirm and ratify, except as modified below, all the terms, conditions and covenants in that certain Lease Agreement dated September 20, 2010 for the rental of the property located at 18443 Kuykendahl Rd, Spring, Texas, 77379 (the "Building") herein called the "Lease" between Landlord and Tenant.

Now, therefore, in consideration of One Dollar ($1.00) and other good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1. Term of Lease: As defined in section 1.1 l & m of the above mentioned Lease, Tenant has been granted an extension of the Lease Term until December 31, 2016
2. Monthly Rental: The rent for the month of November 2011 will be abated. The rent for November 2012 will be deferred ($13,930.80) and will be amortized over the remaining term of the Lease.
   Monthly Rental- $13,014.30 per month for December 1, 2011– October 31, 2012
   $14,162.98 per month for December 1, 2012-October 31.2013
   $15,079.48 per month for November 1, 2013-October 31, 2014
   $15,995.98 per month for November 1, 2014-October 31, 2015
   $16,830.80 per month for November 1, 2015-December 31, 2016
3. Failure of Anthony Miller and Lee Harless to execute a promissory note at the same time of this Amendment will make this First Amendment null and void

IN WITNESS WHEREOF, This First Amendment has been executed as of the above date.

LANDLORD:                                         TENANT;

MarineCorp International, Ltd                      Outlaw Country, LLC
By: Zenith Real Estate Services, Inc.,
As Agent

By: _____              By: _____
Ayaz I. Nasser
President                                         Lee Harless & Dawn Marie Harless

Ex. "C" 11
96

ACCEPTED
01-14-00707-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
10/30/2015 1:52:16 PM
CHRISTOPHER PRINE
CLERK

the strother law firm

4306 yoakum blvd., suite 560
houston, texas 77006
telephone: 713-557-9238
mstrother@strotherlawfirm.com

October 30, 2015

Hon. Christopher A. Prine
Clerk of the Court
First Court of Appeals
**VIA E-FILING**

RE:     Cause No. 2012-23983; The Chopper Group, LLC and Outlaw Country, LLC vs. MarineCorp International, Ltd.; In the 80th Judicial District Court of Harris County, Texas

RE:     Court of Appeals Cause Number 01-14-00707-CV


Dear Clerk:

Enclosed for filing in the above-referenced cause of action is Marinecorp International, Ltd.'s Brief for Appellant.

Your prompt and kind attention hereto will be greatly appreciated.

Yours truly,

MACON D. STROTHER

MDS/kmc
Enclosures
cc:     Brock Akers
        via email bca@akersfirm.com

cc:     Steve Cochell
        via email srcochell@gmail.com

cc:     Lee Harless and Dawn Marie Harless
        11435 Log Cabin Dr.
        Tomball, TX  77375
        **via CM/RRR 7013 0600 0001 1817 8599**

Page | 1